DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE K. SNODGRASS, State Bar #148137
JONATHAN GIVNER, State Bar #208000
ANN M. O'LEARY, State Bar #238408
Deputy City Attorneys
#1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:     (415) 554-4694
Facsimile:     (415) 554-4675
E-Mail:        jon.givner@sfgov.org

Attorneys for Defendants
DENNIS J. HERRERA, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMITTEE ON JOBS CANDIDATE ADVOCACY FUND and BUILDING OWNERS AND MANAGERS ASSOCIATION OF SAN FRANCISCO INDEPENDENT EXPENDITURE POLITICAL ACTION COMMITTEE, political action committees organized under the laws of California and of the City and County of San Francisco,<br><br>Plaintiffs,<br><br>vs.<br><br>DENNIS J. HERRERA, in his official capacity as City Attorney of the City and County of San Francisco, KAMALA D. HARRIS, in her official capacity as District Attorney of the City and County of San Francisco, the SAN FRANCISCO ETHICS COMMISSION of the City and County of San Francisco, and CITY AND COUNTY OF SAN FRANCISCO,<br><br>Defendants. | Case No. C 07 3199 JSW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:   September 17, 2007<br>Time:           1:30 p.m.<br>Judge:          Hon. Jeffrey S. White<br>Courtroom:      2 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

SUMMARY OF ARGUMENT ............................................................................................... iv

BACKGROUND ........................................................................................................................1

    I.    INDEPENDENT EXPENDITURES IN THE 1999 MAYORAL CAMPAIGN AND PUBLIC CRITICISM THEREAFTER ...........................................................1

    II.   CONSIDERATION OF CONTRIBUTION LIMITS IN 1999 AND 2000 .............3

    III.  THE 2000 CITY ELECTION AND THE PASSAGE OF PROPOSITION O ........4

ARGUMENT ..............................................................................................................................5

    I.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS ..................5

        A.    This Court Applies A Less Rigorous Standard of Review To Contribution Limits.................................................................................5

        B.    Section 1.114(c) And Regulation 1.114-2 Only Limit Contributions. ........8

        C.    Plaintiffs' Authorities Are Inapposite And Unpersuasive............................9

        D.    The Challenged Laws Serve To Prevent Actual Or Apparent Corruption. ..................................................................................................11

        E.    Section 1.114(c) And Regulation 1.114-2 Are Closely Drawn. ................13

    II.   PLAINTIFFS HAVE SHOWN NO IRREPARABLE INJURY ...........................14

    III.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR THE CITY ...................................................................................................................15

# TABLE OF AUTHORITIES

**Federal Cases**

*Buckley v. Valeo*
    424 U.S. 1 (1976) ................................................................................................ *passim*

*Cal. Med. Ass'n v. FEC*
    453 U.S. 182 (1981) ............................................................................................ 7, 12, 14

*Citibank v. Citytrust*
    756 F.2d 273 (2d Cir. 1985) ............................................................................... 14

*Citizens Against Rent Control v. City of Berkeley*
    454 U.S. 290 (1981) ............................................................................................ 10

*Citizens for Clean Government v. City of San Diego*
    474 F.3d 647 (9th Cir. 2007) .............................................................................. 8, 10

*FEC v. Beaumont*
    539 U.S. 146 (2003) ............................................................................................ 7

*FEC v. Nat'l Conservative PAC*
    470 U.S. 480 (1985) ............................................................................................ 12

*FEC v. Wis. Right to Life, Inc.*
    551 U.S. __, 127 S.Ct. 2652 (2007) ................................................................... 12

*Fed. Trade Comm'n v. Affordable Media, LLC*
    179 F.3d 1228 (9th Cir. 1999) ............................................................................ 15

*Fund For Animals, Inc. v. Lujan*
    962 F.2d 1391 (9th Cir. 1992) ............................................................................ 15

*Jacobus v. Alaska*
    338 F.3d 1095 (9th Cir. 2003) ............................................................................ 8, 14, 15

*Johnson v. Cal. State Bd. of Accountancy*
    72 F.3d 1427 (9th Cir. 1995) .............................................................................. 5

*Lincoln Club v. City of Irvine*
    292 F.3d 934 (9th Cir. 2002) .............................................................................. 9, 10

*Lydo Enterprises, Inc. v. City of Las Vegas*
    745 F.2d 1211 (9th Cir. 1984) ............................................................................ 14

*McConnell v. FEC*
    540 U.S. 93 (2003) .............................................................................................. *passim*

*Montana Right to Life Ass'n v. Eddelman*
   343 F.3d 1085 (9th Cir. 2003) ...................................................................................13, 14

*Nixon v. Shrink Missouri Government PAC*
   528 U.S. 377 (2000) ................................................................................................ *passim*

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*
   762 F.2d 1374 (9th Cir. 1985) ................................................................................................14

*OakPAC v. City of Oakland*
   No. 06-CV-6366-MJJ (N.D. Cal. Oct. 19, 2006) .......................................................10

*Paramount Land Co. LP v. Cal. Pistachio Comm'n*
   491 F.3d 1003 (9th Cir. 2007) ................................................................................................5

*San Franciscans for Sensible Government v. Renne*
   No. C-99-02456-CW (N.D. Cal.) .................................................................................1, 10, 11

*San Jose Silicon Valley Chamber of Commerce PAC v. City of San Jose*
   No. C 06-04252-JW (N.D. Cal. Sept. 20, 2006) .................................................................10, 11

**San Francisco Statutes, Codes & Ordinances**

Campaign Finance Reform Ordinance
   Regulation 1.114-2 .............................................................................................................5, 8, 11

San Francisco Campaign & Governmental Conduct Code
   Section 1.100(b)(7) ............................................................................................................11
   Section 1.114(a) .................................................................................................................13
   Section 1.114(c) ............................................................................................................. *passim*

**Other Authorities**

Oakland Mun. Code
   § 3.12.050 ..........................................................................................................................11
   § 3.12.060 ..........................................................................................................................11

# SUMMARY OF ARGUMENT

Legislators must be vigilant about the potentially pernicious influence of money in politics, because "[m]oney, like water, will always find an outlet" into elections. *McConnell v. FEC*, 540 U.S. 93, 224 (2003). That fact of life led Congress to enact the 2002 Bipartisan Campaign Reform Act ("BCRA"), which, among other things, limits soft money contributions – including those used to fund independent expenditures – and also led the Supreme Court to uphold those limits. The same principle led San Francisco's voters, in 2000, to limit contributions for independent expenditures in order to prevent actual or apparent corruption. They did so following a series of news reports that both reflected and fueled a public perception of undue influence stemming from large contributions in local elections in 1999 and 2000. Plaintiffs, having waited seven years to challenge those limits, now seek to preliminarily enjoin their enforcement, but their motion should be denied.

Plaintiffs have not shown they are likely to prevail on the merits. Plaintiffs try to invoke strict scrutiny, claiming that the challenged laws also limit expenditures. But contribution limits – which, "unlike limits on expenditures, entail only a marginal restriction on the contributor's ability to engage in free communication" and leave contributors ample other ways to support candidates – need only satisfy "the lesser demand of being closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 134-36. The law at issue here meets that standard. The voters adopted it after the unregulated 1999 and 2000 elections, in which the influx of soft money from well-connected contributors to independent committees led to public perception of undue influence in City government. The City's contribution limits serve the significant purpose of combating actual or apparent corruption. This public interest justifies restrictions not only on contributions to candidates, but also contributions to entities making "noncoordinated expenditures." *McConnell*, 540 U.S. at 152 n.48. And those limits are closely tailored, because they leave contributors with ample other options to support and affiliate with their preferred candidates. Moreover, Plaintiffs' claims of irreparable harm are belated, coming seven years too late, and are unsupported.

The challenged contribution limits here serve vital public interests in helping protect the integrity of the City's system of representative government and benefit public participation in local political debate. The Court should uphold those public benefits and deny Plaintiffs' motion.

# BACKGROUND

## I. INDEPENDENT EXPENDITURES IN THE 1999 MAYORAL CAMPAIGN AND PUBLIC CRITICISM THEREAFTER

In October 1999 the Ninth Circuit affirmed a preliminary injunction against provisions of the City's Campaign Finance Reform Ordinance ("CFRO") that strictly limited contributions for or against local candidates.[1] The parties settled the case by consent decree, agreeing that the City would not enforce the limits but that the settlement would have no res judicata or collateral estoppel effect. *See* RFJN, Ex. J.

The Ninth Circuit's decision came in the middle of a contested mayoral campaign, just two weeks before Election Day and approximately two months before the runoff election between the incumbent Mayor Willie Brown and Board of Supervisors President Tom Ammiano. There was an immediate influx of contributions to committees supporting Mayor Brown. By the time Mayor Brown was re-elected, committees had made approximately $2.5 million in independent expenditures – of which more than 99% was spent to support him. *See* Declaration of John St. Croix ("St. Croix Dec."), Ex. I.[2]

Local newspapers reported extensively on the "unprecedented flow" and "unparalleled influx" of contributions to independent expenditure committees. *See* Declaration of Ann O'Leary ("O'Leary Dec."), Exs. E, F, H and I. One newspaper reported that "[h]alf of the money used to finance Mayor Willie Brown's campaign . . . came from independent expenditure committees." St. Croix Dec. Ex. N; *id.*, Ex. D (describing vow of "prominent associations of big and small business leaders" to "do whatever it takes to help Mayor Willie Brown beat Ammiano"). Newspapers noted that some of the soft money contributors had interests in potential contracts and development projects that could benefit from Mayor Brown's election. O'Leary Dec., Ex. C; *id.*, Ex. A. (*San Francisco Examiner*

---

[1] Under those provisions, no person could contribute more than $150 to support a candidate who had not accepted the City's voluntary spending limits, or more than $500 to support a candidate who had accepted those limits. *See* Plaintiffs' Request for Judicial Notice ("RFJN"), Ex. H (*San Franciscans for Sensible Government v. Renne*, No. C-99-02456-CW [N.D. Cal.] ["*SFSG*"] at 3-4). The caps applied to *all* contributions, whether to candidates or to independent committees. *Id.*

[2] In contrast, in the 1995 mayoral election, when the contribution limits invalidated in *SFSG* were still in effect, committees reported spending only $21,733 to support or oppose candidates. *Id.*

article stating that "developers and contracting firms that do millions of dollars of business at City Hall have pumped hundreds of thousands into independent expenditure committees to re-elect Brown.").

In 2000 and 2001, the press began to report on the possible relationship between campaign donations and the award of government contracts. *See* O'Leary Dec., Exs. L, M, N, O. For example newspapers carried stories reporting the following:

- One major local developer contributed $95,000 to the .COM Better Government Committee, which in turn spent $93,000 on a mailer for Mayor Brown. The donation came just weeks before a Planning Commission hearing on the draft environmental impact report for that contributor's development project. *See id.*, Ex. L; *id.* ¶ 13 (project was ultimately approved after the publication of the article).
- On January 13, 2000, the City's Planning and Redevelopment Commissions decided to include the site of the future Bloomingdale's in a redevelopment area, making the developer eligible for redevelopment assistance, including a City property tax increment. The developer had contributed $50,000 in "soft" money to groups supporting the mayor's campaign, and company executives had contributed another $16,500. *See id.*, Exs. N, M.
- Prominent individuals, who were members of the City's business community and had interests in City decisions, made contributions to these committees of up to $120,000. *See id.*, Ex. M.

In a five-part series of articles investigating the appearance of influence in the City, the *San Francisco Chronicle* suggested that there was a relationship between contributions to independent committees and City decisions affecting the contributors. *See id.*, Ex. N. It reported that:

- A major retailer and associated firms donated $371,778 to four committees not long after obtaining an agreement with the City's Redevelopment Agency to build new headquarters on the City's waterfront.
- The owner of San Francisco's cable TV franchise donated $33,414 in soft money, mostly to the Committee on Jobs PAC, and later won an additional City contract to provide cable internet access.

- A major bank contributed $82,880 in soft money, mostly to the Committee on Jobs PAC, after successfully lobbying against a proposed ordinance banning ATM fees.

O'Leary Dec., Ex. N. *See also* Declaration of Charles M. Marsteller ("Marsteller Dec.") ¶¶ 9-10 (describing press coverage regarding independent expenditures and resulting perceived corruption).

## II. CONSIDERATION OF CONTRIBUTION LIMITS IN 1999 AND 2000

On November 1, 1999, the City's Board of Supervisors ("the Board") urged the Ethics Commission ("the Commission") to study measures designed to curb the influence of special-interest contributions on public policy and administration and to submit legislation to that effect to the Board. *See* St. Croix Dec. ¶ 9 & Ex. A (November 8, 2000 minutes and memorandum from Ginny Vida). Between November 8, 1999 and June 26, 2000 – when the Commission placed Proposition O, which contained the contribution limits challenged here, on the ballot – the Commission held 13 public meetings to consider public financing of local campaigns and other possible means to curb actual and apparent corruption. *See id.* ¶¶ 10-23, Exs. A-M. During this time, the Commission reviewed numerous memoranda and reports, reviewed model policies from other jurisdictions, and heard live testimony from dozens of people including national experts. *See id.* This testimony concerned, among other things, the extensive spending in the 1999 election and the public perception of special influence arising from it. The testimony showed that "San Francisco has been a pioneer in record-level independent campaign spending." *See id.*, Exs. A, C, E (testimony of former mayor of Tucson, Arizona), F, G; *see also* Marsteller Dec. ¶¶ 13-15.

During these meetings, the Commission and the Board considered several ways to address the perceived undue influence from monied interests that contributed heavily in local elections. These included full and partial public financing for local candidates; heightened reporting requirements, contribution limits, and expenditure limits for independent expenditure committees; and public financing for candidates opposed by independent expenditures. *See* St. Croix Dec. Exs. A-C, E-G, J.

On February 15, 2000, after eight public meetings, the Commission adopted draft legislation and forwarded it to the Board. *See* St. Croix Dec. ¶ 18 & Ex. H. The Commission's Chair and Executive Director testified before the Board regarding the high levels of independent expenditures in the 1999 Mayoral election and the need for campaign finance reform legislation. *See id.*, Exs. I, J, K

1  (Executive Director's Report); Ex. H (minutes at 3); Ex. I (Vida February 16, 2000 testimony).  The
2  Commission's Executive Director testified that "the campaign finance system in San Francisco is in a
3  state of crisis," and that "at numerous meetings of the Ethics Commission over the past four months,
4  members of the public have expressed their concern about the appearance or perception of corruption
5  in San Francisco politics."  *Id.*, Ex. J (Vida April 12, 2000 testimony at 1, 4).  Moreover, surveys
6  showed that "the greatest concern to voters is the perceived influence of special interests on the
7  electoral system and the perception that big money and big spending may influence the policymaking
8  of those who are elected."  *Id.* at 4.  The Board, however, decided not to place any campaign finance
9  reform measure on the ballot.  *Id.*, Ex. K.

10  The Commission – which can place measures before the voters without Board approval –
11  again considered the legislation in May 2000.  One expert testified that a limit on contributions to
12  independent committees would address "the influence of independent expenditures in the last mayoral
13  election" and prevent committees from "launder[ing] money to a candidate."  *Id.*, Exs. K (minutes at
14  4), L (minutes at 3).  The Commission amended the legislation to set the contribution limits that now
15  appear in the San Francisco Campaign and Governmental Conduct Code ("S.F. C&GCC") Section
16  1.114(c) and voted to place the measure that became Proposition O on the November 2000 ballot.
17  *See id.*, Ex. L (minutes at 1, 3); Ex. M (minutes at 3-4).  Among other things, the measure set up a
18  public campaign financing system and set new campaign contribution limits, including annual limits
19  on contributions to fund independent expenditures.

20  **III.     THE 2000 CITY ELECTION AND THE PASSAGE OF PROPOSITION O**

21  Meanwhile, soft money spending continued unabated.  All eleven Board seats were up for
22  election, and by early November committees had spent over one million dollars in independent
23  expenditures on candidates and ballot measures.  *See id.*, Ex. N (Executive Director's Report).  In
24  light of this independent spending, the Commission lifted the voluntary candidate spending limits in
25  six of the eleven races.  *Id.* (November 5, 2000 Press Release).  As one local newspaper reported,
26  "developers, big businesses, small businesses, real estate agents, labor unions and just about everyone
27  else with a financial stake in the outcome – pump[ed] hundreds of thousands of dollars of 'soft
28  money' into their picks."  *Id.,* Ex. N.  Plaintiffs and other committees dramatically stepped up their

fundraising and spending. Plaintiff Committee on JOBS Candidate Advocacy Fund received $785,000 from 24 contributors in 2000, for an average contribution over $30,000. *Id.* ¶ 26, Ex. P.

The voters considered the Commission's measure, Proposition O, at the November 2000 election. RFJN, Ex. A. In the official argument in support of the measure, the Commission stated it would "ensure the integrity of the electoral process," and that the independent expenditure contribution limit would "reduce the influence of large contributions on elected officials." *Id.* Other printed arguments in favor of the measure pointed to "the *influence of big money* skewing our City's planning process" and "*huge* campaign contributions given by corporations and wealthy landlords with development projects pending before city departments." *Id.* (emphasis in original). The voters, in evident agreement, adopted Proposition O.

## ARGUMENT

### I. PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS[3]

#### A. This Court Applies A Less Rigorous Standard of Review To Contribution Limits.

Because Section 1.114(c) and CFRO Regulation 1.114-2 limit contributions for independent expenditures – capping them at $500 per committee per year, and capping aggregate contributions to all committees at $3,000 per year – the applicable standard of review is "less rigorous" than strict scrutiny. The challenged laws are valid so long as they satisfy "the lesser demand of being closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 136, 137 (quotes omitted); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387-88 (2000). The City's contribution limits survive this test.

Plaintiffs erroneously argue that the Court should apply strict scrutiny, claiming Section 1.114(c) and its implementing regulation also restrict independent committees' *expenditures*. Plaintiffs' Mem. of Pts. & Auth. ("MPA") at 10:3-4. Plaintiffs call Section 1.114 a limit on

---

[3] Plaintiffs recite the basic preliminary injunction standards. However, even if a plaintiff shows serious questions going to the merits, "simply raising a serious claim is not enough to tip the hardship scales" to justify an injunction. *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007). Conversely, "even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).

1  independent expenditures, insisting it "restricts . . . the amount of money that such committees can
2  spend on political speech." MPA at 3:9, 5:5, 2:18-19; *id*. at 9:5-6. In fact, because they do not deny
3  that Section 1.114(c) and its regulation pass muster *if analyzed as contribution limits*, Plaintiffs' entire
4  motion rests on their theory that those laws are expenditure limits.

    This Court must not be misled. In calling Section 1.114(c) an expenditure limit, Plaintiffs
unjustifiably seek to blur the difference between two fundamentally disparate types of campaign
finance laws. They ignore the plain text of the ordinance and its regulation, which places *no* ceiling
on expenditures. They also ignore literally decades of campaign finance jurisprudence – which
makes clear that contribution limits are conceptually and legally distinct from expenditure limits, and
that strict scrutiny applies only to the latter. *McConnell*, 540 U.S. at 136 (quotes omitted).

    The distinction between contribution limits and expenditure limits has its roots in *Buckley v. Valeo*, 424 U.S. 1 (1976). There, the Supreme Court upheld the Federal Election Campaign Act's ("FECA") contribution limits, while striking down its expenditure restrictions. Expenditure limits, the Court held, "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Id.* at 19. As such, expenditure limits "impose far greater restraints on the freedom of speech and association than do . . . contribution limitations" (*id.* at 44), because contribution limits, in contrast, "entail[] only a marginal restriction" on speech. *Id.* at 20. "While contributions may result in political expression if spent by a candidate or an association to present its views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* at 20-21.[4] Similarly, contribution limits affect rights of association only modestly, because they "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Id*. at 22. FECA's contribution limits did not violate the First Amendment because their "overall effect" was "merely to require candidates and political committees to raise funds from a greater number of

---

[4] A "contribution serves as a general expression of support," but "does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Buckley,* 424 U.S. at 21.

persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression." *Id*.

Since 1976, the Court repeatedly has affirmed that contribution limits are distinct from, and receive more relaxed scrutiny than, expenditure limits. In *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 195 (1981), for example, the Court reviewed FECA's limit on contributions to political committees as a contribution limit, even though it "restricts the ability of [plaintiff] CMA to engage in speech through a political committee[.]" The Court called contributions "speech by proxy," which is "not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection." 453 U.S. at 195-96. Similarly, in *Nixon*, 528 U.S. at 386-87, the Court affirmed *Buckley* – which "drew a line between expenditures and contributions" – and held that it has "been plain ever since *Buckley* that contribution limits would more readily clear the hurdles before them" than expenditure limits. 528 U.S. at 387. In *FEC v. Beaumont*, 539 U.S. 146 (2003), the Court repeated

> [g]oing back to *Buckley* . . . restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression.

539 U.S. at 161-62 (cites, quotes omitted). Thus, instead of having to survive strict scrutiny, a contribution limit – even if it "involve[es] significant interference with associational rights" – passes muster if it "satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id*. at 162 (quotes omitted, emphasis added).

Most recently, the *McConnell* Court upheld BCRA's soft money contribution limits, affirming that because "the communicative value of large contributions inheres mainly in their ability to facilitate the speech of their recipients," contribution limits impose only "limited burdens . . . on First Amendment freedoms." 540 U.S. at 135, 136. *McConnell* – which Plaintiffs fail even to cite – is of key relevance here. First, the Court declined to apply strict scrutiny even though some of the law's contribution limits were phrased, in part, as limits on how the entities that received contributions could spend them. The Court explained that even where those provisions

> prohibit[] national parties from receiving or spending nonfederal money … [or] prohibit[] state party committees from spending nonfederal money on federal election activities, *neither provision in any way limits the total amount of money parties can spend. Rather, they simply limit the source and individual*

> *amount of donations. That they do so by prohibiting the spending of soft money does not render them expenditure limitations.*

*Id.* at 139 (emphasis added, cite omitted). In other words, "for purposes of determining the level of scrutiny, it is irrelevant that Congress chose . . . to regulate contributions on the demand side rather than the supply side." *Id*. at 138.

Second, *McConnell* recognized that contribution limits force the recipient to solicit funds from more donors or face a reduction in funds. But this created no First Amendment problem. To the contrary, "the restriction here tends to increase the dissemination of information by forcing parties, candidates, and officeholders to solicit from a wider array of potential donors." *Id*. at 140; *see also Buckley*, 424 U.S. at 22.

The Ninth Circuit likewise has made clear that the high court has "erected a *fundamental legal and conceptual divide* between contributions and expenditures," which "later cases have respected." *Jacobus v. Alaska*, 338 F.3d 1095, 1108 (9th Cir. 2003) (emphasis added). The "act of contribution, rather than the context in which contribution occurs, determines the standard of review." *Citizens for Clean Government v. City of San Diego*, 474 F.3d 647, 651 (9th Cir. 2007) (ban on contributions exceeding $250 to any committee supporting or opposing candidate is reviewed under "less rigorous scrutiny").

### B.     Section 1.114(c) And Regulation 1.114-2 Only Limit Contributions.

Under these cases, Section 1.114(c) limits contributions, not expenditures. By its plain terms, Section 1.114(c) makes no mention of expenditures, discussing only contributions. And while Regulation 1.114-2 *mentions* expenditures, it does so only to clarify that committees can receive and spend contributions over $500 if the excess is spent "for lawful purposes other than supporting or opposing candidates for City elective office." In this way, it merely "regulate[s] contributions on the demand side rather than the supply side." *McConnell*, 540 U.S. at 138. Neither the ordinance nor the regulation "in any way limits the total amount of money [committees] can spend. Rather, they simply limit the source and individual amount of donations. That they do so by prohibiting the spending of [excess contribution amounts] does not render them expenditure limitations." *Id*. Additionally, that the City's contribution limits may incidentally force committees "to raise funds from a greater number

of persons" if they wish to maintain their funding levels does not create any constitutional problem. *Buckley*, 424 U.S. at 22; *McConnell,* 540 U.S. at 140. That result is inherent in *any* contribution limit and is unremarkable.

Moreover, that Section 1.114(c) caps contributions to independent committees, rather than to candidates, is immaterial. Whether it is made to a candidate or to an independent committee, a contribution is itself only an inchoate and generalized statement of support, whose "communicative value . . . inheres mainly in [its] ability to facilitate the speech of [its] recipients." *McConnell*, 540 U.S. at 135. While Plaintiffs imply that their status as independent committees somehow transforms Section 1.114(c) into an expenditure limit – complaining that "Section 1.114(c) cuts off the source of the expenditures, namely, the members' contributions that pay for them" (MPA at 14) – that observation simply does not compel strict scrutiny. *See McConnell*, 540 U.S. at 139.

### C. Plaintiffs' Authorities Are Inapposite And Unpersuasive.

Plaintiffs rely on *Lincoln Club v. City of Irvine*, 292 F.3d 934 (9th Cir. 2002), and three unpublished district court decisions to argue that Section 1.114(c) imposes an expenditure limit. But *Lincoln Club* turned on highly unusual facts that are absent here, making it distinguishable, and the preliminary district court orders are distinguishable and non-binding.

*Lincoln Club* involved a local law that limited contributions to independent expenditure committees to $320. 292 F.3d at 936. But that fact alone did not compel strict scrutiny, much less invalidate the law: the court noted that although "Irvine's Ordinance clearly places a limit on contributions to independent expenditure committees . . . such a restriction does not place a severe burden on protected speech and associational freedoms. This is because *Buckley* does not consider political contributions to be fully protected speech." *Id*. at 938. Instead, the court held that the law substantially burdened First Amendment rights for a different reason: it "barr[ed] an independent expenditure committee from making any independent expenditures whatsoever if the source of the committee's money [was] membership dues that exceed[ed] the Ordinance's prescribed [$320] maximum." *Id.* at 936, 938. Because the plaintiff committees in that case "derive[d] their resources from annual membership dues of $2,000 per member," they had to choose between "maintain[ing their] present organizational structure," which "precluded [them] from making any political

expenditures whatsoever," or "mak[ing] dramatic changes to [their] organizational structure." 292 F.3d at 938-39. The ordinance thus created "substantial burdens on protected speech and associational freedoms [which] necessitate the application of strict scrutiny." *Id*. at 939.

This case is far different. Regulation 1.114-2 makes clear that a committee may accept a contribution exceeding the $500 cap, and spend $500 of that contribution on independent expenditures to support or oppose local candidates, so long as the remainder is used for other lawful purposes. Indeed, because the unique facts on which *Lincoln Club* relied are absent, that decision shows that San Francisco's limit on contributions to independent expenditure committees is permissible: it "does not place a severe burden on protected speech and associational freedoms," and "does not warrant strict scrutiny."[5] 292 F.3d at 938.

Plaintiffs' reliance on past decisions from this district also misses the mark. MPA at 11-13 (citing *SFSG*, *San Jose Silicon Valley Chamber of Commerce PAC v. City of San Jose*, No. C 06-04252-JW (N.D. Cal. Sept. 20, 2006) and *OakPAC v. City of Oakland*, No. 06-CV-6366-MJJ (N.D. Cal. Oct. 19, 2006)). None of these decisions is controlling, and each one's procedural posture limits its persuasive value. First, the Ninth Circuit cast doubt on the district court's decision in *SFSG* in October 2000, noting that the "legal question is unresolved" and expressly reserving any opinion regarding the constitutional issues in the case. *See* RFJN, Ex. I. As discussed above, *McConnell* later resolved those legal issues – in Defendants' favor.[6] Second, *City of San Jose* is currently on appeal. Third, the *OakPAC* decision was a temporary restraining order that was effective only for three

---

[5] Plaintiffs also suggest that strict scrutiny is required by *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981). MPA at 10-11. But as the Ninth Circuit has recently explained, the Court in that case "avoided any direct statement regarding the standard of review," and in fact "seemed to apply the level of scrutiny described in *Buckley*," requiring the law to merely "advance a *legitimate* governmental interest *significant* enough. . . ." *Citizens for Clean Government,* 474 F.3d at 651 (emphasis original). And to the extent plaintiffs read *Citizens Against Rent Control* to mean that a contribution limit must satisfy strict scrutiny because it can incidentally "affect expenditures," subsequent caselaw is clearly to the contrary. *See, e.g., McConnell*, 540 U.S. at 135-141.

[6] Moreover, the consent decree approved by the *SFSG* court stipulated that the settlement would not have any res judicata or collateral estoppel effect on future legislation. *See* RFJN, Exh. J.

1  weeks. *See* RFJN, Ex. E at 5. The parties there have since stipulated to stay the case pending the
2  outcome of *City of San Jose*. *See* RFJN, Ex. F.[7]

### D. The Challenged Laws Serve To Prevent Actual Or Apparent Corruption.

Because they limit contributions, Section 1.114(c) and Regulation 1.114-2 need only be "closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 136. They are.

When the voters adopted Proposition O in 2000, there were well-documented public concerns arising out of the 1999 and 2000 elections about the perception of undue influence and political favoritism. There were news reports that well-connected individuals and corporations had contributed large sums to independent expenditure committees and received benefits from elected City officials. The voters adopted the City's contribution limits with the express intent of "eliminat[ing] or reduc[ing] the appearance or reality that large contributors may exert undue influence over elected officials." *See* S.F. C&GCC § 1.100(b)(7). In the words of the Commission in its official ballot argument in favor of Proposition O, the measure sought to "ensure the integrity of the electoral process" by "reduc[ing] the influence of large contributions on elected officials[.]" RFJN, Ex. A. *See also* St. Croix Dec. Ex. J (noting that limiting the "influence, or the appearance of influence, of private contributions on policymaking . . . will . . . help to restore public confidence in the electoral process"); Ex. J (noting Supervisor concern that "the level of independent spending" is "the most serious problem in San Francisco campaigns"); Ex. K (discussing "perceived influence from large campaign contributions"). The many newspaper accounts describing concerns about undue influence, and the voters' conclusion that Proposition O was necessary to prevent that appearance or reality, show the significant purpose behind the measure's contribution limits. *Nixon*, 528 U.S. at 393, 394 (citing newspaper accounts and voters' determination of necessity to support need for contribution limits to prevent actual and apparent corruption).

---

[7] All three cases are also distinguishable on their facts. All three involved contribution limits that were more restrictive than Section 1.114(c)'s $500 limit. *See SFSG* at 3-4 ($150 to $500 cumulative contribution limit to candidates and committees); *City of San Jose* at 2-3 ($250 contribution limit); *OakPAC* at 2 (citing Oakland Mun. Code § 3.12.050 & 3.12.060) ($250 or $100 limit). More importantly, none of the three courts considered a record of actual or apparent corruption remotely comparable to the record here.

The Supreme Court has "made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell*, 540 U.S. at 143; *Nixon*, 528 U.S. at 388-89. "Corruption" for this purpose does not necessarily mean actual *quid pro quo* arrangements: "[o]f almost equal concern . . . is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.*; *McConnell*, 540 U.S. at 143 (recognizing "the broader threat from politicians too compliant with the wishes of large contributors"). This interest in preventing the appearance of undue influence from large contributors is sufficient to justify limiting contributions to political committees, and certainly justifies the limits set forth in Section 1.114(c). *See Cal. Med. Ass'n*, 453 U.S. at 197-98.

Relying primarily on *FEC v. Nat'l Conservative PAC*, 470 U.S. 480 (1985) – which involved a limit on *expenditures*, not contributions – Plaintiffs claim the City's contribution limits promote no anti-corruption interest because the independent expenditures are not coordinated with candidates' campaigns. MPA at 15-16. But this argument conflates expenditures and contributions, and also ignores controlling authority. In 2003, the *McConnell* Court expressly denied that "the First Amendment prohibits Congress from regulating contributions" in order to address the "source and amount of funds available to engage in express advocacy and numerous other *noncoordinated* expenditures." 540 U.S. at 152 n. 48 (emphasis added). It construed the government's interest broadly enough to justify regulation beyond "contributions made directly to, contributions made at the express behest of, and expenditures made in coordination with" candidates. 540 U.S. at 152. Any claim to the contrary, the Court held, reflects a "crabbed view of corruption, and particularly of the appearance of corruption," and also "ignores precedent" and "common sense[.]" *Id.*; *see Cal. Med. Ass'n*, 453 U.S. at 199 n.19 (even contributions used only to provide "administrative support" to committee can corrupt political process). Just last term, the Court explained that "it may be that, in some circumstances, 'large *independent expenditures* pose the same dangers of actual or apparent quid pro quo arrangements as do large contributions [to candidates]." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. __, 127 S.Ct. 2652, 2672 (2007) (emphasis added).

1    Independent expenditures, like coordinated expenditures, have the potential to create actual or apparent corruption because large contributions "are likely to create actual or apparent indebtedness" on the part of elected officials, "*regardless of how those funds are ultimately used*." *McConnell*, 540 U.S. at 155 (emphasis added). There is a genuine risk that "officeholders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder. Even if it occurs only occasionally, the potential for such undue influence is manifest." *Id*. at 153. In this case, in light of the record compiled by the City, Plaintiffs are not likely to be able to show that Section 1.114(c) does not serve the important interest of preventing that actual or apparent influence.

### E. Section 1.114(c) And Regulation 1.114-2 Are Closely Drawn.

Section 1.114(c) and Regulation 1.114-2 are "closely drawn" to serve the City's interest in preventing actual or apparent corruption while avoiding "unnecessary abridgement" of First Amendment rights. *Buckley*, 424 U.S. at 25. The *Buckley* Court held a $1000 contribution limit to be "closely drawn" where it

> focuse[d] precisely on the problem of large campaign contributions . . . while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.

*Id.* at 28. Similarly, the *McConnell* Court held that BCRA's limit on soft money contributions to national political parties were "closely drawn" because parties had other ways to solicit contributions. 540 U.S. at 154-61. Thus, when "examining whether a contribution limitation is sufficiently tailored to a state's asserted interest, the focus is as much on those aspects of associational freedom unaffected by the law as the limitations that are imposed." *Mont. Right to Life Ass'n v. Eddelman*, 343 F.3d 1085, 1094 (9th Cir. 2003).

Here, individuals seeking to contribute to an independent committee can express their political views and associate themselves with political candidates and associations in a number of ways. First, they may contribute up to $500 directly to a candidate. S.F. C&GCC Section 1.114(a). Second, they may contribute additional amounts of up to $500 to an independent expenditure committee supporting a candidate. *Id*., § 1.114(c). Third, they may contribute up to $3000 to all independent committees

1  each year. *Id.* Finally, they can make direct expenditures in support of a candidate, and volunteer
2  their services to a candidate, without restriction.

3  "In the context of contribution limits, the requirement of 'close tailoring' does not require 'the
4  least restrictive alternative.'" *Jacobus*, 338 F.3d at 1115 (citing *Cal. Med. Ass'n*, 453 U.S. at 199
5  n.20). A contribution limit is permissible unless it is "so radical in effect as to render political
6  association ineffective, drive the sound of a candidate's voice below the level of notice, and render
7  contributions pointless." *Nixon*, 528 U.S. at 397. The City's contribution limits are within the limits
8  held acceptable in *Nixon*. In fact, Plaintiffs do not even challenge the amounts of the limits. Those
9  limits are closely drawn, and Plaintiffs are unlikely to be able to show otherwise.

## II. PLAINTIFFS HAVE SHOWN NO IRREPARABLE INJURY

11 Plaintiffs claim they will suffer irreparable injury absent an injunction. But these claims are
12 belied by Plaintiffs' years of delay in challenging the City's contribution limits. Because interim
13 injunctions "are generally granted under the theory that there is an urgent need for speedy action to
14 protect the plaintiffs' rights," a plaintiff's delay "tends to indicate at least a reduced need for such
15 drastic, speedy action." *Citibank v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "By sleeping on its
16 rights a plaintiff demonstrates the lack of need" for preliminary relief. *Lydo Enterprises, Inc. v. City
17 of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) (cites and quotes omitted). Plaintiffs were active when
18 the voters passed Proposition O in 2000, and have been active since, yet they have not challenged the
19 law until now, seven years and eleven City elections later. Such a "long delay before seeking a
20 preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v.
21 Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

22 Moreover, Plaintiffs' supposed "evidence" of irreparable harm is conclusory. Plaintiffs'
23 declarants offer little more than "bald, conclusory allegations that their [efforts] would have been
24 more 'effective' had they been able to raise more money," which is insufficient. *Mont. Right to Life
25 Ass'n*, 343 F.3d at 1095. Plaintiff JOBS Fund admits that even after Proposition O was adopted, it
26 *has* been able to raise money to pay for independent expenditures. Nayman Dec., ¶16. Even if it had
27 not, its contributors – each of whom donated an average of more than $30,000 in 2000 – could easily
28 pay directly for independent expenditures themselves.

### III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR THE CITY

In "balanc[ing] the hardships of the public interest against a private interest, the public interest should receive greater weight." *Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999); *Fund For Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992) (if injunction would implicate public interest, plaintiffs must show the "public interest favors the[m]").

An injunction would cause significant harm to the City, its voters, and the public interest. Because their purpose "directly implicate[s] the integrity of our electoral process," contribution limits "tangibly benefit public participation in political debate." *McConnell*, 540 U.S. at 136-37; *Jacobus*, 338 F.3d at 1107 ("Campaign finance reform presents 'a case where constitutionally protected interests lie on both sides of the legal equation'"). A "failure to regulate the arena of campaign finance allows the influence of wealthy individuals and corporations to drown out the voices of individual citizens, producing a political system unresponsive to the needs and desires of the public, and causing the public to become disillusioned with and mistrustful of the political system." *Jacobus,* 338 F.3d at 1107. San Francisco voters adopted Proposition O after two elections in which large contributions to committees, including Plaintiffs, created a perception of undue influence. The voters and the City face the same issues today. Enjoining Section 1.114(c) in the weeks before this year's election could promote voter cynicism and disengagement, deprive the public of the protections they adopted in 2000, and cast a cloud over the City's system of representative government. To avoid these harms, Defendants urge the Court to deny Plaintiffs' request for preliminary relief.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: August 27, 2007

DENNIS J. HERRERA
City Attorney

By:_____/s/_____
WAYNE SNODGRASS
Deputy City Attorney