# EXHIBIT A

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**



Ethics Commission

1390 Market Street, Suite 801
San Francisco, CA 94102
Phone 554-9510 Fax 703-0121

# SAN FRANCISCO ETHICS COMMISSION AGENDA
## for
## Monday, November 8, 1999, 5:00 p.m.
## City Hall
## One Dr. Carlton B. Goodlett Place, Room 408

I.  Call to order and roll call

II.  Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.

III.  Conference with the City Attorney – Litigation

Motion that the Ethics Commission convene in closed session with the City Attorney for the purpose of conferring or receiving advice from the City Attorney regarding the following litigation: (1) Clinton Reily, Clinton Reily for Mayor, and Fred A. Rodriguez v. Louise Renne and the City and County of San Francisco, U.S. District Court No. C99-4395 CW; and (2) San Franciscans for Sensible Government, et al. v. Louise H. Renne and City and County of San Francisco, U.S. District Court No. C99-2456 CW, as permitted by Government Code Section 54956.9(a).

IV.  Discussion and vote on whether to disclose action taken or discussions held in closed session.

(1) Motion that the Ethics Commission finds that it is in the best interest of the public that the Ethics Commission elect at this time not to disclose its closed session deliberations concerning the litigation listed above.

OR:

(2) Motion that the Ethics Commission finds that it is in public interest to disclose information discussed in closed session, and directs the Chairperson to immediately disclose that information.

V.  Discussion and possible approval of minutes of the meeting of October 6, 1999

VI.  Executive Director's report

1.  Public policy program
2.  Investigation and enforcement program
3.  Report on volume of calls received via the Whistleblower hotline
4.  Campaign finance disclosure program
4.  Campaign finance audit program
5.  Lobbyist program
6.  Campaign consultant program
7.  Statements of economic interests

(Please turn over for page 2)

SF Ethics Commission Agenda – November 8, 1999                                                    2

VI.     Discusssion and possible action re: proposal of a program providing for public financing of elections in San Francisco, and whether the Commission should direct the staff to prepare a draft ballot measure for the March 1999 ballot. The Commission is addressing this issue pursuant to a resolution proposed by Board of Supervisors President Tom Ammiano. Supervisor Ammiano's resolution and the Commission's staff report on public financing of elections are available from the Commission office.

VIII.   Discussion and possible approval of draft annual report covering fiscal year 99-00. (The draft annual report will be available from the Commission office on Friday, November 5.)

IX.     Discussion and possible reconsideration of previously approved format to replace or revise the current format for electronic reporting of campaign finance statements, in accordance with new FPPC forms and in view of new electronic formats adopted by the Secretary of State; and proposed request for supplemental appropriation to implement new or revised electronic format.

        Motion that the Ethics Commission adopt the .CAL format for electronic filing of campaign statements submitted by candidates and committees, that the Commission request a supplemental appropriation in an amount of $10,000 to fund a work order to the Department of Telecommunications and Information Services (DTIS) to implement the .CAL format by April 1, 2000; that the Commission withdraw its earlier request for a supplemental in the amount of $10,000 to fund a work order to DTIS to revise the EFPOC format; and that the Commission suspend use of the current EFPOC format when the .CAL format is ready.

        DTIS has informed the Commission that the .CAL format is technically superior to the Commission's current EFPOC format. For this reason, the staff proposes adoption of the .CAL format. The .CAL is one of two standards that have been adopted by the California Secretary of State.

X.      Discussion of items for future agendas

XI.     Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

XII.    Adjournment

### _Know Your Rights Under the Sunshine Ordinance_

_Government's duty is to serve the public, reaching its decisions in full view of the public. Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business. This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review._

_For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force at 554-6075._

_This location is wheelchair accessible. In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products. Please help the City accommodate these individuals._

_Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street, Suite 801, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site http://www.ci.sf.ca.us/ethics/_

 **SfGOV** san francisco

sfgov | residents | business | government | visitors | online services | search     go !

Ethics Commission >> Meeting Information

# Ethics Commission

**November 08, 1999**

(Approved 12/6/99)

Minutes of the

San Francisco Ethics Commission

Meeting at City Hall

One Dr. Carlton B. Goodlett Place, Room 408

November 8, 1999; 5:00 p.m.

**I. Call to order and roll call**

Commission Chairperson Isabella H. Grant called the meeting to order at 5:10 p.m.

**COMMISSION MEMBERS PRESENT:** Isabella H. Grant, Chairperson; Henri E. Norris, Vice-Chairperson; Carol M. Kingsley, Commissioner; Robert D. Dockendorff, Commissioner; Paul H. Melbostad, Commissioner.

**STAFF PRESENT:** Ginny Vida, Executive Director; Naomi Starkman, Deputy Executive Director; Joe Lynn, Campaign Finance Officer; Katherine Havener, Ethics Investigator/Legal Analyst; Shaista Shaikh, Campaign Finance Auditor; Armando Gomez, Elections Clerk; Tina Tan, Intern.

**OFFICE OF THE CITY ATTORNEY:** Julie Moll, Deputy City Attorney

**OTHERS PRESENT:** Sheryl White, Statecraft, Inc.; Joan Mandle, California Common Cause; Mike Mooney and Lou Ellsworth, Alliance for Democracy; Aroza Simpson, Grey Panthers; David Fairley, Matt Spencer and David Grace, Green Party; Holli Thier, League of Women Voters; Lucy Colvin, Electoral Reform Coalition; Caleb Kleppner, Center for Voting and Democracy; Jim Reid, Reid for Supervisor; Richard Knee; Kate Gillick; Charles Marsteller, San Francisco Common Cause.

**MATERIALS DISTRIBUTED:**

S.F. Ethics Commission Agenda, November 8, 1999

Draft Minutes of the S.F. Ethics Commission Meeting of October 6, 1999

Approved Minutes of the S.F. Ethics Commission Meeting of September 23, 1999

Executive Director's Report, November 8, 1999

Memo to Ethics Commission Members from Ginny Vida re: Fundamental Policy

Considerations: Public Financing of Campaigns

Memo to Ethics Commission Members from Ginny Vida re: Information on Public Financing of Campaigns

Memo to Ethics Commission Members from Ginny Vida re: Public Financing of Campaigns in San Francisco

"Oakland Plan for Funding Campaigns - spending limits, public money," San Francisco Chronicle, October 29, 1999

"How Much is Too Much?," Daily Journal, October 20, 1999

"Supervisors Want Say In Finance Rules," San Francisco Examiner, November 2, 1999

"Real Campaign Reform," San Francisco Bay Guardian, October 13, 1999

"Supervisors Tread On Appointed Panels' Turf; Ethics, Art Boards Get Pointed Advice," San Francisco Chronicle, November 2, 1999

Memo to Ginny Vida from Department of Telecommunications and Information Services re: Online Campaign Contribution Disclosure Filing System Format

Statecraft Handout re: proposed CAL electronic format

Common Cause Handout re: public financing

**II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.**

There was no public comment.

**III. Conference with the City Attorney - Litigation**

**Motion 99-11-8-37 (Norris/_____) Moved, seconded and passed: That the Ethics Commission convene in closed session with the City Attorney for the purpose of conferring or receiving advice from the City Attorney regarding the following litigation: (1) Clinton Reilly, Clinton Reilly for Mayor, and Fred A. Rodriguez v. Louise Renne and the City and County of San Francisco, U.S. District Court No. C99-4395 CW; and (2) San Franciscans for Sensible Government, et al. v. Louise H. Renne and City and County of San Francisco, U.S. District Court No. C99-2456 CW, as permitted by Government Code Section 54956.9(a).**

The Commission adjourned into closed session at 5:15 p.m. and reconvened in open session at 5:45 p.m.

**IV. Discussion and vote on whether to disclose action taken or discussions held in closed session.**

**Motion 99-11-8-38 (Melbostad/Kingsley) Moved, seconded and passed: That the Ethics Commission finds that it is in the best interest of the public that the Ethics Commission elect at this time not to disclose its closed session deliberations concerning the litigation listed above.**

**V. Discussion and possible approval of minutes of the meeting of October 6, 1999.**

Motion 99-11-8-39 (Melbostad/Kingsley) Moved, seconded and passed: That the minutes of the October 6, 1999 meeting be approved.

VI. Executive Director's Report

Executive Director Ginny Vida referred the Commission to the Executive Director's Report in the agenda packet.

**VI. Discussion and possible action re: proposal of a program providing for public financing of elections in San Francisco, and whether the Commission should direct the staff to prepare a draft ballot measure for the March 1999 ballot.**

Ms. Vida explained how the issue of public financing came before the Ethics Commission. She explained that Board President Tom Ammiano had asked the Ethics Commission to consider submitting a measure to the voters for the March 2000 ballot on public financing of campaigns. She noted that the full Board had subsequently amended the resolution to request that the Commission submit its proposal to the Board instead of the voters. Ms. Vida stated that in anticipation of the Commission's consideration of this issue, Deputy Director Naomi Starkman had researched other jurisdictions that currently have partial public financing programs. She commended Ms. Starkman for her hard work in preparing a comprehensive report for the Commission's review.

Ms. Vida stated that the Commission should discuss whether it wants to consider a public financing proposal, and if so, whether it wants to submit a proposal to the Board of Supervisors or to the voters. She noted that the Commission has tentatively scheduled special meetings for December 1 and 2 to consider public financing.

Ms. Starkman explained that the "Fundamental Policy Considerations" memo would best guide the Commission's discussion of public financing. She stated that the Commission should identify what goals it seeks to accomplish in pursuing public financing of campaigns.

Commissioner Paul H. Melbostad explained that since the variable contribution limits and aggregate contribution limits to independent expenditure committees were recently enjoined, the Commission should consider another method to encourage candidates to comply with the spending limits.

Supervisor Tom Ammiano addressed the Commission, urging members to submit a public financing initiative by the December 8 deadline for placement on the March 2000 ballot. He noted that voters support curbs on candidate spending, and that without public financing, soft money will greatly influence local elections.

Commissioner Melbostad and Chairperson Grant agreed that the amount of public money that candidates receive should be enough to encourage them to accept voluntary spending limits. Commissioner Norris stated that she favors only full funding of campaigns in order to achieve these goals.

Commissioner Kingsley expressed concern that the Commission's already established priorities would not receive enough attention should the staff be asked to develop and administer a public financing program. She also expressed concern that public financing would compete with important social programs for general fund appropriations. She further stated that given the complexity of the public financing issue, it would be unrealistic to ask staff to draft a proposal to meet the December 8 deadline.

Commission Chair Grant expressed concern about submitting a measure for the March ballot, in view of the short time available to prepare, consider and submit a proposal. She noted that a proposal that is hastily prepared and considered might be invalidated by the courts.

The Commission discussed with Deputy City Attorney Julie Moll whether a voter-approved budget for the public financing program would be guaranteed. Ms. Moll stated that while a voter-approved ordinance could designate the amount of money required to fund the program, such a provision would not be enforceable; the Board and the Mayor have authority to decide whether to appropriate money, and how much to appropriate, each fiscal year. She stated that the only way to guarantee that enough funds are appropriated each year to support public financing would be with a Charter amendment. Ms. Moll also advised that the Ethics Commission does not have the authority to place a Charter amendment on the ballot.

The Commission then heard public comment on public financing.

Public Comment

Joan Mandel of California Common Cause urged the Commission to put public financing before the voters. She stated that public financing would make politicians more accountable to the public, limit money spent on campaigns, level the playing field and begin to restore voter confidence in the electoral process.

Mike Mooney of the Alliance for Democracy expressed his group's support for public financing. He stated that public financing is cost effective and would increase participatory democracy in San Francisco.

Aroya Simpson of the Grey Panthers expressed her group's support for public financing. She stated that a public financing program would increase participatory democracy and reduce candidate dependence on large contributions.

Lou Elsworth of Alliance for Democracy expressed support for public financing. He stated that the cost of funding a public financing program would be minor compared to the cost to democracy if legislators are still allowed to remain beholden to corporate interests.

David Fairley of the San Francisco Green Party expressed support for full public financing of campaigns. He stated that the purpose of public financing is to better fund a larger array of candidates, thereby broadening the spectrum of public debate. He opposed a partial funding program because it would still leave some candidates without enough money to run viable campaigns.

Holli Thier, Co-President of the League of Women Voters, urged the Commission to put public financing on the March 2000 ballot. She stated that public financing would level the playing field for all candidates.

Charles Marstellar of San Francisco Common Cause stated that the cost of partial public financing, assuming highly competitive elections, would be approximately $750,000 per year, or $1 per resident. vFor full financing, the cost would be $1.5 million per year, or $2 per resident. He stated that this would be a small price to pay to insulate the Mayor and the Board of Supervisors from large contributors and special interests. He also stated that the Center for Governmental Studies had drafted a proposed bill to amend the Campaign Finance Reform Ordinance to include public financing. The proposed bill contains a viability threshold that candidates must meet to be able to receive seed money.

Lucy Colvin of the Electoral Reform Coalition urged the Commission to put public financing on the March 2000 ballot. She stated that public financing would give lesser known candidates the ability to inform the public of their viewpoints. She indicated that the Commission could work with the City of Oakland, which is currently is considering a public financing measure.

Caleb Kleppner of the Center for Voting and Democracy urged the Commission to put public financing on the ballot in March 2000. He stated that the Commission could

receive assistance from experts in the field and could use legislation already in place in other cities as a model. He stated that public financing would encourage candidates to abide by spending limits and would allow poorly funded candidates a better chance to be heard by the electorate.

Jim Reid, former candidate for Mayor and candidate for Board of Supervisors, stated that public financing would make it less difficult for candidates such as he to wage campaigns, and would give more candidates an incentive to run for office.

David Grace of the Green Party indicated his support for public financing.

Richard Knee, a resident of San Francisco, urged the Commission to focus its attention on public financing so it can submit the issue to the voters in March 2000.

Kate Gillick, a resident of San Francisco, urged the Commission to consider public financing. She stated that public financing would better allow candidates who support social programs to become officeholders.

After some discussion, Commissioner Dockendorff introduced a motion that Commission staff draft a full public financing proposal for consideration by the Commission for placement on the March 2000 ballot.

> **Motion 99-11-8-40 (Dockendorff/Norris) Moved, seconded and passed: That Commission staff draft a full public financing ordinance for consideration by the Commission for placement on the March 2000 ballot.**

The Commission agreed to convene on December 1 and December 2 to consider the draft ordinance.

**VIII. Discussion and possible approval of draft annual report covering fiscal year 99-00.**

**Motion 99-11-8-41 (Melbostad/Dockendorff) Moved, seconded and passed: That the annual report covering fiscal year 99-00 be approved.**

**IX. Discussion and possible reconsideration of previously approved format to replace or revise the current format for electronic reporting of campaign finance statements, in accordance with new FPPC forms and in view of new electronic formats adopted by the Secretary of State; and proposed request for supplemental appropriation to implement new or revised electronic format.**

> **VI.**
>
> This matter was continued to the next regular meeting scheduled for December 6.

> **X. Discussion of items for future agendas**

There was no discussion of future agenda items.

> **XI. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.**

XI. There was no further public comment.

> **X. Adjournment**

> X. The Commission meeting was adjourned at 8:05 p.m.

X.

Respectfully Submitted,

_____

Katherine Havener
Ethics Investigator/Legal Analyst



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

DATE:      November 3, 1999

TO:        Members, Board of Supervisors

FROM:      Ginny Vida  *G.V.*
           Executive Director, Ethics Commission

RE:        **Public financing of campaigns in San Francisco**

---

As you know, Board President Tom Ammiano recently proposed a resolution asking the Ethics Commission to study and hold public hearings on public financing of campaigns for local elective office, and to submit a public financing proposal to the voters at the March 2000 election. At its November 1 meeting, the full Board approved an amended version of the resolution requesting that the Commission submit its public financing proposal to the Board, rather than to the voters.

At its next regular meeting scheduled for **Monday, November 8, at 5:00 p.m.,** Room 408 City Hall, the Commission will consider whether to propose public financing of elections, and if so, whether to propose a measure to the voters in the March election or to the Board of Supervisors.

On behalf of the Ethics Commission, I invite your comments on a possible proposal to provide public financing of campaigns for local elective office in San Francisco.

A copy of the November 8 agenda and staff reports on public financing are enclosed. Members of the Board are welcome to attend this meeting.

**If you are unable to attend the November 8 meeting but would like to convey your thoughts to the Commission on this issue, please call me at 554-9513.** I would also be pleased to meet with you or your staff prior to, or following, the Commission's November 8 meeting.

Thank you for your assistance. I look forward to hearing from you.

P:\SHARED\Public Finance\memo to BOS 11.99.doc



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

**Date:**        November 1, 1999

**To:**         Members, Ethics Commission

**From:**       Ginny Vida, Executive Director *J.V.*
                By: Naomi Starkman, Deputy Executive Director

**Re:**         Fundamental Policy Considerations: Public Financing of Campaigns

The purpose of this memorandum is to identify some of the fundamental policy issues the Ethics Commission should consider before deciding whether to propose public financing of campaigns in San Francisco. The staff is prepared to study any of these and other policy issues the Commission deems appropriate.

1. **Purpose**. Identifying the purpose of a public finance program will likely determine eligibility criteria, and how public financing relates to spending and contribution limits. The Commission should consider whether any of the following purposes support adopting a program for San Francisco.

   - Provide seed money to all candidates, to make elections more competitive?
   - Provide subsidies only to candidates who can demonstrate significant public support?
   - Encourage candidates to limit spending?
   - Reduce reliance on private contributions?
   - Reduce time spent by candidates and officeholders on fund-raising?

2. **Scope of Program.** The scope of the program will likely determine the amount of money that should be set aside to fund the program.

   - Full or partial public financing?
   - Which elective offices should be covered?
   - Which elections (primary, general, run-off, recall) should be covered?

3. **Eligibility Requirements.** The eligibility requirements determine whether candidates would receive public funds.

   - Must a candidate qualify to have his/her name appear on the ballot to be eligible, or may write-in candidates be eligible?
   - Must a candidate be opposed by another candidate who has either qualified to receive public financing, or raised a certain amount of money, in order to be entitled to receive public financing?
   - If a candidate is unopposed, is the candidate entitled to receive public financing?
   - Should there be time restrictions on certification of eligibility?
   - Should candidates be required to demonstrate a certain level of public support to be eligible? If so, should this support be demonstrated by:

- ❖ raising a certain amount in private contributions; or
- ❖ raising a certain number of private contributions, or
- ❖ receiving a certain number of signatures from registered voters?
- Should there be other types of eligibility requirements (for example, a requirement to participate in debates or to file campaign statements in a timely fashion)?
- What happens if a candidate fails to qualify for the ballot after qualifying for and accepting public financing?
- What happens if a candidate withdraws from the race after qualifying for and accepting public financing?

4. <u>Partial Public Financing: Amount of Public Subsidy.</u> If the Commission concludes that partial public financing is the appropriate scope of the program, how much public money should be made available to each candidate?

- <u>Matching Fund Formula.</u> Should there be a matching fund formula? (For example, $1 of public funds for each $1 of private funds raised by the candidate)?
  - ❖ Should there be a cap on matching funds per candidate (for example, if spending limits are adopted, 50 % of the spending limit for the office)?
  - ❖ Should there be a time limit on solicitation and acceptance of contributions that are eligible for matching funds (for example, 12 months before and 3 months after election day)?
  - ❖ Should matching funds be available to match contributions from nonresidents (individuals who live outside San Francisco, or outside the supervisorial district)?
  - ❖ Should the formula change in response to contingent events? For example, if there are spending limits that can be lifted when one candidate exceeds a certain amount, would the matching fund formula change when the spending limits are lifted?
- <u>Flat sum.</u> Should there be a flat sum that all candidates for the same office who qualify for public financing are entitled to receive? Should the amount change in response to contingent events?

5. <u>Restrictions on Candidates who Accept Public Financing.</u>

- Should candidates be required to limit overall spending?
  - ❖ Should candidates be restricted in the amount they may contribute to their own campaign?
- Should candidates be restricted in the amount of contributions they may receive from entities (non-individuals)?
- Should candidates be restricted in the amount of contributions they may receive from non-residents ( individuals who live outside San Francisco, or outside the supervisorial district)?
- Should there be a time limit on fundraising (for example, 12 months before and 12 months after election day)?

6. <u>Restrictions on Use of Public Funds.</u> Should candidates be restricted in how they use public funds?

- May a candidate use public funds to purchase computers, cell phones, pagers or other equipment that has a useful life beyond that of the campaign? If so, should the equipment become City property at the end of the campaign?
- Should candidates be required to return all surplus money to the General Fund?

- Should there other restrictions on uses of public funds, such as prohibiting expenditure of public funds on gifts, contributions, or legal fees?

7. <u>Expenditure and Contribution Limits.</u>  In light of the recent court ruling enjoining parts of the CFRO, the Commission may want to consider modifying the spending and contribution limits.

- Should public financing be offered as a way to encourage candidates to limit spending?  If so, should the existing spending limits be maintained?  Existing contribution limits?
- Should there be one contribution limit applicable to all candidates for the same office, rather than variable contribution limits?  If so, what should the limit be (for example, $150 or $500)?
- Should there be a trigger provision which raises or lifts the spending limits under specified circumstances?
- If a nonparticipating candidate raises or spends a specified amount, should the limits be raised or lifted?  If so, what should the trigger be (currently, the trigger is 50% of the spending limit)?
- Should the contribution, spending and matching limits be adjusted automatically to according to changes in the consumer price index, or should voter approval be required for such adjustments?

8. <u>Administration & Enforcement.</u>  What departments should administer and enforce the program?

- Who determines whether a candidate is eligible to receive public financing (for example, the Ethics Commission, its staff, the Director of Elections, or the Controller)?
    - ❖ If an officer or staff member determines eligibility, may candidates appeal the determination to some other body?  For example, if the Ethics Commission staff determines eligibility, may candidates appeal the determination to the Commission?
- Should the Ethics Commission audit all participating candidates?
- What level of funding should be allocated for administrative costs?
- Should the penalties for violations of the public finance provisions be the same as those currently in the CFRO?  Are different penalties more appropriate?  For example, should a candidate who violates one of the requirements be prohibited from participating in the program in future elections?
- What should be the statute of limitations for bringing an action for violation of the public finance provisions?
- Should the Ethics Commission give priority to complaints alleging violations of the public finance program?

9. <u>Funding.</u>  What sources of funding should there be for a public finance program?

- Should the public financing program be funded through the City's General Fund?
- What if the amount appropriated is insufficient to cover the costs?
    - ❖ Would candidates get a pro rata share of the amount available?  Or would the program be suspended?
- Should the Charter be amended to guarantee full funding of the program?
- What other sources of funding should be investigated?
    - ❖ Property tax check-offs?
    - ❖ Private contributions to the City?



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

**Date:**      November 1, 1999

**To:**        Members, Ethics Commission

**From:**      Ginny Vida, Executive Director *GV.*
            By: Naomi Starkman, Deputy Executive Director

**Re:**        Information on Public Financing of Campaigns

## I.    Introduction

At the October 4, 1999 meeting of the Board of Supervisors, President Tom Ammiano introduced a resolution asking the Ethics Commission to study and hold public hearings on public financing of campaigns for local elective office. The resolution urges the Commission to consider several specific issues regarding public financing and to submit a proposed campaign reform measure for the March 2000 Primary election. The deadline for submitting measures for the March 2000 election is December 8, 1999.

So that the Commission may fully understand the myriad issues involved in this request, staff has compiled preliminary information on public finance programs in other jurisdictions. The staff report does not address all of the specific issues raised by President Ammiano's request, nor does it include any recommendations; rather, it explains the purpose of public financing of campaigns, details such programs in other cities, and raises questions for the Commission's consideration.

Staff is prepared to consider this matter further, and develop whatever additional information the Commission deems appropriate. Staff is also prepared to develop a public finance proposal for consideration at the December 1 and 2 special meetings, should the Commission decide to submit a measure to the voters by December 8.

## II.    The Purpose of Public Financing of Campaigns

There are many different models of public financing of campaigns. Some programs are intended to promote more competitive elections, by reducing some of the fundraising advantages enjoyed by incumbents and by giving challengers an incentive to join the race. These programs typically provide candidates with "seed money"—or small grants of cash. Other programs are intended to reduce the potential for candidates and officeholders to become beholden to private contributors. These programs typically provide large subsidies to candidates who can demonstrate significant public support. Many programs are also designed to encourage limits on overall campaign spending by setting spending limits for candidates who accept public financing. All of the programs studied by the staff have specific eligibility criteria, and impose restrictions on those candidates who receive public financing.

Should the Commission propose a public financing program for San Francisco, it should first consider the purpose and goal of such a program.[1] The purpose of San Francisco's program will

---

[1] Enclosed is a separate memorandum, entitled "Fundamental Policy Considerations," in which the staff briefly outlines many of the issues the Commission should consider before deciding whether to propose public financing for San Francisco campaigns.

likely determine eligibility criteria, and how public financing relates to spending and contribution limits. For example, if the purpose is to make elections more competitive by providing seed money to candidates, the eligibility criteria should be relatively easy for candidates to satisfy. If the purpose is to provide subsidies to only those candidates who can demonstrate significant public support, the eligibility criteria should be more difficult to satisfy. If the Commission intends to encourage candidates to limit spending, the program should include realistic spending limits. If the Commission's goal is to reduce candidate reliance on private contributions, then the amount of the public subsidy should be large enough to attract candidates to accept public funds.

## III.    Public Financing at the Local Level

Commission staff studied four cities that have public financing of campaigns: Los Angeles, New York City, Long Beach and Tucson. In addition, the City of Oakland is currently considering a public financing program. For this reason, staff has included information about the Oakland proposal. Each public financing program, discussed in detail below, has unique and varied features, some of which are designed specifically for that jurisdiction. Information concerning each program is organized into the following sections: general statistical information; eligibility criteria; the matching fund formula; the matching fund cap; contribution and expenditure limits; administration of the matching fund program, the costs associated with the matching fund program; and information about participation in the program.

## A.    LOS ANGELES

### 1.    General Information

| Date Program Enacted | 1990 |
|---|---|
| Date Program Implemented | 1993 |
| Number of elections conducted under program | 4 |
| Number of offices covered by program | 4: Mayor, City Attorney, Controller, and City Council |
| Number of districts | 15 council districts |
| Number of registered voters | 1,458,718 |
| 1998-99 Annual City Budget | $4.07 billion |
| Geographic area | 470 Sq. Miles |
| 1996 Population | 3.7 million |
| Amount of money set aside for matching fund program | $8 million[2] ($2.20 per capita) |

### 2.    Eligibility Criteria

Candidates must meet certain requirements to be eligible to receive public matching funds. To be eligible, candidates must agree to limit both campaign spending and the use of personal funds, and must agree in writing to participate in a debate. Once qualified, a candidate may request matching funds for small contributions from individuals, up to the maximum funds available for that candidate. To qualify for matching funds, candidates must meet the following requirements:

---

[2] Please see below for more information on the amount of funds disbursed from 1993 - 1997.

| Candidate | Requirement |
|---|---|
| All Candidates | Agree to abide by the spending limits. |
| Mayor | Agree not to contribute more than $100,000 per election from personal funds; |
| | Receive $150,000 or more in contributions of $500 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $200,000 or more. |
| City Attorney and Controller | Agree not to contribute more than $100,000 per election from personal funds; |
| | Receive $75,000 or more in contributions of $500 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $100,000 or more. |
| City Council | Agree not to contribute more than $25,000 per election from personal funds; |
| | Receive $25,000 or more in contributions of $250 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $50,000 or more. |

For candidates for the office of Mayor, City Attorney or Controller, the "qualifying" contributions must be received within 24 months of the election. These candidates may receive contributions of up to the $1,000 contribution limit, but only the first $500 counts for qualification purposes. For City Council candidates, the "qualifying" contributions must be received within 18 months of the election. Contributions of up to the $500 limit may be received, but only the first $250 counts for qualification purposes. According to the Los Angeles City Ethics Commission ("LACEC"), this aspect of the program was designed to enhance the importance of smaller contributions from individuals.[3] Although candidates can begin fundraising 18 to 24 months before the election, only contributions from individuals received within 12 months of the election are matched.[4]

### 3.    Matching Funds Formula: $1 to $1 rate[5]

If a candidate has qualified for matching funds, that candidate's contributions will be matched as follows:

| Candidate | Matching Funds Formula |
|---|---|
| Mayor, City Attorney or Controller | $1 of public matching funds for every $1 raised from an individual in contributions totaling no more than $500 per individual received within 12 months before the election. |
| City Council | $1 of public matching funds for every $1 raised from an individual in contributions totaling no more than $250 per individual received within 12 months before the election. |

---

[3] The LACEC has discussed possibly amending this provision to provide public matching funds up to the contribution limits. This would mean that candidates could receive more public funds with less effort, assuming their contributors are able to contribute the maximum amount.

[4] Although the legislative intent of this requirement is unclear, the LACEC believes that it was intended to provide a disincentive to candidates to begin fundraising early. LACEC staff noted that incumbents historically begin fundraising long before challengers.

[5] There has been some discussion in Los Angeles of changing the formula to $2 of public funds to every $1 from an individual. A change in the formula would mean that participating candidates would receive their matching funds at a faster rate.

The following contributions are not eligible to be matched: any contribution received from the candidate, from his or her immediate family, or any loan, pledge, or non-monetary contribution. Only contributions from individuals (not those from businesses, unions, political committees or other organizations) will be matched.

4.    **Maximum Matching Funds Available**

The matching funds program establishes limits on the public funds available to each qualified candidate as follows:

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $667,000 | $800,000 |
| City Attorney | $300,000 | $350,000 |
| Controller | $267,000 | $300,000 |
| City Council | $100,000 | $125,000 |

The maximum matching funds for the primary election are 30 percent of the expenditure limits for the primary election. The maximum matching funds for the general election are 45 percent of the expenditure limits for the general election. Candidates in a general runoff election are eligible to receive one-sixth of the allowable matching funds immediately, without regard to the matching fund formula. Thereafter, candidates must meet the qualifications stated above in order to receive additional matching funds and can receive funds on a $1 to $1 basis.

5.    **Contribution Limits**

The contribution limits are as follows:

| Candidate | Contribution Limit per Contributor per Election | Limit on Total Contributions Received from Non-Individuals |
|---|---|---|
| Mayor | $1,000 | $900,000 |
| City Attorney and Controller | $1,000 | $400,000 |
| City Council | $500 | $150,000 |

In addition, when any candidate expends more than $30,000 in personal funds in support of his/her candidacy, the contribution limit is lifted for that candidate's opponents. When an opponent raises an amount equal to the amount of personal funds being used, the contribution limits are reinstated. Candidates cannot receive unlimited contributions because the aggregate contribution limits remain in place. The aggregate contribution limit establishes a ceiling on the total amount a person can contribute to all candidates appearing on the ballot.[6]

6.    **Expenditure Limits**

To receive public matching funds, candidates must agree to abide by the following expenditure limits:

---

[6] The aggregate contribution limit formula is as follows: $500 x the number of City Council offices appearing on the ballot, plus $1,000 per Citywide race x the number of Citywide races on the ballot, but in no case less than $1,000.

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $2,200,000 | $1,760,000 |
| City Attorney | $990,000 | $770,000 |
| Controller | $880,000 | $660,000 |
| City Council | $330,000 | $275,000 |

The expenditure limits are lifted if any candidate who declines to accept matching funds spends in excess of the applicable spending limit for that race. (The contribution limits remain in effect unless a candidate spends more than $30,000 of his/her own funds, as indicated above.) In addition, the limits are lifted if one or more independent expenditure committees spend, in the aggregate, more than $200,000 for a candidate for Mayor, $100,000 for a candidate for City Attorney or Controller, and $50,000 for a candidate for City Council.

The expenditure limits have been lifted six times since 1993. In 1993, the limits were lifted for the mayoral race. In 1995, the limits were lifted for two City Council races. In 1997, the limits were lifted for the City Attorney's race. The limits were lifted in each of these instances due to candidate spending. In 1999, the limits were lifted in two City Council races due to independent expenditure committee spending.

7.     Administration of Matching Funds Program

If a candidate qualifies, s/he files a matching funds payment request with the LACEC, which reviews the request and campaign statements filed by the candidate in order to determine eligibility. Staff then certifies the amount of matching funds to be received. A candidate may not request less than $10,000 in payments at any one time until two weeks before an election, during which time a candidate may request $1,000 or more in matching funds payments at any one time. The LACEC then authorizes the Controller to make matching funds payments to the candidate.

The Los Angeles Charter requires the LACEC to audit all candidates who receive public matching funds. These audits test for compliance with the matching funds regulations. Certifying eligibility is done before the election and includes conducting a "spot check"—a facial review of a candidate's record keeping procedures. Each candidate is assigned to an auditor who performs a spot check of the candidate's records during the campaign period.[7] A spot check can take one to two hours per candidate.[8] In addition, after the election a complete audit is conducted of each candidate's statements. Each of these audits may take three weeks to perform.

If the LACEC determines that available matching funds may not be sufficient to satisfy the full entitlement of all eligible candidates, it will notify the Controller to withhold sufficient amounts to ensure that candidates receive a pro-rata share of the amount of their entitlement. The balance is paid when the LACEC determines that sufficient funds exist to pay the balance, or a portion thereof.

8.     Costs Associated with the Matching Funds Program

As noted above, the City of Los Angeles sets aside $8 million annually for its public finance program. The table below indicates funds disbursed from 1993 to 1997.

---

[7] The LACEC has five full-time auditors.

[8] First time candidates may require more time than experienced candidates. Spot checks of candidates who employ professional bookkeepers who routinely perform such campaign work may require only a minimal amount of time.

| Year | Offices Covered | Number of Participating Candidates | Primary Election | General Election | Total |
|------|-----------------|-----------------------------------|------------------|------------------|-------|
| 1993 | Mayor, City Attorney, Controller, 8 City Council districts | Incumbents: 6 | $3.3 million | $1.5 million | $4.8 million |
| | | Challengers: 18 | | | |
| | | Open Seat Candidates: 34 | | | |
| 1995 | 8 City Council districts | Incumbents: 1 | $329,498 | $172,104 | $521,602 |
| | | Challengers: 10 | | | |
| | | Open Seat Candidates: 3 | | | |
| 1997 | Mayor, City Attorney, Controller, 8 City Council districts | Incumbents: 8 | $737,225 | $190,778 | $928,003 |
| | | Challengers: 10 | | | |
| | | Open Seat Candidates: 4 | | | |

LACEC staff could not provide specific information regarding the overall administrative costs of its public finance program. However, LACEC staff noted that in the most recent election, it distributed $1.4 million in matching funds to 14 candidates. Roughly 1 ½ Analysts administered the program from January to April, at a salary cost of $18,000. This amount does not include costs associated with training, the issuance of advice, or materials. More importantly, these figures change on an annual basis, depending on the number of candidates running for office and the number of participants in the matching funds program. LACEC staff could not estimate the costs incurred by the Controller with respect to releasing public funds to candidates.

9. **Participation in Matching Funds Program**

Between 1993 and 1997, 84 percent of all open seat candidates participated in the program. During that period, 60 percent of incumbents and 81 percent of challengers participated. According to a survey conducted by the LACEC, candidates and treasurers have said the program has helped control campaign spending. (However, it is important to note that the spending limits have been lifted repeatedly.) Candidates who participated in the program generally have viewed it as assisting challengers. In addition, they cited the availability of matching funds as "seed money" to jump start campaigns. Those surveyed stated that participation in the program reduced the amount of time that was otherwise spent on fundraising.

## B.    NEW YORK CITY

1. **General Information**

| | |
|---|---|
| Date Program Enacted | 1988 |
| Date Program Implemented | 1989 |
| Number of elections conducted under program | 7 |
| Number of offices covered by program | 5: Mayor, Public Advocate, Comptroller, Borough President and City Council |
| Number of council districts | 51 |
| Number of registered voters | 3,356,402 |

| 1999-2000 Annual City Budget | $35 billion |
|---|---|
| 1996 Population | 3.7 million |
| Geographic area | 309 Sq. Miles |
| Amount of money set aside for matching fund program | $28 million[9] ($3.80 per capita) |

2.    Eligibility Criteria

To qualify for public financing, candidates must raise a certain amount of contributions from a minimum number of residents within the candidate's district. Contributions must be at least $10 to count toward the threshold. Participating candidates must also comply with contribution and spending limits. Since 1996, candidates who agree to participate in the program are also required to participate in a series of public debates. The requirements are as follows:

| Candidate | Minimum Dollar Amount Raised | Minimum No. of Contributors |
|---|---|---|
| Mayor | $250,000 | 1,000 |
| Public Advocate, Comptroller | $125,000 | 500 |
| Borough President | $10,000 - $46,013[10] | 100 |
| City Council | $5,000 | 50 |

3.    Matching Funds Formula: $4 to $1; $5 to $1

| Candidate | Matching Funds Formula |
|---|---|
| Participating candidates. | $4 for every $1 raised up to $250 per contributor, for a maximum in public funds of $1,000 per contributor.[11] |
| If the spending limits are lifted. | $5 for every $1 raised up to $1,250 in public funds per contributor. |

Only contributions from New York City residents are matchable. In addition, there are restrictions on how public funds are spent. Candidates may not spend public funds for any illegal purposes or on the following items: petition litigation; payments to a candidate or his/her family; contributions or loans to another candidate or committee; or gifts. Candidates are required to purchase items at fair market value.

If a candidate withdraws from a race, s/he must return any public funds that are not spent as of the date of withdrawal. Candidates are also required to repay public funds that are misused.

---

[9] Although the City of New York has been able to set aside $28 million for its matching funds program, staff at the New York City Campaign Finance Board ("Board") noted that it has never disbursed this amount. See below for more information on the amount of money that has been actually disbursed in recent elections.

[10] The amount depends on the Borough in which a candidate campaigns as follows: Staten Island: $10,000; Bronx: $24,076; Manhattan: $29,751; Queens: $39.032; Brooklyn: $46,013.

[11] For example, a $250 contribution is worth $1,250 to a candidate; the original contribution ($250), plus $4 for each of the first $250 contributions ($1,000).

4.    Maximum Matching Funds Available

The maximum matching funds for the primary election is, on average, 50 percent of the expenditure limits for the primary election. The maximum matching funds for all candidates for the general election are 55 percent of the expenditure limits for the general election. The maximum matching funds are increased if the spending limits are lifted. The matching funds program establishes limits on the public funds available to each qualified candidate as follows:

| Candidate | 2001 Maximum Public Funds[12] | 2001 Maximum Public Funds if the Spending Limits are Lifted |
|---|---|---|
| Mayor | $2,877,050 | $3,487,333 |
| Public Advocate, Comptroller | $1,798,500 | $2,180,000 |
| Borough President | $647,350 | $784,667 |
| City Council | $75,350 | $91,333 |

5.    Contribution Limits

Contributions to all candidates are limited as follows:

| Candidate | 2001 Contribution Limits |
|---|---|
| Mayor, Public Advocate, Comptroller | $4,500 |
| Borough President | $3,500 |
| City Council | $2,500 |

Participants in the matching fund program are prohibited from accepting corporate contributions and contributions from political committees that have not registered with the Board.

6.    Expenditure Limits

To receive public matching funds, a candidate must agree to abide by the following expenditure limits:

| Candidate | 2001 Primary Election | 2001 General Election |
|---|---|---|
| Mayor | $5,501,000 | $5,231,000 |
| Public Advocate, Comptroller | $3,540,000 | $3,270,000 |
| Borough President | $1,357,000 | $1,177,000 |
| City Council | $201,000 | $137,000 |

The spending limits are lifted if a non-participating candidate raises or spends 50 percent of the spending limit. When the spending limits are lifted, the public funds available to participating candidates increase. According to Board staff, the spending limits for City Council races have been lifted several times in the past few elections, including the current election. Board staff indicated that the limits have been lifted in one of every ten City Council races.

---

[12]  There are separate limits for the primary and general elections.

7.    Administration of Matching Funds Program

To support their request for public funds, candidates must submit background documentation establishing that they have met the eligibility requirements. The Board staff reviews these documents to determine eligibility, and submits "payment reports" to the members of the Board, which approves the funding. The Board staff has the authority to release the funds.

The Board audits all campaigns to ensure compliance with the requirements of the program. The auditing begins immediately after the candidate becomes eligible to receive funds.

8.    Costs Associated with Matching Funds Program

As noted, the City of New York sets aside $28 million for its matching funds program. However, it has never come close to disbursing this amount. The table below indicates public funds disbursed since 1989.

| Year | Offices Covered | Number of Participating Candidates | Amount Disbursed |
|------|-----------------|-----------------------------------|------------------|
| 1989 | Mayor, Comptroller, Borough President, City Council | 37 | $4.5 million |
| 1991 | City Council District | 111 | $2.6 million |
| 1993 | Mayor, Public Advocate, Comptroller, Borough President, City Council | 66 | $6.5 million |
| 1997 | Mayor, Public Advocate, Comptroller, Borough President, City Council | 82 | $6.4 million |

In addition, from 1990-1997, the Board disbursed $5.1 million in public funds in off-year elections to fill vacancies.

The Board was not able to provide specific information regarding the administrative costs of the matching funds program. The Board's total budget is estimated at $3 million, including $2 million in personnel costs for its 47 staff members.

9.    Participation in the Matching Funds Program

The percentage of candidates for all offices that have participated in the campaign finance program has grown from 32 percent in 1989 to 61 percent in 1997. According to a report issued by the Board, the majority of all 229 candidates who were on the 1997 ballot joined the program, including all three incumbents for the offices of Mayor, Public Advocate and Comptroller.

According to the Board, over the ten-year life of the program, public funds have offered candidates with the ability to run more competitive campaigns. Because public funds are generally distributed for races with open seats, the Board estimates that candidate acceptance of public funds will likely increase when New York City's term limits go into effect in 2001.

## C.    LONG BEACH

### 1.    General Information

| | |
|---|---|
| Date Program Enacted | 1994 |
| Date Program Implemented | 1998 |
| Number of elections conducted under program | 1 |
| Number of offices covered by program | 5: Mayor, City Attorney, City Auditor, City Prosecutor, and City Council |
| Number of districts | 9 council districts |
| 1999-2000 Annual City Budget | $4.07 Billion |
| 1996 Population | 437,900 |
| Geographic area | 50 Sq. Miles |
| Number of Registered Voters | 200,791 |
| Amount of money set aside for matching fund program | $0[13] |

### 2.    Eligibility Criteria

To qualify for matching funds, candidates must meet the following requirements:

| Candidate | Requirements |
|---|---|
| All Candidates | Agree to abide by the spending limits. |
| Mayor | Raise at least **$20,000** in contributions of **$500**[14] or less; |
| | Be opposed by a candidate who has qualified for matching funds or who has raised $40,000 |
| City Attorney, City Auditor, and City Prosecutor | Raise at least **$10,000** in contributions of **$350**[15] or less; |
| | Be opposed by a candidate who has qualified for matching funds or has raised $20,000 |
| City Council | Raise at least **$5,000** in contributions of **$250**[16] or less; |
| | Be opposed by a candidate who has qualified for matching funds or has raised $10,000 |

In addition, candidates must file their campaign disclosure statements in a timely manner in order to receive matching funds.

---

[13] Please see below for more information on the cost of the program.

[14] Only the first $200 may be counted for the purpose of reaching the $20,000 threshold.

[15] Only the first $150 may be counted for the purpose of reaching the $10,000 threshold.

[16] Only the first $100 may be counted for the purpose of reaching the $5,000 threshold.

3.    Matching Funds Formula: $1 to $2; $1 to $1

| Election | Matching Fund Program |
|---|---|
| Primary elections | $1 in matching funds for every $2 raised through private contributions |
| General elections | $1 in matching funds for every $1 raised through private contributions. |

Funds not specifically earmarked for campaign expenses must be returned to the City.

4.    **Maximum Matching Funds Available**

The maximum available matching funds cannot exceed 33 percent of the expenditure limit for the primary election and 50 percent of the expenditure limit for the runoff election. The maximum funds available for candidates are as follows:

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $67,980 | $51,500 |
| City Attorney, City Auditor, City Prosecutor | $33,900 | $25,500 |
| City Council | $13,530- $22,110[17] | $10,500 - $16,500 |

5.    **Contribution Limits**

The individual contribution limits per election are as follows[18]:

| Candidate | 1998 Primary/General |
|---|---|
| Mayor | $500 |
| City Attorney, City Auditor, City Prosecutor | $350 |
| City Council | $250 |

6.    **Expenditure Limits**

To receive public matching funds, candidates must agree to abide by the following expenditure limits:

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $206,000 | $103,000 |
| City Attorney, City Auditor, City Prosecutor | $103,000 | $51,000 |
| City Council | $41,000 - $67,000 | $21,000 - $33,000 |

---

[17] As noted, there are nine City Council districts in Long Beach. The number of registered voters ranges from 9,726 to 32,594 in those districts.

[18] The City Clerk's Office adjusts the limits annually based on changes in the CPI. The Clerk then rounds the figures off to the nearest $50.

During each election cycle, the City Clerk must determine the number of registered voters in each district and the mean number of voters in all such districts. If the number of registered voters in a district exceeds the mean number of voters, the expenditure limits for City Council candidates are increased two dollars for the primary election and one dollar for the general election for each registered voter in excess of the mean.

According to the City Clerk's office, there is no provision that triggers the lifting of the spending limits. For this reason, the spending limits have never been lifted. In addition, although candidates are permitted to contribute to their own campaigns per election, there are caps on the amount of funds candidates can loan or otherwise transfer to their campaigns as follows:

| Candidate | Primary/General |
|---|---|
| Mayor | $25,000 |
| City Attorney, City Auditor, City Prosecutor | $15,000 |
| City Council | $10,000 |

These limits apply even if the candidate does not accept public financing.

7.    Administration of Matching Funds Program

Once a person applies for matching funds, the City Clerk verifies the candidate's eligibility and requests funds from the Finance Department, which processes the request. Applications can only be submitted once every 10 working days.

8.    Costs Associated with Matching Funds Program

As noted, Long Beach does not set aside specific funds for its program. In 1998 (the only year in which funds were disbursed), the City Clerk disbursed $48,448 in matching funds. Because one candidate returned $7,529, the total net amount distributed was $40,919. In order to disburse additional funds to participants, the City Clerk's office must ask for supplemental appropriations from the Long Beach City Council.

The City Clerk's Office could not provide exact figures regarding the cost of administration of its matching fund program. The Deputy City Clerk estimated that she spends 6 hours processing one application for public funds. For the 1998 election, she processed 6 applications.

9.    Participation in the Matching Funds Program

For the 1998 election, there were 36 candidates on the ballot. Of those 36, six candidates applied for and received matching funds, although one candidate returned the funds to the city.

## D.    TUCSON

### 1.  General Information

| Date Program Enacted | 1985 |
|---|---|
| Date Program Implemented | 1987 |
| Number of elections conducted under program | 6 |
| Number of offices covered by program | 2: Mayor and City Council |
| Number of districts | 6 council districts |
| FY 1999-2000 Budget | $4.07 Billion |
| 1996 Population | 437,900 |
| Geographic area | 50 Sq. Miles |
| Number of Registered Voters | 200,791 |
| Amount of money set aside for matching fund program | $325,000[19] ($.42 per capita) |

### 2.    Eligibility Criteria

Candidates must meet the following eligibility criteria in order to receive public funds:

| Candidate | Requirement |
|---|---|
| Mayor | Receive 300 contributions of $10 or more from Tucson residents |
| City Council | Receive 200 contributions of $10 or more from Tucson residents |

A candidate can make a contribution to his/her own campaign to assist in establishing eligibility. The contribution will count as one of the required contributions of $10 or more. However, contributions from the candidate will not be matched by public funds. In addition, loans and non-monetary contributions are not included in determining eligibility to receive public funds.

### 3.    Matching Funds Formula: $1 to $1

Once the City has verified eligibility, a candidate is eligible to receive the following matching funds, up to a limit of one-half the spending limits. Only those funds received from individuals during the specified campaign period may be matched with public funds.[20] Public matching funds must be spent only for direct campaign purposes.[21]

---

[19] Tucson has established an Election Campaign Account, into which are deposited donations for the support of public financing. Refunds from candidates following each election are also deposited into this account. Please see below for more information on the costs associated with the program.

[20] The campaign period includes the entire time from the date on which an individual becomes a candidate for a specific election until the election or defeat of the candidate. It ends on the date the Mayor and Council declare the result of the election.

[21] Examples include printing/mailing of campaign literature, pamphlets, signs, television/radio advertisements, and renting of campaign headquarters and telephones. However, any goods with a value in excess of $200, any part of which was purchased with public funds, which has a useful life extending beyond the campaign period becomes the property of the City of Tucson.

| Candidates | Matching Fund Formula |
|---|---|
| Mayor, Council Member | $1 for $1 match of all individual contributions, regardless of whether the contributors reside within Tucson |

4.    **Maximum Matching Funds Available**

The maximum amount a candidate may receive in public matching funds is as follows:

| Mayor | Council Member |
|---|---|
| $77,341.98 | $38,677.59 |

5.    **Contribution Limits**

Under Arizona law, all candidates for the office of Mayor or Council Member may receive up to $320 from an individual, up $320 from most political committees, and up to $1,630 from each "qualified political committee."[22] The aggregate amount of contributions a candidate may accept from all political committees is $8,140.

Contributions may be received from any person or group eligible to contribute, whether or not located within the City of Tucson. However, only contributions received from Tucson residents may be used to establish eligibility to receive matching funds.

A candidate may contribute up to 3 percent of the expenditure limit to his/her campaign. If a candidate contributes or promises more than $12,750 of his/her own money to his/her exploratory committee or campaign, the contribution limits are lifted for the other candidates. When an opponent raises an amount equal to the amount of personal funds being used, the contribution limits are reinstated.

6.    **Expenditure Limits**

Expenditure limitations are based upon the number of registered voters in the City of Tucson as of June 30 of the election year. In addition, a candidate cannot spend more than 75 percent of the expenditure limitation through the day of the Primary Election.

|  | Mayor | Council Member |
|---|---|---|
| Preliminary expenditure amount per voter | $.5857 | $.2929 |
| Maximum amount a candidate may spend through the end of the campaign period | $154,683.96 | $77,355.18 |
| Maximum amount a candidate may spend through the day of the Primary Election | $116,012.97 | $58,016.39 |
| Maximum amount a candidate may contribute to own campaign (3 percent of total) | $4,640.52 | $2,320.66 |

According to the City Clerk's Office, there is no provision that triggers the lifting of the spending limits. Participating candidates who exceed the spending limits are required to pay the City $3 of their own money

---

[22] *See* Section 16-905 of the Arizona Revised Statutes. A "qualified political committee" is one which has received funds from 500 or more individuals in amounts of $10 or more in the one year. Also note that an individual's combined contributions to all state or local candidates, political committees contributing to state or local candidates, and political committees advocating the election or defeat of state or local candidates, may not exceed a total of $3,040 in a calendar year. Contributions to political parties are exempt from this limitation.

for every $1 spent over the limit.

7.    Administration of Matching Funds Program

The City Clerk serves as the Campaign Finance Administrator and decides whether a candidate has met the eligibility requirements. The City contracts with an independent auditor who reviews each request for disbursement of public funds. The firm reports the results of the review to the City Clerk.

8.    Costs Associated with Matching Funds Program

In 1995, the City Clerk disbursed $237,183 in public matching funds. In 1997, it disbursed $160,499. Information about the funds disbursed in other elections is contained in the attached report. City Clerk staff did not have specific information about overall administrative costs. The attached chart indicates the costs associated with auditing participating candidates.

9.    Participation in Matching Funds Program

According to Tom Volgy, former Mayor of Tucson, the Tucson program has been successful because the voters have yet to elect a candidate who has not agreed to participate in the program. Mr. Volgy has stated that Tucson's program has resulted in less costly, more competitive elections with higher voter participation. The attached chart indicates the participants in its matching funds program.

## E.  OAKLAND

The City of Oakland is currently considering public financing of its campaigns. Oakland's City Council will vote on a proposed public financing program on November 9, 1999. For this reason, staff has included information about the Oakland proposal for the Commission's consideration.

1.  General Information

| Date of Implementation | The City Council has stated that it will wait until 1/1/01 to implement this program. |
|---|---|
| Number of offices covered by program | 5: Mayor, City Attorney, City Council, Auditor School Board |
| Number of council districts | 7 (1 Councilmember elected at large) |
| Number of registered voters | 172,450 |
| 1999-2000 City Budget[23] | $600 million |
| 1996 Population | 372,242 |
| Geographic area | 56 Sq. Miles |
| Amount of money set aside for matching fund program | $230,000 ($.61 per capita) |

2.    Eligibility Criteria

To be eligible for matching funds, all candidates would be subject to the following requirements:

---

[23] Oakland has a two-year fiscal period from 1999-2001.

| Requirement |
| --- |
| Accept contribution and spending limits. |
| Be opposed by another candidate for the same office who has qualified for matching funds or whose campaign report indicates that s/he has received contributions, made expenditures, or has cash on-hand of at least 7 percent of the spending limit for that office. |
| Raise 5 percent of the spending limit. Only the first $100 or less of a contribution from each individual would be matched. |

3.    Matching Funds Formula: $1 to $1

The proposal would provide one dollar of public matching funds for each $1 of the first $100 or less contributed by each individual contributor per election.

Public matching funds could only be used for the following purposes: purchase of services from a communications medium; printing, photography, graphics or other campaign advertising production costs; office supplies; payment of rent for campaign offices; payment of campaign staff and consultants; postage and other commercial delivery services; repayment of loans; and other expenditures deemed appropriate by the Oakland Public Ethics Commission ("OPEC").

Unspent matching funds must be returned to the Election Campaign Fund within 5 business days from the defeat, withdrawal or election of a candidate.

4.    Maximum Matching Funds Available

The total amount of public funds allocated to each candidate would be 15 percent of the proposed spending limit for each office.

5.    Contribution Limits

Currently, candidates may accept up to $500 per contributor if they comply with the voluntary spending limits. Candidates who do not limit their spending may accept up to $100 per contributor, per election. The public finance proposal does not change these limits.

Candidates who receive public funds would be prohibited from contributing more than 5 percent of the spending limit to their own campaign.

6.    Expenditure Limits

The current expenditure limits for candidates for Mayor, City Attorney, Auditor, and Councilmember-at-Large are $1.00 per city resident per election. The current expenditure limits for candidates for District Councilmember and School Board Directors are $1.50 per City Council/school district per election.

The proposal would reduce the current voluntary spending limits for all races, except those for the office of City Council. The expenditure limits for candidate for Mayor would be $.70 per city resident. The expenditure limits for all other citywide offices would be $.50 per resident. The expenditure limits for School Board Directors would be $1 per resident.

| Candidate | Current Expenditure Limits | Proposed Expenditure Limits |
|---|---|---|
| Mayor | $372,000[24] | $260,000 |
| Auditor, City Attorney Councilmember-at-Large | $372,000 | $186,000 |
| Councilmembers | $82,000[25] | N/A |
| School Board Directors | $82,000 | $55,000 |

The spending limits are lifted if a candidate receives contributions or makes expenditures equaling 50 percent of the spending limit. The limits are also lifted if an independent expenditure committee spends more than $15,000 on a District City Council or School Board election or $70,000 in a City Attorney, Auditor, Councilmember-at-Large or Mayoral election.

7.      Administration of the Matching Funds Program

OPEC would be charged with administration of the matching funds program. Because that office has only two full-time employees, the City Auditor would certify candidates to receive public funds by reviewing campaign statements. The Auditor would also be required to conduct mandatory audits of all candidates accepting public matching funds.

A candidate who meets the eligibility requirements would be permitted to submit a request for matching funds each time a threshold of $3,000 or more in matchable funds is reached. A qualified candidate may request funds of $1,000 or more 10 calendar days before the election. OPEC would have 10 calendar days to review and approve or deny the request.

8.      Costs Associated with the Matching Funds Program

The proposal would set aside $230,000 annually for the Election Campaign Fund. It also authorizes OPEC to limit the allocation of funds for the primary election to assure that sufficient funds remain available for the general election. The proposal sets aside 7.5 percent of the Election Campaign Fund for the cost of administration for OPEC and the City Auditor, or $17,250.

IV.     Conclusion

The programs detailed above should provide the Commission with some background information regarding municipal publicly financed programs. As indicated, each jurisdiction has developed specific features that may, or may not, be appropriate for San Francisco. As noted, staff is prepared to consider this matter further, and develop whatever additional information the Commission deems appropriate. In addition, staff is available to discuss this report prior to the November 8 meeting.

---

[24] All figures are rounded off.

[25] This is the average amount. Depending on the district, the amount ranges from $81,089 to $83,155.

## CITY OF TUCSON CAMPAIGN FINANCE PUBLIC MATCHING FUND (PMF) PROGRAM

| Year | Total Candidates | PMF Candidates Signed Contracts | PMF Candidates Received Funds | Public Funds Disbursed | | | Returns & Contributions From Candidates | Audit Cost | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | From Contributions and Returns | From General Fund | Total | | Per Audit Cost | Number of Audits | Subtotal | Other Costs | Total |
| 1987 | 20 | 12 | 7 | 1,033.00 | 91,971.13 | 93,004.13 | 4,983.69 | 750 | 16 | 12,000.00 | 2,250.00 | 14,250.00 |
| 1989 | 7 | 3 | 3 | 6,376.06 | 33,724.32 | 40,100.38 | 5,809.19 | 865 | 3 | 2,595.00 | - | 2,595.00 |
| 1991 | 19 | 11 | 8 | 16,777.37 | 154,576.70 | 171,354.07 | 6,752.22 | 865 | 8 | 6,920.00 | 5,926.50 | 12,846.00 |
| 1993 | 13 | 10 | 7 | 19,953.14 | 74,103.03 | 94,056.17 | 9,934.59 | 865 | 7 | 6,055.00 | 612.50 | 6,667.00 |
| 1995 | 20 | 16 | 10 | 18,285.81 | 219,224.27 | *237,182.50 | 16,371.56 | 825675 | 20 | 15,000.00 | 9,615.84 | 24,615.84 |
| 1997 | 13 | 11 | 8 | 13,300.00 | 147,199.48 | 160,499.48 | 3,795.55 | 825675 | 18 | 13,500.00 | 1,225.00 | 14,725.00 |

The Campaign Finance Public Matching Fund Programs mandated by Subchapter B of Chapter XVII of the Tucson Charter. These provisions approved by the electorate in 1985 and in effect since 1987 provide that an individual who has signed a campaign contract agreeing to limit campaign expenditures and who meets eligibility requirements, is entitled to receive one dollar in public matching funds for each dollar received during the campaign period from any individual contribution. (Neither loans nor the transfers of anything of value other than money is matched.)

The City budgets for this program in the general fund and has also established the Election Campaign Account, into which is deposited donations to the City for the support of public election campaign financing. Refunds from candidates following each election are also deposited in this account. In 1987, all refunds from candidates were applied to 1989 disbursements to candidates. A similar procedure was used in 1989 and 1991. However, in 1993 refunds from candidates (as well as contributions from the public received by December 1, 1993) were used to offset disbursements to candidates in 1993 from the general fund.

The City contracts with an independent auditor to perform the necessary audits of the records of those candidates who participate in the program. In 1987 pre and post election audits were done. In 1989, 1991 and 1993 only pre election audits were done. Both pre and post audits were also completed for 1995 and 1997.

1987 - Two of the candidates who qualified to receive funds did not request funding necessitating only the pre-election audit for each of those candidates. Both pre and post election audits were done for the other 7 who received public funds. Costs were also incurred for development and preparation of procedures, forms, etc.

1991 - In addition to the 8 regular pre-election audits, several special audits were required.

1993 - In addition to the 7 regular pre-election audits, costs were incurred for City sponsored seminars and from the updating and improvement of procedures.

1995 - Pre and post election audits were conducted for 10 candidates. Costs were also incurred for City sponsored seminars and additional auditing costs. *Reduced by $103.68--Contributions From Candidates outside the 1995 campaign.

1997 - Two of the candidates who signed campaign contracts did not file a Statement to Establish Eligibility necessitating pre and post election audits for only 9 candidates. One candidate who qualified to receive matching funds did not accept any funds. Costs were also incurred for City sponsored seminars and additional auditing costs.

Prepared by City Clerk--Final Report May 27, 1997

S.F. Ethics Commission

## GENERAL INFORMATION

| | LOS ANGELES | NEW YORK CITY | LONG BEACH | TUCSON |
|---|---|---|---|---|
| Date Program Enacted | 1990 | 1988 | 1994 | 1985 |
| Date Program Implemented | 1993 | 1989 | 1998 | 1987 |
| Number of elections conducted under program | 4 | 7 | 1 | 6 |
| Number of offices covered by program | 4: Mayor, City Attorney, Controller, and City Council | 5: Mayor, Public Advocate, Comptroller, Borough President and City Council | 5: Mayor, City Attorney, City Auditor, City Prosecutor, and City Council | 2: Mayor and City Council |
| Number of districts | 15 council districts | 51 | 9 council districts | 6 council districts |
| Number of registered voters | 1,458,718 | 3,356,402 | 200,791 | 200,791 |
| 1998-99 Annual City Budget | $4.07 billion | $35 billion | $4.07 Billion | $4.07 Billion |
| Geographic area | 470 Sq. Miles | 309 Sq. Miles | 50 Sq. Miles | 50 Sq. Miles |
| 1996 Population | 3.7 million | 3.7 million | 437,900 | 437,900 |
| Amount of money set aside for matching fund program | $8 million ($2.20 per capita) | $28 million ($3.80 per capita) | $0 | $325,000 ($.42 per capita) |

11/1/99

## ELIGIBILITY CRITERIA

### LOS ANGELES

| Candidate | Requirement |
|---|---|
| All Candidates | Agree to abide by the spending limits. |
| Mayor | Agree not to contribute more than $100,000 per election from personal funds; |
| | Receive $150,000 or more in contributions of $500 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $200,000 or more. |
| City Attorney and Controller | Agree not to contribute more than $100,000 per election from personal funds; |
| | Receive $75,000 or more in contributions of $500 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $100,000 or more. |
| City Council | Agree not to contribute more than $25,000 per election from personal funds; |
| | Receive $25,000 or more in contributions of $250 or less; |
| | Be opposed by another candidate who has qualified for matching funds or who has raised, spent, or has cash-on-hand of $50,000 or more. |

### NEW YORK CITY

| Candidate | Minimum Dollar Amount Raised | Minimum No. of Contributors |
|---|---|---|
| Mayor | $250,000 | 1,000 |
| Public Advocate, Comptr | $125,000 | 500 |
| Borough President | $10,000 - $46,013 | 100 |
| City Council | $5,000 | 50 |

### LONG BEACH

| Candidate | Requirements |
|---|---|
| All Candidates | Agree to abide by the spending limits. |
| Mayor | Raise at least $20,000 in contributions of $500 or less; |
| | Be opposed by a candidate who has qualified for matching funds or who has raised $40,000 |
| City Attorney, City Audito | Raise at least $10,000 in contributions of $350 or less; |
| | Be opposed by a candidate who has qualified for matching funds or has raised $20,000 |
| City Council | Raise at least $5,000 in contributions of $250 or less; |
| | Be opposed by a candidate who has qualified for matching funds or has raised $10,000 |

### TUCSON

| Candidate | Requirement |
|---|---|
| Mayor | Receive 300 contributions of $10 or more from Tucson residents. |
| City Council | Receive 200 contributions of $10 or more from Tucson residents. |

## MATCHING FUNDS FORMULA

### LOS ANGELES

| Candidate | Matching Funds Formula |
|---|---|
| Mayor, City Attorney or Controller | $1 of public matching funds for every $1 raised from an individual in contributions totaling no more than $500 per individual received within 12 months before the election. |
| City Council | $1 of public matching funds for every $1 raised from an individual in contributions totaling no more than $250 per individual received within 12 months before the election. |

### NEW YORK CITY

| Candidate | Matching Funds Formula |
|---|---|
| All participating candidates. | $4 for every $1 raised up to $250 per contributor, for a maximum in public funds of $1,000 per contributor. |
| If the spending limits are lifted. | $5 for every $1 raised up to $1,250 in public funds per contributor. |

### LONG BEACH

| Election | Matching Fund Program |
|---|---|
| Primary elections | $1 in matching funds for every $2 raised through private contributions. |
| General elections | $1 in matching funds for every $1 raised through private contributions. |

### TUCSON

| Candidates | Matching Fund Formula |
|---|---|
| Mayor, Council Member | $1 for $1 match of all individual contributions, regardless of whether the contributors reside within Tucson. |

MAXIMUM MATCHING FUNDS AVAILABLE

LOS ANGELES

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $667,000 | $800,000 |
| City Attorney | $300,000 | $350,000 |
| Controller | $267,000 | $300,000 |
| City Council | $100,000 | $125,000 |

NEW YORK CITY

| Candidate | 2001 Maximum Public Funds | 2001 Maximum Public Funds if the Spending Limits are Lifted |
|---|---|---|
| Mayor | $2,877,050 | $3,487,333 |
| Public Advocate, Comptro | $1,798,500 | $2,180,000 |
| Borough President | $647,350 | $784,667 |
| City Council | $75,350 | $91,333 |

LONG BEACH

| Candidate | Primary Election | General Election |
|---|---|---|
| Mayor | $67,980 | $51,500 |
| City Attorney, City Auditor, City Prosecutor | $33,900 | $25,500 |
| City Council | $13,530- $22,110 | $10,500 - $16,500 |

TUCSON

| Mayor | Council Member |
|---|---|
| $77,341.98 | $38,677.59· |