# EXHIBIT E

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Ethics Commission



1390 Market Street, Suite 801
San Francisco, CA 94102
Phone 554-9510 Fax 703-0121

# SAN FRANCISCO ETHICS COMMISSION AGENDA
for
<u>Monday, January 10, 2000, 5:30 p.m.</u>
City Hall
One Dr. Carlton B. Goodlett Place, Room ~~400~~ 416*

**\*Please note change in room number.**

I. Call to order and roll call

II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

III. Discussion and possible approval of the minutes of the meetings of December 1, 2, and 6, 1999

IV. Executive Director's report
   1. FY 00-01 budget
   2. Public policy program
   3. Investigation and enforcement program
   4. Report on volume of calls received via the Whistleblower hotline
   5. Campaign finance disclosure program
   6. Campaign finance audit program
   7. Lobbyist program
   8. Campaign consultant program
   9. Statements of economic interests
   10. Amendments to the Sunshine Ordinance
   11. Search for Campaign Finance Assistant (Class 1426 Senior Clerk Typist)
   12. 1999 COGEL conference

V. Receipt of testimony, discussion and possible vote on legislative proposals for public financing of election campaigns

   A. Presentation by expert witnesses and staff re: public financing of campaigns for elective office. Expert witnesses will include Robert Stern, Director, Center for Governmental Studies; Rebecca Avila, Executive Director, Los Angeles Ethics Commission; Tom Volgy, former Mayor of Tucson; and Professor Bruce Cain, UC Berkeley.

   B. Discussion and possible action re: Legislative proposals for public financing of campaigns for elective office, and whether the Commission should propose legislation to the Board of Supervisors. Related documents will be available from the Ethics Commission office on Friday, January 7.

SF Ethics Commission Agenda – January 10, 2000                                     2

VI. Discussion and possible approval of proposed Records Management Policy. Copies of the proposed policy are available from the Commission office.

VII. Items for future agendas. Discussion only.

VIII. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

IX. Adjournment

### *Know Your Rights Under the Sunshine Ordinance*

*Government's duty is to serve the public, reaching its decisions in full view of the public. Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business. This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review.*

*For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force, Rachel Arnstine O'Hara, Clerk, City Hall, room 362, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102-4683. Office telephone: (415) 554-6171; Fax: (415) 554-6177; E-mail: Rachel_ArnstineO'Hara@ci.sf.ca.us. Copies of the Sunshine Ordinance can be obtained from the Clerk of the Sunshine Task Force, the San Francisco Public Library and on the City's web site at www.ci.sf.ca.us.*

*This location is wheelchair accessible. In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products. Please help the City accommodate these individuals.*

*Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street, Suite 801, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site http://www.ci.sf.ca.us/ethics/*

P:\SHARED\AGENDA\2000\011000.doc




sfgov | residents | business | government | visitors | online services | search

Ethics Commission >> Meeting Information



# Ethics Commission

January 10, 2000

(Approved as amended 03/13/00)

Minutes of the

San Francisco Ethics Commission

Meeting at City Hall

One Dr. Carlton B. Goodlett Place, Room 416

January 10, 2000 at 5:30 p.m.

(Amended text in italics.)

I. **Call to order and roll call.**

Commission Chair Isabella H. Grant called the meeting to order at 5:45 p.m.

**COMMISSION MEMBERS PRESENT:** Isabella H. Grant, Chairperson; Henri E. Norris, Vice-Chairperson; Carol M. Kingsley, Commissioner; Robert D. Dockendorff, Commissioner; Paul H. Melbostad, Commissioner.

**STAFF PRESENT:** Ginny Vida, Executive Director; Naomi Starkman, Deputy Executive Director; Joe Lynn, Campaign Finance Officer; Katherine Havener, Ethics Investigator/Legal Analyst.

**OFFICE OF THE CITY ATTORNEY:** Claire Sylvia, Deputy City Attorney; Julie Moll, Deputy City Attorney.

**OTHERS PRESENT:** Robert Stern, Director, Center for Governmental Studies; Rebecca Avila, Executive Director, Los Angeles Ethics Commission; Tom Volgy, former Mayor of Tucson; Jocelyn Larkin, California Common Cause; Joan Kingery, San Francisco Common Cause; Brad Benson, Office of Supervisor Tom Ammiano.

**MATERIALS DISTRIBUTED:**

S.F. Ethics Commission Agenda, January 10, 2000

S.F. Ethics Commission Ad Hoc Committee on Public Financing Notice of Special Meeting and Agenda, January 13, 2000

Approved minutes of the S.F. Ethics Commission Meeting of November 8, 1999

Draft minutes of the S.F. Ethics Commission Meeting of December 1, 1999

Draft minutes of the S.F. Ethics Commission Meeting of December 2, 1999

Draft minutes of the S.F. Ethics Commission Meeting of December 6, 1999

Executive Director's Report, January 10, 2000

Memo to Ethics Commission Members from Ginny Vida re: Results of the Ethics Commission Survey on Electronic Filing for Lobbyists and Campaign Consultants

Memo to Ethics Commission Members from Ginny Vida re: Fundamental Policy Considerations: Public Financing of Campaigns

Memo to Ethics Commission Members from Ginny Vida re: Amending the Campaign Finance Reform Ordinance to Provide for Public Financing of Election Campaigns

Memo to Ethics Commission Members from Ginny Vida re: Key Provisions of a Partial Public Financing Program

Memo to Ethics Commission Members from Ginny Vida re: Records Management Policy

Memo to Ethics Commission Members from Ginny Vida re: Televising of January 10 Meeting

Resolution by Supervisor Leland Yee: Urging Local Campaign Committees That Make Independent Expenditures to Fully and Timely Disclose the Amount and Source of Contributions Received, and the Amount and Payee of All Expenditures Made by the Committee.

Memo from Jacqueline Minor to Clerks and Secretaries of Boards, Commissions and Other Policy Bodies re: New Sunshine Ordinance Changes in the Public Meeting Provisions

Memo to Ethics Commission Members from Deputy City Attorney Claire Sylvia re: Proposition G: Amendments to the San Francisco Sunshine Ordinance

Los Angeles City Ethics Commission document re: Overview of Los Angeles Campaign Finance

System, January 2000

Los Angeles City Ethics Commission document re: Los Angeles City Campaign Finance Law

II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.

There was no public comment.

III. Discussion and possible approval of the minutes of the meetings of December 1, 2, and 6, 1999

Motion 00-1-10-1 (Dockendorff/Melbostad) Moved, seconded and passed: That the minutes of the December 1, 1999 meeting be approved.

Motion 00-1-10-2 (Dockendorff/Norris) Moved, seconded and passed: That the minutes of the December 2, 1999 meeting be approved.

Motion 00-1-10-3 (Melbostad/Kingsley) Moved, seconded and passed: That

the minutes of the December 6, 1999 meeting be approved as amended. (See Item VIII, Public Comment.)

IV. Executive Director's report

Executive Director Ginny Vida referred the Commission to the Executive Director's Report in the agenda packet.

IV. Receipt of testimony, discussion and possible vote on legislative proposals for public financing of election campaigns

A. Presentation by expert witnesses and staff re: public financing of campaigns for elective office.

Robert Stern, Director, Center for Governmental Studies

Mr. Stern introduced himself as the Director of the Center for Governmental Studies, a non-profit research organization which has been studying campaign financing for 16 years. He stated that there are several cities across the country with public financing laws, many of which have been in effect for years. He indicated that the public financing systems in New York and Los Angeles work very well, especially on lower level races such as school board or city council. Mr. Stern stated that the latest trend in public financing is full public financing, or "clean money." In a full public financing system, candidates qualify for public funds by receiving a small number of qualifying contributions. Once a candidate qualifies and agrees to certain conditions, e.g., spending limits, he or she then receives public money to finance his or her campaign. Full public financing allows qualified candidates the opportunity to get their messages across to voters without further need to fundraise.

Mr. Stern indicated that one of the main difficulties in developing a full public financing system is determining at what level to set the qualification threshold. The threshold needs to be set at a level so that serious candidates can qualify but fringe candidates do not bankrupt the system. Mr. Stern stated that if the qualification threshold is too low, there may be too many candidates and not enough funds in the budget to cover all candidates' campaigns.

Mr. Stern referred to the staff's memo on full public financing. He indicated that the spending limits suggested in the memo ($600,000 for candidates for Mayor and $75,000 for candidates for Supervisor) were too low, especially given the recent level of campaign spending in San Francisco. He indicated that the $20,000 limit for supervisorial run off campaigns would be too low because run-off campaigns are often the most competitive. He stated that the Commission should make the limits high enough to provide candidates sufficient incentive to accept them and to enable them to get their message to the voters. He suggested that in deciding what the limit should be, the Commission should determine how much television, radio and print advertising a candidate could buy with the limit. Mr. Stern recommended that the Commission not limit qualifying contributors to voters in a particular district. He indicated that it would be easier to limit qualifying contributions to all San Francisco voters. Mr. Stern also stated that the $50 minimum qualifying contribution might be too high, and that the Commission might want to encourage smaller contributions.

Mr. Stern then referred to staff's memo on partial public financing. He suggested that the Commission consider providing matching funds to candidates at a higher ratio than 1 to 1, such as 4 to 1. He reasoned that once a candidate agrees to public financing, the money should come easily. Mr. Stern agreed with staff that candidates who face no opposition should not receive public financing. Mr. Stern questioned why, under the staff's proposal, spending limits would be lifted when a non-participating candidate spends more than 100

percent of the spending limit. He suggested that the limits be lifted when the non-participating candidate spends 50 to 75 percent of the spending limits. Mr. Stern agreed with the staff's proposal that spending limits be lifted if committees make independent expenditures that, in the aggregate, equal at least 50 percent of the spending limit in support of one candidate in the district.

Mr. Stern recommended that either a partial or a full public financing program would be better than no public financing at all. He indicated that it is very difficult to write a perfect public financing law because all laws need to be revised as court decisions are issued and other circumstances change. He indicated that no public financing system has ever been repealed. He did note that a public financing law passed in Seattle was later preempted by state law.

Mr. Stern suggested that the Commission consider including in any proposal a limitation on loans by candidates to their campaigns. While the City cannot restrict candidate *contributions* to their own campaigns, courts have allowed governments to limit how much candidates can lend. Mr. Stern suggested limiting loans to $25,000 or $50,000. Mr. Stern also suggested that a provision be added prohibiting city contractors or by those who are bidding on a City contract from making campaign contributions. Mr. Stern added that all candidates who accept public money should be audited, not just 25 percent of publicly funded candidates. He stated that a provision to audit all candidates would increase voter confidence.

Mr. Stern recommended that San Francisco's public financing program, if enacted, should not go into effect until Jan 1, 2001 at the earliest. He stated that waiting until next year would prevent candidates who have already planned their campaign strategies from having to change these strategies in accordance with a new law. Moreover, it would give the Commission time to adopt public financing regulations.

Mr. Stern stated that the Commission should seek to ensure a guaranteed budget to fund the public financing program. He disagreed with staff's proposal that the public financing provisions would not apply in the event there were insufficient funds to pay for the program. In this event, he suggested, each candidate could, instead, receive a percentage of available funds. Mr. Stern recommended that to ensure that the program is fully financed, the City should appropriate funds every year to the program so as to build up sufficient resources. Mr. Stern also suggested that campaign statements be preserved forever, not just for four years, since this information is important to researchers. Finally, Mr. Stern suggested that the Ethics Commission retain outside counsel to provide it legal advice in addition to the City Attorney.

Commissioner Kingsley asked Mr. Stern whether he could offer any alternatives for funding a public financing program other than from the general fund. Mr. Stern suggested the Arizona model as one alternative: Arizona adds a ten percent levy to civil and criminal judgments to pay for public financing. However, he expressed his view that the best way to fund a public financing program is in fact through the general fund. He stated that jurisdictions that have tried to fund public financing programs voluntarily, i.e., with check-off provisions, have failed, because less than one percent of citizens will voluntarily allocate money to pay for political campaigns.

Commissioner Dockendorff asked Mr. Stern how the Commission could best pursue the goals of reducing the cost of campaigns and shortening the period during which candidates campaign. Mr. Stern suggested putting a restriction on the period of time during which candidates may raise money, for example, no more than 1 year to 18 months before the election. Mr. Stern indicated that limiting the time during which candidates may fundraise puts challengers on a more level playing field with incumbents. Mr. Stern also indicated that

candidate use of the Internet is a good way to reduce the cost of campaigns.

Commissioners Melbostad and Dockendorff expressed their concern over the impact of independent expenditures on campaigns. They asked Mr. Stern how independent expenditures might be limited. Mr. Stern stated that the courts have thus far prevented municipalities from limiting independent expenditures. He stated that disclosure is the best way to reduce their impact on campaigns, since the public would then know who is financing the independent spending. Mr. Stern suggested that another way to reduce the impact of independent spending is to provide greater public financing to candidates who do not receive independent expenditures. Commissioner Norris asked Mr. Stern if there was any way to anticipate and prepare for last minute spending by independent expenditure committees. Mr. Stern indicated that there is no accurate way to do this. He stated that an effective remedy for independent spending could only be achieved through an amendment to the U.S. Constitution.

### Rebecca Avila, Executive Director, Los Angeles Ethics Commission

Ms. Avila presented an overview of the structure and mission of the Los Angeles Ethics Commission ("LAEC"). She stated that the LAEC, supported by a staff of 22 and a $1.2 million budget, has jurisdiction over campaign, governmental ethics and lobbying laws.

Ms. Avila informed the Commission that the LAEC administers a partial public financing program. Under the program, candidates qualify for public funds by demonstrating that they are viable. City council candidates are deemed viable, for example, if they raise $25,000 in contributions of $500 or less. Once a candidate raises the threshold amount, he or she may receive matching funds in the amount of one public dollar for every private dollar earned. Candidates who choose to participate in the program must agree to limit the amount of personal funds that they contribute to their campaigns and must agree to participate in a debate with at least one viable opponent. A viable opponent is an opponent who also participates in the public financing program or who raises the threshold amount of contributions.

Ms. Avila explained that the Los Angeles Charter requires that the program be fully funded from the general fund. She stated that the City appropriates to the Commission $2 million every year up to the full budget of $8 million so as to fully finance the program.

Ms. Avila discussed additional features of the LAEC public financing program. She stated that their program has a fundraising window, wherein candidates for citywide offices may not campaign earlier than 2 years prior to the election. For city council candidates, the window is 18 months. Candidates must generally stop fundraising 90 days after an election. Moreover, in Los Angeles, all candidates and treasurers must attend training offered by Commission staff and must sign a statement that they have read and understand the public financing law. Ms. Avila noted that this training component prevents candidates from inadvertently violating the law and gives the Commission greater standing in enforcing the law. Ms. Avila also stated that that the Commission audits all candidates who receive public financing as well as non-participating candidates who raise more than $100,000. Each candidate is assigned an auditor, providing the candidate a clear link with LAEC staff.

Ms. Avila stated that Los Angeles' partial public financing program has been effective because it ensures more competitive elections by giving voters a real choice between candidates. Ms. Avila cited LAEC reports that evaluated the

first three elections in Los Angeles under the public financing program. The reports concluded that the program controlled incumbent spending and allowed viable challengers who participated in the program to compete more effectively.

Ms. Avila stated that participation in the program is high and is increasing. Currently, the candidate participation rate is at 88 percent. When the program was first implemented, the Commission was concerned that it would not be able to attract incumbent participation. The LAEC has since determined that incumbents do participate. In the last election, for instance, only one incumbent did not accept public financing. She stated that candidates have found that public financing allows them to interact more with voters and to spend less time fundraising.

Ms. Avila stated that there is no clear evidence as to whether public financing has reduced the influence of special interests. She believes that it does, stating that in 1999, candidates relied 2 to 1 on individuals over non-individuals in financing their campaigns. She stated that the LAEC is beginning to discuss ways to combat the influence of independent expenditures. Ms. Avila stated that the LAEC is also considering increasing the amount of matching funds awarded to candidates who face opponents who spend great amounts of their personal funds, and amending their matching fund formula to provide for $2 of public funds for every $1 raised by the candidate.

In response to an inquiry by Commissioner Melbostad, Ms. Avila stated that qualifying contributions in Los Angeles are not limited to a particular district. Qualifying contributions to Los Angeles candidates may even be received from non-Los Angeles residents. Ms. Avila expressed her concern that if qualifying contributions were limited to a particular district, candidates running in wealthy districts would have a much easier time raising qualifying contributions than candidates running in lower income districts.

*Commissioner Dockendorff asked Ms. Avila whether the LAEC had any mechanism to control expenditures to independent expenditure committees. Ms. Avila responded that the LAEC required disclosure of independent expenditures. In addition, she stated, the Los Angeles Charter contains a provision which limits to $500 contributions to independent expenditure committees which are established to support or oppose a particular candidate. She indicated that many independent expenditure committees were not subject to this limit because they were not established to support or oppose a candidate. She also indicated that the independent expenditure limit has not been challenged in court.*

### Tom Volgy, former Mayor of Tucson

Mr. Volgy informed the Commission that he was the architect of Tucson's partial public financing program. He stated that Tucson was the first city to introduce such a program, which began in 1985 and has been in place through 7 council elections and 4 mayoral campaigns. He stated that the Tucson model has been copied by more than 185 municipalities.

Mr. Volgy stated that his goals in implementing a public financing program in Tucson were to achieve more competitive elections and to reduce the impact of special interest money on candidates and elected officials. In 1983, he decided to put a campaign finance reform initiative before the voters. Mr. Volgy chose not to ask the city council to create this legislation, since he felt legislation passed by initiative better reflects the will of the voters, and moreover, cannot be changed by elected officials absent a Charter amendment. Mr. Volgy reported that the initiative passed easily.

Mr. Volgy told the Commission that the system implemented in Tucson was intentionally made very simple so that voters could understand it and so that candidates were not discouraged from running for office. Under Tucson's program, a candidate takes out a petition, declaring that he or she will voluntarily submit to spending limits. Once this is done, the candidate may try to qualify for public financing. To qualify as a participating candidate for Mayor in Tucson, 300 voters must contribute $10 or more to the candidate. To qualify as a participating candidate for city council, 200 voters must contribute $10 or more. Once a candidate meets this threshold, he or she is able to receive matching funds in the amount of $1 of public money for every private dollar raised, up to the spending limit. The spending limits currently represent 29 cents per voter for city council races, and 58 cents for mayoral races. The Tucson program also provides for strict auditing provisions and a personal financing limit of 3 to 5 percent of the spending limit. Contribution limits are governed by the state.

Mr. Volgy stated that the program has resulted in a dramatic reduction in campaign spending. In 1999, which was the most heavily contested and expensive race since the reform system began, the amount spent by winning and losing candidates combined was 24 percent less than the amount spent in 1983, before campaign financing was implemented. Public financing has also reduced the impact of special interests and has led to increased competitiveness in elections. Mr. Volgy stated that there are more candidates and more heavily contested races under the public financing system in Tucson than there were prior to reform, and the power of incumbency has been reduced. Public financing has also changed the way candidates conduct their campaigns. In 1983, prior to public financing, candidates spent their money almost solely on television and radio. Now, candidates have much more direct contact with voters. Mr. Volgy also stated that the public financing program has significantly changed Tucson's political culture. The public is highly supportive of campaign finance reform, and candidates are compelled to participate in the program and accept spending limits so as to comply with the public will.

Commissioner Norris asked Mr. Volgy if the Tucson program has guaranteed city funding. Mr. Volgy stated that the Charter provides that the program be fully funded. He stated that the funding the program was easy, since the cost of the program reflects less than 1/10 of 1% (.00062) of the city's budget. He stated that in drafting the public financing ordinance, he did consider the idea of private funding, but determined that private funding would not be sufficient to finance the program. He stated that Tucson does offer voters an opportunity to voluntarily support the program by checking off a box on their water bill.

*Mr. Volgy informed Commissioner Dockendorff that the Tucson program contains no provision limiting independent expenditures. He stated that San Francisco has been a pioneer in record-level independent campaign spending, and that he believes that similar spending will occur in Tucson in upcoming elections. He stated that were he to draft Tucson's program again, he would insert the public financing provisions the Commission is currently considering. He believes that public financing programs limit the impact of independent campaigns because the public money given to participating candidates puts them on a level playing field with candidates who benefit from independent expenditures.*

*Mr. Volgy also stated that disclosure can control the power of independent expenditures. He stated that the Commission should require independent expenditure committees to report early and often as to what they plan to spend money on. He stated that committees would be able to report expenditures early because they must pay for advertising and other items well before an election. He indicated that independent expenditure committees should report daily in the last months before an election.*

Commissioner Kingsley asked Mr. Volgy how Tucson voters became so supportive of public financing. Mr. Volgy stated that the public was already revolted with politics, so that it was not difficult. He also said that at his request, the Mayor of Seattle gave press conferences explaining to Tucson voters the success of Seattle's system.

Commissioner Grant asked Mr. Volgy whether Tucson had considered a full public financing program. Mr. Volgy indicated that the State of Arizona is implementing a full public financing program this year. He stated that there are strong merits to both full and partial public financing, and that either system is better than none at all.

The Commission then heard public comment on public financing.

### Public Comment

**Brad Benson** of Supervisor Ammiano's office urged the Commission to forward a recommendation for a public financing program to the Board of Supervisors as soon as possible. He stated that public financing is the only way to address the increasing prevalence and power of independent expenditures. Mr. Benson suggested that the Commission require independent expenditure committees to disclose contributors. He stated that reporters would be better able to publicize the amount and impact of independent expenditures if Commission staff issued detailed reports about the level and kind of independent expenditures during the election season.

**Jocelyn Larkin** of California Common Cause complimented the Commission on the caliber of the invited experts on public financing. She indicated that public financing is the first step to clean elections. She stated that Common Cause was disappointed that the Commission did not put a public financing measure on the March 2000 ballot. She urged the Commission to forward a public financing proposal to the Board of Supervisors. She stated that Common Cause is prepared to collect signatures and put a public financing initiative on the November ballot if the Board of Supervisors fails to enact a program.

**Joan Kingery** of San Francisco Common Cause encouraged the Commission to propose passage of a public financing program.

**B. Discussion and possible action re: legislative proposals for public financing of campaigns for elective office, and whether the Commission should propose legislation to the Board of Supervisors**

Commissioner Grant said that the Commission will continue its consideration of public financing of campaigns at the Thursday, January 13 meeting of the Ad Hoc Committee on Public Financing. She stated that the Committee will decide on key provisions at that time. If these provisions are approved, the Commission will consider draft legislation at the February 7 meeting. A decision on whether to forward draft legislation to the Board of Supervisors will be made at the February 15 meeting.

**VI. Discussion and possible approval of proposed Records Management Policy**

Executive Director Ginny Vida informed the Commission that under the S.F. Administrative Code, all City departments must have a records management policy. She asked the Commission to approve the policy under which Commission staff has been operating.

Motion 00-1-10-4 (Melbostad/Norris) Moved, seconded and passed: That the proposed Records Management Policy be approved.

VII. Items for future agendas.

No items were discussed.

VIII. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.

Anita Mayo of Pillsbury, Madison and Sutro requested corrections in the December 6, 1999 minutes. She stated that the third full paragraph on Page 2 should read: "Anita Mayo of Pillsbury, Madison & Sutro noted that general purpose county committees do not have to file pre-election reports."

She also requested that the fourth paragraph of Section IV on page 2 read as follows: "Ms. Mayo noted that these general purpose committees file pursuant to state law, which provides that San Francisco committees are county committees. She said that general purpose county committees do not file in odd-numbered years, the year in which the mayoral races occur. Ms. Mayo stated that such committees are not skirting the statute but are following their obligations under the law."

V. Adjournment

Motion 00-1-10-5 (Norris/Kingsley) Moved, seconded and passed: That the meeting be adjourned.

The Commission meeting adjourned at 8:30 p.m.

Respectfully Submitted,

_____

Katherine Havener

Ethics Investigator/Legal Analyst



# Leland Y. Yee, Ph.D.
San Francisco Board of Supervisors

DATE: 12/20

TIME: _____

# FAX TRANSMITTAL

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone (collect), and return the original message to me at the above address via the U.S. Postal Services. Thank you.

THE FOLLOWING CONTAINS __3__ PAGES, INCLUDING COVER SHEET.

TO: Ginny Vida

FAX NUMBER: 703-0121

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

FROM:         **COLLEEN CROWLEY**

FAX NUMBER:   **(415) 554-7751**

COMMENTS:

_____
_____
_____
_____
_____

IF YOU DID NOT RECEIVE ALL MATERIALS DESCRIBED ABOVE OR HAVE ANY OTHER QUESTIONS, PLEASE CALL ME AT (415) 554-7752.

401 Van Ness Avenue, Room 308 • San Francisco, CA 94102-4540 • (415) 554-7752 • Fax (415) 554-7751 • TDD (415) 554-5227

Leland.Yee@sfgov.us

FILE NO. 992290                                    RESOLUTION NO. _____

1 [Campaign Reporting by Local Independent Expenditure Committees]
2 URGING LOCAL CAMPAIGN COMMITTEES THAT MAKE INDEPENDENT
3 EXPENDITURES TO FULLY AND TIMELY DISCLOSE THE AMOUNT AND SOURCE OF
4 CONTRIBUTIONS RECEIVED, AND THE AMOUNT AND PAYEE OF ALL EXPENDITURES
5 MADE BY THE COMMITTEE.
6
7        WHEREAS, The Voters of San Francisco have expressed great concern over the role
8 of money in local election campaigns; and,
9        WHEREAS, State and local law impose contribution limits and disclosure requirements
10 on local committees that raise and spend money to influence the outcome of local elections;
11 and,
12       WHEREAS, The purpose of these contribution limits and disclosure requirements is to
13 prevent real and apparent corruption of elected officials and promote voter confidence in the
14 integrity of local elections and government; and,
15       WHEREAS, Committees that make independent expenditures are playing an
16 increasingly significant role in local election campaign; and,
17       WHEREAS, Recent court ruling have enjoined enforcement of the limits on
18 contribution to committees that make only independent expenditures, thereby permitting
19 these committee to raise unlimited amounts of money to support or oppose candidates for
20 local office; and,
21       WHEREAS, In absence of contribution limits, disclosure of the source of funding to
22 these committees is even more critical to assist the voters in making informal choices; and,
23       WHEREAS, Section 84203.5 of the California Government Code requires committees
24 that make independent expenditures to disclose certain information about their expenditures
25 in Independent Expenditure reports due in advance of each election; and,

SUPERVISOR YEE
BOARD OF SUPERVISORS                                              Page 1
                                                                  12/13/99

7-2

1  WHEREAS, The Act requires committees to disclose after each election information about the amount and source of contribution received, and the Act does not require disclosure of this information before election day; and,

4  WHEREAS, Disclosure of the source and amount of contributions made to influences an election in advance of the election would best serve the purpose of disclosure; and now therefore be it

7  RESOLVED, That Board of Supervisors of the City and County of San Francisco urges that local campaign committees that make independent expenditures fully and timely comply with all applicable disclosure requirements, including the requirements imposed by Section 84203.5 of the California Government Code, and report information about the amount and source of contributions received by the committee in advance of the election; and, be it

12  FURTHER RESOLVED, That these committees should file these reports immediately with the San Francisco Ethics Commission; and, be it

14  FURTHER RESOLVED, That these committees should continue to disclose in advance of the election this information about contribution received on a rolling basis, within 24 hours of receipt of the contribution.

SUPERVISOR YEE
BOARD OF SUPERVISORS

Page 2
12/13/99