# EXHIBIT F

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**



Ethics Commission

1390 Market Street, Suite 801
San Francisco CA 94102
Phone 554-9510  Fax 554-8757

# SAN FRANCISCO ETHICS COMMISSION
## AD HOC COMMITTEE ON PUBLIC FINANCING
### NOTICE OF SPECIAL MEETING AND AGENDA
### FOR
### Thursday, January 13, 2000, 5:00 P.M.

City Hall, 1 Dr. Carlton B. Goodlett Place, Room ~~408~~ 400*

I. Call to order and roll call

II. Receipt of testimony, discussion and possible vote on legislative proposals for public financing of election campaigns

   A. Continued presentation by expert witnesses and staff re: public financing of campaigns for elective office.

   B. Discussion and possible action re: Legislative proposals for public financing of campaigns for elective office, and whether the Commission should propose legislation to the Board of Supervisors. Related documents will be available from the Ethics Commission office on Friday, January 7.

III. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.

IV. Adjournment

---

*Know Your Rights Under the Sunshine Ordinance*

*Government's duty is to serve the public, reaching its decisions in full view of the public. Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business. This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review.*

(Please turn over for page 2)

SF Ethics Commission Agenda – January 13, 2000

*For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force, Rachel Arnstine O'Hara, Clerk, City Hall, room 362, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102-4683. Office telephone: (415) 554-6171; Fax: (415) 554-6177; E-mail: Rachel_ArnstineO'Hara@ci.sf.ca.us. Copies of the Sunshine Ordinance can be obtained from the Clerk of the Sunshine Task Force, the San Francisco Public Library and on the City's web site at www.ci.sf.ca.us.*

*This location is wheelchair accessible. In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products. Please help the City accommodate these individuals.*

*Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street #701, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site www.ci.sf.ca.us/ethics*

s:agenda/2000/011300 special mtg.doc



sfgov | residents | business | government | visitors | online services | search

Ethics Commission >> Meeting Information

# Ethics Commission

January 13, 2000

(Approved as amended 3/13/00)

Minutes of the

San Francisco Ethics Commission

Ad Hoc Committee on Public Financing

City Hall

One Dr. Carlton B. Goodlett Place, Room 400

January 13, 2000; 5:00 p.m.

(Amended text appears in italics.)

**I. Call to order and roll call**

Ad Hoc Committee Chairperson Paul H. Melbostad called the meeting to order at 5:15 p.m.

**COMMISSION MEMBERS PRESENT:** Isabella H. Grant, Commission Chairperson; Carol M. Kingsley, Commissioner; Robert D. Dockendorff, Commissioner; Paul H. Melbostad, Commissioner. Vice-Chairperson Henri E. Norris joined the meeting in progress.

**STAFF PRESENT:** Ginny Vida, Executive Director; Naomi Starkman, Deputy Executive Director; Joe Lynn, Campaign Finance Officer; Katherine Havener, Ethics Investigator/Legal Analyst; Shaista Shaikh, Campaign Finance Auditor.

**OFFICE OF THE CITY ATTORNEY:** Claire Sylvia, Deputy City Attorney.

**OTHERS PRESENT:** Chuck Squatriglia, San Francisco Chronicle; Denise D'Anne; Joan Mandle, California Common Cause.

**MATERIALS DISTRIBUTED:**

S.F. Ethics Commission Agenda, January 14, 2000

Memo dated November 29, 1999, to Ethics Commission Members from Ginny Vida re:

    Amending the Campaign Finance Reform Ordinance to Provide for Public Financing of Election Campaigns

Memo dated November 30, 1999, to Ethics Commission Members from Ginny Vida re: Key

Provisions of a Partial Public Financing Proposal

Memo dated November 1, 1999, to Ethics Commission Members from Ginny Vida re:

Fundamental Policy Considerations: Public Financing of Campaigns

Los Angeles City Ethics Commission document re: Overview of Los Angeles Campaign Finance

System, January 2000

Los Angeles City Ethics Commission document re: Los Angeles City Campaign Finance Law

II. Receipt of testimony, discussion and possible vote on legislative proposals for public financing of election campaigns

   A. Continued presentation by expert witnesses and staff re: public financing of campaigns for elective office.
   B. Discussion and possible action re: Legislative proposals for public financing of campaigns for local office, and whether the Commission should propose legislation to the Board of Supervisors.

Commissioner Melbostad noted that the purpose of the Ad Hoc Committee meeting is to develop a consensus on the development of a public financing system. Commissioner Melbostad requested that staff present testimony regarding interviews with witnesses who were unable to appear at the January 10, 2000 Commission Meeting.

Deputy Executive Director Naomi Starkman reported that she and Executive Director Ginny Vida had spoken by telephone on January 6, 2000 with Ruth Jones, a member of the Arizona Clean Elections Commission and a professor of political science at Arizona State University. Ms. Vida and Ms. Starkman also spoke to Ray Lisi, a staff member of the Federal Elections Commission on January 10, 2000.

<u>Ms. Starkman summarized the testimony provided by Ms. Jones, including her recommendations, as follows:</u>

> Arizona is one of several states that have enacted full public financing legislation. The Arizona Citizens Clean Elections Act is scheduled for implementation this year. The Arizona Commission is currently writing regulations interpreting the Act, and candidates in Arizona are already raising money without having formal regulations in place. Sufficient time for implementation should be provided for to allow for development of regulations and other start-up processes.
>
> The goal of full public financing is to reduce the role of special interests in campaigns. Partial public financing programs do not address this problem adequately because they still require candidates to raise money.
>
> The Ethics Commission should determine its goals in pursuing public financing. For example, if the Commission's goal is to reduce the level of spending in campaigns, then it should provide enough money to make participation in the program worthwhile. A $5 qualifying contribution is too low, especially in San Francisco. The staff's recommendation of

$50 is appropriate. The concept of allowing contributions "up to" $50 is problematic. Verifying the large number of smaller contributions would create severe administration problems. It would also be difficult to verify a certain number of signatures in addition to requiring a certain number of qualifying contributions.

Raising $50 amounts might be easier in some districts than in others. One solution might be to allow businesses to contribute the $50 in lower income districts. Seed money would be critical for candidates who have no funds to set up shop.

The Commission should determine at the outset how much money will be needed for a public finance program. Arizona's Clean Elections Act provides a 10 percent surcharge on civil and criminal penalties. The Arizona Commission has been able to collect more than $5 million for its program through the surcharge. However, the surcharge is being challenged in the superior and federal courts.

Any public finance proposal should be written in consultation with election experts. The Commission should be realistic about the amount of time it will take to certify candidates for public funds. In Arizona it currently takes 21 days to verify a sampling of 5 percent of signatures.

*Commissioner Robert D. Dockendorff noted that Ms. Jones offered significant information relating to San Francisco, its districts and the amount of money each district is capable of raising. Commissioner Dockendorff inquired about the source of Ms. Jones' knowledge and the basis of her assumptions. Ms. Starkman informed the Commission that staff had provided material about San Francisco. Ms. Starkman noted that Ms. Jones may have formed her opinions based on this information.*

<u>Ms. Starkman then reported on the testimony provided by Ray Lisi on the program of public financing of federal elections, as follows:</u>

Presidential candidates running in the primary election receive partial public financing, and candidates who are nominated for the general election receive a full grant of public funds. The FEC also funds party convention committees.

Partial public funding is available to Presidential primary candidates in the form of federal matching payments. Candidates seeking their party's nomination to the Presidency can qualify to receive matching funds by raising over $5,000 in each of 20 states (i.e., over $100,000). Only contributions from individuals apply toward this threshold. Although an individual may contribute up to $1,000 to a candidate, only a maximum of $250 counts toward the threshold and is matchable.

In exchange for public funding, the candidates pledge to limit national spending for all primary elections and to limit spending in each state based on its voting age population. There is no trigger provision to lift the spending limits. Candidates must also agree not to spend more than $50,000 of their personal funds in connection with the campaign. The maximum amount of matching funds a candidate may receive is limited to half of the overall spending ceiling. Candidates are also subject to a complete bank audit. Complete audits are conducted after the general election, not during the election season.

The FEC is required to determine whether candidates have met the eligibility criteria and to certify the candidates eligible to receive matching funds. The FEC conducts an item-by-item review of each eligibility submission to ensure that the candidates have, in fact, met the $100,000 threshold. FEC regulations specify that these submissions must be processed within 15 business days during the election year.

Once the FEC determines that a candidate has met the eligibility criteria, he or she may submit contributions from individuals for matching. The FEC's audit staff reviews these submissions to see if the requests meet the standards for matchability. The contributions, for example, must be in the form of a check or other negotiable written instrument made payable to the candidate or his or her campaign committee. Once the FEC is satisfied that the submissions comply with the law, the FEC certifies to the U.S. Treasury an amount due the candidate.

After the campaign, the FEC audits each candidate's committee to ensure that funds were not misused and that the committee maintained proper records and filed accurate reports. The committee must repay only the portion of nonqualified campaign expenses that were defrayed with public funds. A ratio formula is used to determine the amount of the repayment.

The Presidential nominee of each major party may become eligible for a full public financing grant of $60 million for the general election campaign upon his or her nomination. This means that grants to presidential nominees are made in July and August when the conventions are held.

To be eligible, candidates must agree to limit their spending to the amount of the grant and must pledge not to accept private contributions for the campaign. Private contributions may, however, be accepted for a special account maintained exclusively to pay for legal and accounting expenses related to complying with campaign finance law.

These legal and accounting expenses are not subject to the expenditure limit. In addition, candidates may spend up to $50,000 of their own money on the campaign.

Once the FEC certifies a candidate's eligibility, the Treasury Department makes the necessary payments. After the campaign, the FEC audits each candidate's committee to ensure that the funds were not misused and that the committee maintained proper records and filed accurate reports.

Funding for the federal program comes from the $3 check-off that appears on federal income tax forms. While disbursements from the fund are indexed to inflation, the $3 tax check-off is not. In recent years, public participation in the tax check-off has gradually decreased from a high of 28 percent in 1980 to less than 12 percent in 1997. The federal program currently does not have enough money to fully fund all presidential primary candidates who are certified. However, the Fund does provide full funding for the general election candidates nominated by the major parties.

The FEC estimates that the 1988 Presidential election cycle, which was the most expensive cycle to date, cost the FEC about $5 million to administer. Combining that figure with the total 1988 payments from the Presidential Election Campaign Fund brings the approximate cost of the program for that cycle to $182 million. In FY 1993, the Commission's full budget was $21 million and the Commission had a full time staff of 276 to carry out all of the agency's functions.

An adequate implementation period should be provided for in any public financing program, and a legislative proposal should include specific provisions rather than options.

Ms. Starkman also summarized her conversation with Political Scientist Bruce Cain. Mr. Cain told her that the focus of a public finance program should be to foster competition by encouraging candidates to take part in the electoral process. It was his opinion that the goal of public financing should not be to limit the role of private money in campaigns, which he deemed an impossible task. He commended the Commission's efforts and stated that he thought public financing was a valuable experiment.

Following Ms. Starkman's presentations, Commissioner Melbostad asked for comments from the public. He requested that speakers address the following three issues: 1) the threshold for qualifying (i.e., amount of contributions, number of contributions and a formula for matching funds; 2) additional requirements for participating candidates (i.e., publicly financed candidates must agree to a limitation on expenditures and be opposed by a candidate who meets certain requirements); and 3) whether additional funding should be provided if the spending limits are lifted in the case of a high spending opponent or independent expenditures benefiting an opponent.

Commissioner Dockendorff asked the Committee to address the following issues:

1) whether the program should provide full or partial public financing; 2) how to limit the length of the campaign season as compared to filing periods; 3) qualification requirements; 4) offices to be covered; 5) expenditure limits; 6) additional disclosure with respect to independent expenditures; and 7) political party contributions.

Ms. Vida referred the Committee to her November 30, 1999 memo regarding Key Provisions of a Partial Public Financing Proposal. She recommended the following plan of action to the Commission.

> That on or about February 16, the Commission propose to the Board of Supervisors draft legislation for a pilot program of public financing for candidates for supervisor. The draft legislation would be an ordinance that the Board has the authority to adopt (voter approval would not be required). At the same time, the Commission would forward to the Board a draft Charter amendment (for which voter approval is required) for a permanent program of public financing.

1. The Commission would recommend that the Board adopt the pilot program for implementation before the November 7, 2000 election. In order for the Commission to implement the pilot program, the Board would need to approve the draft legislation no later than April 15, 2000.

2. If the Board declines to adopt the pilot program, the Commission would recommend that the Board submit the proposed Charter amendment to the voter at the November 7, 2000 election. The deadline for Board submission of a Charter amendment is July 28, 2000.

3. If the Board neither adopts the pilot program nor submits the proposed Charter amendment to the voters, the Ethics Commission would consider submitting an ordinance to the voters at the November 7, 2000 election. (The Commission does not have authority to submit a Charter amendment directly to the voters.) The proposed ordinance would be similar to the Charter amendment forwarded to the Board, in that it would create a permanent program of public financing of candidates for all local elective offices. The deadline for submission of an ordinance is August 9, 2000.

Public Comment

Joan Mandel, Consultant for California Common Cause, noted that the Commission has gathered as much information as possible. She encouraged the Commission to go forward with a proposal.

Denise D'Anne, a supervisorial candidate, commended the Commission for its efforts. She expressed concern about a program that would allow a candidate to accept private contributions even when the candidate receives public matching funds.

The Committee then discussed specific components of a public financing proposal. Each commissioner listed his/her goals in pursuing such a program. Commissioner Grant stated that the purpose should be to limit spending; and to limit time spent on fundraising.

Commissioner Dockendorff stated that the purpose should be to provide access to all candidates (i.e., to prevent candidates from being eliminated due to funding issues).

Commissioner Melbostad stated that the purpose should be to provide incentives for limiting spending and to encourage candidates of modest means to participate.

Commissioner Carol M. Kingsley stated that the purpose should be to make elections more competitive and to allow candidates to spend more time on issues and less time on fundraising.

Ms. Vida noted that some Commission members had previously expressed concern about limiting the corrupting influence of campaign contributions on political decision making.

After some discussion, the Committee reached a consensus regarding several issues. The Committee agreed to a qualifying threshold of $5,000, with qualifying contributions ranging from $10 to $100 from at least 50 contributors. The Committee considered whether candidates should receive a lump sum after meeting the qualifying threshold. The Committee did not decide what this amount would be. The Committee also considered whether contributions should be matched dollar for dollar until the candidate reaches the $75,000 spending limit. With respect to run-off elections, the City would grant $5,000 to candidates who qualify for the run-off and thereafter match dollar for dollar up to $5,000. The Committee recommended that the expenditure ceiling not be lifted. The Committee asked staff to determine whether the absence of a provision for lifting the expenditure ceiling in Long Beach had created any problems.

Commissioner Henri E. Norris stated that candidates who are negatively affected by independent expenditures should be provided with additional funding. Commissioner Norris stated her strong preference for full public financing.

The Committee then discussed the following additional requirements:

1. That the program be voluntary;
2. That candidates agree to limit personal spending and loans to $10,000;
3. That candidates agree to limit campaign expenditures to qualified campaign expenditures;
4. That a candidate must be opposed by a serious candidate;
5. That the candidates agree to debate; and
6. That the candidate be eligible to be elected.

Commissioner Kingsley requested that staff create a spreadsheet to determine the possible costs of a public financing program under various scenarios. She also asked staff to look into alternatives to the General Fund as a source of funding. The Committee agreed to discuss possible source(s) of funding for a public financing program at the next Committee meeting on February 7.

II. **Public Comment**

There was no further public comment.

III. **Adjournment**

**Motion 00-1-13-6 (Grant/Norris) Moved, seconded and passed: That the meeting be adjourned.**

The meeting was adjourned at 8:45 p.m.

Respect

submitte

Shaista Shaikh

Campaig Finance Auditor



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D. DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

DATE:   January 7, 2000

TO:     Members, Ethics Commission

FROM:   Ginny Vida  *GV*.
        Executive Director

RE:     Televising of January 10 Meeting

The January 10 meeting will be televised live or recorded for later broadcast on Channel 54. This will be the Ethics Commission's first televised meeting.

Enclosed are some suggestions from Citywatch on participating in televised meetings.

Tips for City Hall Presenters
from Mike Freeman, CITYWATCH Production Supervisor

Five rooms in City Hall are equipped with video cameras. Many City Hall meetings are cablecast live on CITYWATCH, cable channel 26, the City's government channel. Many others are taped for replay later. These tips will help you create a presentation that will be effective in the meeting room and on television.

- Remember to stay 6-10" away from the microphone and do not shout.

- Avoid bobbing and weaving too much or the camera won't be able to follow you.

- It is preferable for only person to present at a time. If more than one person needs to be involved in a presentation (for example when a translator is needed) take turns addressing the microphone.

- If you hold up an object, hold it long enough for the camera to get a shot. You can glance at the monitor to check whether the object is in the shot.

- If the object or visual is important, mention it verbally so the camera operator knows that they should get the shot.

- Large posters are not recommended, but if you must use them, display them long enough for the camera to get a shot.

- The best options for presenting information are computer-based presentations, video tapes or standard size paper documents displayed with the graphics camera. Slides can not be shown.

- Use S-VHS or VHS videotapes only. Be sure your videotape is the best possible quality, and record at standard speed, with both hifi and normal audio.

**Tips for Powerpoint or other graphic presentations**

- Television is a relatively low resolution medium compared to print or computer display.

- The proportions for television are 3:4 height to width. This is approximately the same as an 8 1/2 x 11" sheet of paper turned sideways.
- Your paper document should be readable from 7 feet away.

- Use Sans serif fonts unless your text is very large.

- Avoid thin lines, especially horizontal lines.

- Avoid highly saturated colors. Avoid red & purple.

- Use 18 pt. Fonts or larger.

- Avoid putting important information on the edges of the frame.

- Keep your design and images simple.

## Tips and requests for the Meeting Clerks from CITYWATCH
*Please:*
### Before the meeting
- You are encouraged to provide the "Tips for CITY Hall Presenters" document to anyone planning to make an audio-visual presentation.
- Test videotapes and computer-based presentations at least thirty minutes before the meeting. If there is a problem notify building AV staff immediately.
- Notify CITYWATCH when there will be a videotape or computer-based presentation.
- Check that the videotape gets re-cued and the computer-based presentation is reset to the beginning.
- Check that lights are set to "Preset 2" in the Board Chamber (Rm. 250), "Preset 1" in all other meeting rooms.
- If a feed needs to be provided for an overflow room, try to notify CITYWATCH before the meeting starts.
- Check that the document camera's power and light are on.

### During the meeting
- Make sure that microphones are switched on when needed.
- Prompt speakers to use the microphone correctly, not too close and not too far away. Speakers should address the front of the mic from 6 to 10 inches away.
- Prompt speakers to direct their comments to the Board, not the audience.
- In general, select live feed as the video source when a meeting is taped or cablecast. CITYWATCH staff should switch to the document camera or computer-based presentation when appropriate. If they fail to select the correct source at the right time you can provide a verbal cue or select the source yourself. <u>*You are responsible for starting and selecting the video player.*</u>
- Only go to closed session when procedurally necessary.
- Wait one minute before going into closed session or until the live feed shows a "closed session" graphic.
- If a speaker needs to display an object or graphic too large for the document camera prompt them to hold it facing toward the Board and to hold it long enough for the camera to get the shot.
- Discourage more than one person from presenting at the same time-only one public mic can work at a time.

### After the meeting
- Call CITYWATCH before selecting Closed Session, or wait until the CITYWATCH station ID is displayed in Live Feed.

# CITY OF LOS ANGELES
CALIFORNIA

CITY ETHICS COMMISSION

RICHARD WALCH
PRESIDENT

RAQUELLE DE LA ROCHA
VICE-PRESIDENT

PAUL KREKORIAN
MIRIAM KRINSKY
ART MATTOX



REBECCA AVILA
EXECUTIVE DIRECTOR

CITY ETHICS COMMISSION
201 NO. LOS ANGELES ST
LA MALL - SUITE 2
LOS ANGELES, CA 90012
(213) 237-0310
(213) 485-1093 FAX
www.lacity.org ETH

## Overview of Los Angeles Campaign Finance System
*January 2000*

Through Charter amendments, the voters of the City of Los Angeles approved 1) limits on contributions to City candidates in 1985 and 2) the financing of a matching public funds program linked to voluntary spending limits in 1990. The system is designed to provide competitive elections and prevent the corrupting influence of large contributions. The 1990 Charter amendment also triggered implementation of a campaign finance ordinance containing other reforms that also are described in this summary.

### A. Limits on campaign contributions to City candidates
*(City Charter section 312)*

1. $1,000 per person per election for a citywide office candidate (Mayor, City Attorney, Controller)

2. $500 per person per election for a Council candidate

3. Aggregate limit on the amount any single donor can give to all candidates on the ballot in an election - based on the following formula: $500 multiplied by the number of Council seats on the ballot plus $1,000 multiplied by the number of citywide offices on the ballot (and in no case is the aggregate limit less than $1,000).

4. The definition of "person" contained in Government Code section 82047 is applicable and includes individual, corporation, partnership and any group of persons acting in concert.

5. The primary and general elections are separate elections so, for example, a corporation could make a $500 contribution in the primary and later another $500 contribution in the general to a candidate for City Council.

6. Total contributions from persons other than individuals are limited as follows:
   City Council candidates - $150,000 per election
   City Attorney and Controller - $400,000 per election
   Mayor - $900,000 per election

AN EQUAL EMPLOYMENT OPPORTUNITY – AFFIRMATIVE ACTION EMPLOYER   Recyclable and made from recycled waste 

7. If a candidate spends more than $30,000 in personal resources on his/her campaign, then the individual contribution limit (i.e. $500 or $1,000) is lifted for his/her opponents but the aggregate contribution limit (i.e. the total a person can contribute to all candidates in an election) remains in effect. Once an opponent raises an amount in over-the-limit contributions equal to the personal funds used, the contribution limits come back on.

8. Affiliated entities or aggregation of payments: a provision of the campaign finance ordinance establishes the criteria for determining whether to aggregate contributions from affilited entities (e.g. contributions from a corporation and any subsidiary would be aggregated for purposes of the limit.) *(Los Angeles Municipal Code 49.7.2)*

### B. Fundraising Window

Candidates for citywide office may begin raising funds no sooner than 24 months before the election and candidates for City Council may begin raising funds no sooner than 18 months before the election. All candidates must cease fundraising 90 days after the election unless they are granted an extension by the City Ethics Commission. *(Los Angeles Municipal Code 49.7.7)*

### C. Required contributor information

City law requires that candidates have in their files *prior to* depositing contribution checks the following information for the contributor: name, address, occupation, employer's name and address, date and amount of the contribution.
*(Los Angeles Municipal Code 49.5.16)*

### D. Limits on contributions to other committees

1. Any committee other than a candidate's controlled committee ( including an independent expenditure committee for example), which supports or opposes any candidate for Mayor, City Attorney, Controller or City Council can accept no more than $500 total in contributions from any person in a *calendar* year.
*(City Charter section 312)*

### E. Spending limits and public matching funds

At the time candidates file their intention to be on the ballot in the next primary election, they must declare whether they will participate in the City's public matching funds program. If they agree to limit their spending and the amount of personal resources they contribute to their campaigns -- and meet other qualifications -- they may receive a limited amount of public dollars to match contributions they receive from individuals. (Additional information regarding the

matching funds program is available from the City Ethics Commission.)

### F. Campaign contribution "laundering" provisions

1. The City Charter prohibits any person from making a contribution in other than their legal name or in the name of another person. In addition no person can make a contribution in his/her name of anything belonging to another person or received from another person on the condition that it be used as a contribution.

2. In the wake of several contribution laundering schemes uncovered in City elections, the City Council passed a law prohibiting anyone found to have laundered campaign contributions from holding contracts with, obtaining fee waivers from, or acting as a registered lobbyist in the City for a period of one to four years. (*Los Angeles Municipal Code 49.5.21*) This prohibition is in addition to the administrative penalties otherwise levied for violation of City campaign finance laws.

### G. The City Ethics Commission administers the campaign finance laws for the City.
*(City Charter section 600)*

1. Established by a ballot measure, the City Ethics Commission is a five-member board which oversees a semi-independent City agency responsible for administering and enforcing the City's campaign finance, ethics, and lobbying laws.
2. The Commission provides informal and formal advice regarding the application of City laws to specific facts and during the campaign season conducts a mandatory training program for candidates and treasurers.
3. The Commission has the authority to investigate violations of campaign finance laws and levy administrative penalties. The Charter provides the Commission with the authority to issue subpoenas and administer oaths and affirmations.

### H. Penalties for violation of City's campaign finance laws
*(City Charter section 600 and Los Angeles Municipal Code 49.7.28)*

1. *Administrative:* Upon the Commission's finding that a violation has occurred, it may require the violator to:
   a. cease and desist the violation;
   b. file any reports, statements or other documents or information required by law; and/or
   c. pay a monetary penalty of the General Fund of the City of up to $5,000 per violation or three times the amount of the violation, whichever is greater.

2. *Civil:* an intentional or negligent violation of the City's campaign finance laws are liable in a civil action brought by the City Attorney, the City Ethics Commission, or any person residing within the City. Penalties are $5,000 per

violation or three times the amount. Statute of limitations on civil actions is four years.

3. *Criminal*: a person who knowingly or willfully violates the City's campaign finance laws shall be prohibited from acting as a lobbyist or City contractor for four years following the date of conviction. The Office of the City Attorney prosecutes misdemeanors.

RA M:\policy\cfsum.wpd