# EXHIBIT J

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Ethics Commission



1390 Market Street, Suite 801
San Francisco, CA 94102
Phone 554-9510 Fax 703-0121

# SAN FRANCISCO ETHICS COMMISSION AGENDA

## for <u>REGULAR MEETING</u>

### <u>Monday, April 17, 2000, 5:00 p.m.</u> *

### City Hall, One Dr. Carlton B. Goodlett Place, Room 408

**\*<u>PLEASE NOTE CHANGE IN DATE.</u>**

I.   Call to order and roll call

II.  Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

III. Discussion and possible approval of the minutes of the meeting of March 13, 2000.

IV.  Executive Director's report

   1. FY 00-01 budget
   2. Public policy program
   3. Investigation and enforcement program
   4. Report on volume of calls received via the Whistleblower Hotline
   5. Campaign finance disclosure program
   6. Campaign finance audit program
   7. Lobbyist program
   8. Campaign consultant program
   9. Statements of economic interests
   10. Declarations received re: amended Sunshine Ordinance
   11. Staffing

V.   Discussion and possible action re: Proposal to provide an on-line forum for all candidates for local elective office and other possible means to enhance public access to information about candidates. This proposal was prompted by Supvervisor Leno's request that the Ethics Commission propose a program to provide for City-sponsored debates, City web site displays of candidate statements, or other means to enhance public access to information about candidates. A copy of the staff proposal will be available from the Commission office on Friday, April 7.

VI.  Discussion and possible action re: Proposed ordinance authorizing the Ethics Commission to require that all quarterly and other disclosure statements filed by lobbyists and campaign consultants, in accordance with the Lobbyist Ordinance and Campaign Consultant Ordinance, be filed electronically as well as submitted on paper forms. Copies of the draft legislation will be available from the Commission office on Friday, April 7.

VII. Discussion re: Whether the Ethics Commission should expand the pool of political committees subject to audit to include committees that file with the Commission and make

(Please turn over for page 2)

SF Ethics Commission Agenda – April 17, 2000                                                    2

VIII.    independent expenditures.  A staff report will be available from the Commission office on Friday, April 7.

IX.    Discussion and possible action re:  Possible submission of a ballot initiative, in the November 2000 election, providing for public financing of election campaigns, in the event that the Ethics Commission's proposal to provide for public financing of election campaigns is not approved by the Board of Supervisors and the Mayor prior to May 15, 2000.  (The deadline for submission of a ballot measure is August 9, 2000.)

X.    Discussion and possible action re:  Proposal to amend the Commission's bylaws to reflect recent changes incorporated in the Sunshine Ordinance, and to include other substantive and/or technical changes.

XI.    Discussion and possible action re:  Items for future agendas.

XII.    Possible closed session held pursuant to Charter section C3.699-13, Brown Act section 54956.9(c) and Sunshine Ordinance section 67.11 to discuss pending litigation

Conference with Legal Counsel:  Pending Litigation
Number of possible cases:  2

XIII.    Discussion and vote pursuant to Brown Act section 54957.1 and Sunshine Ordinance section 67.14 on whether to disclose action taken or discussions held in closed session.

Motion:  The Ethics Commission finds that it is in the best interests of the public (not) to disclose its closed session deliberations re: pending litigation.

XIV.    Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

XV.    Adjournment

## Know Your Rights Under the Sunshine Ordinance

*Government's duty is to serve the public, reaching its decisions in full view of the public.  Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business.  This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review.*

*For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force, Rachel Arnstine O'Hara, Clerk, City Hall, room 362, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102-4683.  Office telephone: (415) 554-6171; Fax: (415) 554-6177; E-mail: Rachel_ArnstineO'Hara@ci.sf.ca.us.  Copies of the Sunshine Ordinance can be obtained from the Clerk of the Sunshine Task Force, the San Francisco Public Library and on the City's web site at www.ci.sf.ca.us.*

--------

*This location is wheelchair accessible.  In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products.  Please help the City accommodate these individuals.*

--------

*Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity.  For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street, Suite 801, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site: www.sfgov.org/ethics.*

P:\SHARED\AGENDA\2000\041700.doc



sfgov | residents | business | government | visitors | online services | search    go !

Ethics Commission >> Meeting Information

# Ethics Commission

April 17, 2000

**Approved 5/15/00**

### Minutes of the San Francisco Ethics Commission
### Meeting at City Hall
### One Dr. Carlton B. Goodlett Place, Room 408
### April 17, 2000; 5:00 p.m.

**1. Call to order and roll call.**

Chairperson Isabella H. Grant called the meeting to order at 5: 1 0 p.m.

COMMISSION MEMBERS PRESENT: Isabella H. Grant, Chairperson; Henri E. Norris, Vice Chairperson; Robert D. Dockendorff, Commissioner; Paul H. Melbostad, Commissioner; Carol M. Kingsley, Commissioner.

STAFF PRESENT: Ginny Vida, Executive Director; Naomi Starkman, Deputy Executive Director; Shaista Shaikh, Campaign Finance Auditor; Joe Lynn, Campaign Finance Officer; Katherine Havener, Ethics Investigator/Legal Analyst.

OFFICE OF THE CITY ATTORNEY: Julie Moll, Deputy City Attorney; Chad Jacobs, City Attorney Law Clerk.

OTHERS PRESENT: Holly Thier, Co-President of the League of Women Voters; Ellen Elliott, League of Women Voters; Trudell Ian, Director of the League of Women Voters' SmartVoter Project; Lisa Franklin, Past President of the League of Women Voters; Anita Mayo, Esq., Pillsbury, Madison & Sutro; Charles Marsteller. San Francisco Common Cause; David Pilpel, Sunshine Ordinance Task Force; Gilbert Criswell, candidate for Supervisor; and J.R. Manuel, candidate for Supervisor.

MATERIALS DISTRIBUTED:

S.F. Ethics Commission Agenda, April 17, 2000

Minutes of the S.F. Ethics Commission Meeting of February 15, 1999

Draft Minutes of the S.F. Ethics Commission Meeting of March 13, 2000

Executive Director's Report, April 17, 2000

Remarks by Ginny Vida before the Finance Committee, April 12, 2000

Remarks by Ginny Vida before the Finance Committee, April 5, 2000

Memo from Ginny Vida to Members, Ethics Commission, April 14, 2000, re: Proposal for City- sponsored debates

Memo from Ginny Vida to Members, Ethics Commission, April 14, 2000, re: draft legislation

authorizing the Commission to require electronic filing by lobbyists/campaign consultants

Memo from Ginny Vida to Members, Ethics Commission, April 14, 2000, re: auditing committees that make independent expenditures

Memo from Ginny Vida to Members, Ethics Commission, April 14, 2000, re: three public

financing proposals

Memo from Ginny Vida to Members, Ethics Commission, April 14, 2000, re: draft revision of

Ethics Commission Bylaws

Letter dated April 13, 2000, from League of Women Voters of San Francisco to Members of the

Ethics Commission

## II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.

There was no public comment.

## III. Discussion and possible approval of the minutes of the meeting of March 13, 2000.

**Motion 00-4-17-23 (Kingsley/Melbostad) Moved, seconded and passed: That the minutes of the March 13, 2000 meeting be approved.**

## IV. Executive Director's Report.

Executive Director Ginny Vida referred the Commission to the Executive Director's Report in the agenda packet. She informed the Commission that she has agreed to serve as a witness for the FPPC in the lawsuit testing the constitutionality of Proposition 208.

Commissioner Grant said that she approved of the consolidation of San Francisco ethics-related laws into the proposed Campaign and Governmental Conduct Code. Deputy City Attorney Julie Moll noted that the legislation had been drafted and approved by the Board on the first reading.

Charles Marsteller of Common Cause complimented Ms. Vida on her defense of public financing at two recent Finance Committee hearings on that issue. Gilbert Criswell also commended Ms. Vida on her presentations.

V. **Discussion and possible action re: Proposal to provide an on-line forum for all candidates for local elective office and other possible means to enhance public access to information about candidates. This proposal was prompted by Supervisor Leno's request that the Ethics Commission propose a program to provide for City-sponsored debates, City web site displays of candidate statements, or other means to enhance public access to information about candidates.**

Katherine Havener, Ethics Investigator/Legal Analyst, discussed the history of Supervisor Leno's request to the Ethics Commission to forward to the Board a proposal providing for City-sponsored debates. She explained that because an unprecedented number of candidates are anticipated in the November 2000 election, the staff felt it would be impractical for the Commission to attempt to organize debates for such an extensive field.

Ms. Havener presented the staff's suggested alternatives to City-sponsored debates, such as providing candidates with space on the Ethics Commission's website for expanded candidate statements. In addition, the website could publish a list of resources on how to conduct debates.

Holly Thier, Co-President of the League of Women Voters, urged the Commission not to propose a web site program for candidates. She stated that the public would not consider information on the Commission's website to be neutral because of the Commission's reliance on elected officials for approval of its budget. She said the League's web site, www.smartvoter.org, already provides the public with candidate statements. She suggested that a link to the League's web site would be more appropriate.

Commissioner Robert D. Dockendorff took exception to any implication that the Commission would be swayed in the performance of its duties by political considerations. Ms. Their said she did not mean to suggest that the Commission would be influenced but that there might be a public perception of such influence.

Commissioner Dockendorff inquired into the League's decision to exclude candidates from the mayoral debates. Ms. Thier said that in most debates sponsored by the League, each candidate was given time to speak, but that due to the large number of mayoral candidates, the League had limited participation in one mayoral debate to the top three candidates. However, she noted that this was the exception to the rule and the only instance of excluding candidates from debates. She said that the League is planning debates for the upcoming district elections that will include all

candidates.

Ellen Elliott, of the League of Women Voters, said that the public would not trust a program produced by City Hall to be unbiased. She said that the League debates and SmartVoter web site provides the public with sufficient information.

Trudell Ian, Director of the League's SmartVoter Project, said that no candidate is excluded from participation in that project. She invited the Commissioners to visit the site. She said that the League had spend $400,000 on the site, half of that for development. The site provides links to interviews with candidates, election results, and ballot information.

Ms. Vida reported that she had accessed the SmartVoter site shortly before the November 1999 election and had noticed that statements were missing for some candidates. Ms. Ian said that some candidate information was missing because the candidates failed to provide it. Ms. Vida said she had also discovered, and confirmed, that one candidate "statement" was fraudulent. She asked about the League's security procedures. Ms. Ian said a web site official of the League is responsible for reviewing information before posting the data and that the web site is closely monitored. She said the fraudulent data had been posted for only a few hours and had been removed immediately upon notification by Ms. Vida.

J.R. Manuel said he was one of the mayoral candidates excluded from the debate by the League of Women Voters for what he characterized as arbitrary and capricious reasons. He urged the Commission to provide a forum in each district that will give the candidates necessary exposure to the public. He also reported that he had experienced difficulties in following procedures for submitting candidate information to SmartVoter.

Mr. Criswell urged the Commission to adopt the staff recommendation because it would provide voters with additional information.

Lisa Franklin, Past President of the League of Women Voters, described SmartVoter as one-stop shopping for the public.

In response to a question posed by Commissioner Henri Norris, Ms. Ian said that debates must be limited to an hour. Ms. Ian said that this required exclusion of some of the many mayoral candidates, and those invited were the candidates cited by the newspapers as the top 3 in terms of public support. She noted, however, that a local cable access channel was used to provide interviews with all of the candidates. She said that the software for SmartVoter is proprietary.

Commission Chair Grant asked whether staff could work with the League on its web site project. Ms. Vida expressed concern over possibly compromising the Commission's independence by working

in partnership with a member of the political community that could be regulated by the Commission. Mr. Marsteller agreed and suggested referring the question to the Department of Telecommunications and Information Services for their action. Mr. Manuel said that before adopting SmartVoter as an answer to Supervisor Leno's concerns, a Request for Proposal should be issued.

Commissioner Melbostad noted that the issues being discussed provide concrete examples on the need for public financing sufficient to permit the voices of serious candidates to be heard.

**Motion 00-4-17-24 (Melbostad/ Kingsley) Moved, seconded and passed: That the Commission forward Supervisor Leno its recommendation that hosting public debates is not feasible and revisit the issues concerning the web site at its May meeting.**

VI.  **Discussion and possible action re: Proposed ordinance authorizing the Ethics Commission to require that all quarterly and other disclosure statements filed by lobbyists and campaign consultants, in accordance with the Lobbyist Ordinance and Campaign Consultant Ordinance, be filed electronically as well as submitted on paper forms.**

Deputy Executive Director Naomi Starkman stated that the proposed legislation would authorize the Commission to require all campaign consultants and lobbyists to file electronic copies of their reports. The legislation would also provide a late filing fine of $10 per day after the filing deadline until the electronic copy is received by the Commission. Ms. Starkman said the staff proposal provides for a $10 per day fine, rather than the higher fines currently imposed for the late filing of original reports ($25 per day for lobbyists, $50 per day or $100 per day for campaign consultants). She noted that the staff proposal is consistent with the $10 per day fine imposed for the late filing of electronic copies of campaign finance disclosure statements. She also indicated that she has been meeting with DTIS staff concerning the development of this program.

**Motion 00-4-17-25 (Dockendorff/ Kingsley) Moved, seconded and passed: That the Commission propose the ordinance authorizing the Ethics Commission to require that all quarterly and other disclosure statements filed by lobbyists and campaign consultants, in accordance with the Lobbyist Ordinance and Campaign Consultant Ordinance, be filed electronically as well as submitted on paper forms.**

VII.  **Discussion re: Whether the Ethics Commission should expand the pool of political committees subject to audit to include committees that file with the Commission and make independent expenditures.**

Ethics Commission: April 17, 2000

Campaign Finance Auditor Shaista Shaikh reviewed her memorandum on the issue of auditing recipient committees that make independent expenditures. She said that recipient committees that make independent expenditures are already included in the audit pool but could be segregated to form a separate pool to ensure that a certain number are audited. She said that the FPPC auditors treat these committees the same as other committees but do not test for coordination. That is not considered within the scope of an audit. Ms. Shaikh indicated that Los Angeles has never audited non-candidate controlled committees. Ms. Shaikh said the staff does not recommend expanding the scope of the Commission's audits to determine whether expenditures made by independent-spending recipient committees are in fact independent.

Ms. Vida said that the audit process should be not be used for investigative purposes that are beyond the scope of an audit. She said, however, that if evidence of coordination is uncovered in the course of an audit, the Commission could initiate a complaint that could be handled as part of the normal complaint process. She suggested that a fixed number of recipient committees that make independent expenditures could be selected for audit from a separate audit pool.

Commissioner Melbostad said that the audit should test the assertion of independence by these committees. He said that announcing such a procedure would put these committees on notice of their responsibilities. He agreed with Commissioner Dockendorff that the test of coordination should focus on coordination between the committee and the candidate.

Commissioner Grant stated that she does not favor testing the "independence" of the committees in the audit process but does favor expanding the audit pool to include some of those committees.

Commissioner Dockendorff agreed that a certain percentage of audits should be devoted to these committees.

Mr. Marsteller urged the Commission to upgrade its audit capacity and its ability to audit the unusually large number of candidates in a November. He suggested that the Commission form a subcommittee to study the standards of evidence to be used for determining whether an expenditure was in fact "independent" and what the appropriate response of the Commission would be. He stated that the Commission should ask the Fair Political Practices Commission for assistance.

David Pilpel said there are two issues: which committees should be audited and what standards of evidence should be applied. He suggested researching the types of committees and determining how many committees of each type there are. He also asked for an analysis of major expenses, contributors, etc.

Commissioner Melbostad asked that the staff clarify what is done in an audit and what is not done. He said that evidence may be uncovered appropriately in an audit bearing on the "independence" issue, such as evidence that contributors were referred by candidate committees to the committees making independent expenditures.

VIII. **Discussion and possible action re: Possible submission of a ballot initiative, in the November 2000 election, providing for public financing of election campaigns, in the event that the Ethics Commission's proposal to provide for public financing of election campaigns is not approved by the Board of Supervisors and the Mayor prior to May 15, 2000. (The deadline for submission of a ballot measure is August 9, 2000.)**

Ms. Vida identified the three different public financing proposals before the Finance Committee, including the most recent proposal to provide public matching funds when independent expenditures are made in a particular election. Commissioner Grant complimented Ms. Starkman for her "side-by-side" chart comparing the three different proposals. Ms. Vida advised that the legislation will probably be referred to the full Board for action sometime this month.

IX. **Discussion and possible action re: Proposal to amend the Commission's bylaws to reflect recent changes incorporated in the Sunshine Ordinance, and to include other substantive and/or technical changes.**

Ms. Vida proposed that the bylaws have be amended to: 1) reflect recent changes to the Sunshine Ordinance; 2) indicate the Commission's fax number, web page address and e-mail address; 3) include a new policy to discourage City officials from appointing persons to the Commission who have held significant authority positions in political campaigns within the previous two years; 4) prohibit members of the Commission and its Executive Director from employing or being employed by a campaign consultant, or a person who is required to file a Statement of Economic Interests with the Ethics Commission, or who is employed by or holds office in an organization that makes political endorsements; 5) clarify that members of the Commission may receive City benefits; 6) include a new policy to limit the Commission from appointing an Executive Director who has held a significant authority position in a political campaign within the previous two years; and 7) provide that the Personnel Committee meet annually, rather than semiannually. In addition, the proposed revisions would correct typographic and grammatical errors. Some of the proposed changes are technical but others would incorporate conflict of interest provisions affecting staff and Commission members.

In response to a question from Commissioner Melbostad, Mr. Jacobs clarified that the new conflict of interest provisions would apply to attorney-Commissioners and their clients. Commissioner Grant stated that a Commissioner should not vote on a matter

involving a client but that the Commissioner should not be restricted in representing the listed types of clients.

Ms. Moll said that the Charter already restricts Ethics Commissioners from being employed by lobbyists and other persons who are regulated by the Commission. Since the Charter sections governing the Commission were adopted, the Campaign Consultant Ordinance was adopted, bringing campaign consultants under the Commission's regulation. Also, since that time, the rules about who must file their SEI with the Commission (as opposed to their own department) have been clarified. She noted that the proposed restrictions on employment by campaign consultants and SEI filers are consistent with the Charter provisions restricting employment by lobbyists.

Commissioner Melbostad questioned restricting membership in the Commission to those with no campaign experience in the prior two years. He said such experience could be important to the Commission's deliberations.

Ms. Starkman explained that the Commission has begun to work on the conflict of interest codes for each City department. She noted that in revising the bylaws to comply with the new provisions of the Sunshine Ordinance, staff sought to incorporate new conflict of interest rules pertaining to the Commission. She said that the two-year period was based on the City's revolving door policy prohibiting City employees' from lobbying their former departments for two years.

Mr. Pilpel said that the Commission may not have the authority to limit its membership beyond the Charter's limitations.

Mr. Pilpel requested that agenda packets be prepared for pick up by the public on the Thursday before Monday meetings to allow more time for review of the documents.

The Commission then agreed to adopt items 1, 2 and 5 of the staff recommendations (see above).

**Motion 00-4-17-26 (Dockendorff/ Kingsley) Moved, seconded and passed: That the Commission amend its bylaws as proposed in items 1, 2 and 5 of the staff recommendation.**

X.   **Discussion and possible action re: Items for future agendas.**

Ms. Mayo asked that the Commission consider the questions involving unions as lobbyists.

Ms. Moll said that unions are subject to the Lobbyist Ordinance. Ms. Mayo said that the unions may be under the impression that the Commission is further considering these issues. Commissioners Grant

and Dockendorff agreed.

**XI. Possible closed session held pursuant to Charter section C3.699-13, Brown Act section 54956.9(c) and Sunshine Ordinance section 67.11 to discuss pending litigation**

**Motion 00-4-17-27 (Melbostad/Norris) moved, seconded and passed:: That the Ethics Commission convene in closed session with the City Attorney for the purpose of conferring or receiving advice from the City Attorney regarding pending litigation:**

**The Commission adjourned to a closed session.**

**XII. Discussion and vote pursuant to Brown Act section 54957.1 and Sunshine Ordinance section 67.14 on whether to disclose action taken or discussions held in closed session.**

At the conclusion of the closed session, the following motion was approved:

**Motion 00-4-17-28: The Ethics Commission finds that it is in the best interests of the public not to disclose its closed session deliberations re: pending litigation.**

XIII. **Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission**

There was no public comment.

XIV. **Adjournment**

The meeting was adjourned at 8 p.m.

Respectfully submitted,

_____

Joe Lynn
Campaign Finance Officer



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

**EXECUTIVE DIRECTOR'S REPORT
TO THE SAN FRANCISCO ETHICS COMMISSION**

**For the Meeting of April 17, 2000**

1.  **FY 00-01 budget.** The Mayor's Office is including in the FY 01 budget a proposal for the Commission's anticipated move to an alternate location in the Civic Center area. I do not have a final draft at this time, but I believe the amount proposed will be sufficient. We will occupy a space of about 3,000 sq. ft. of contiguous space. This consolidation of our office will greatly enhance our operation.

2.  **Public Policy Program.** Deputy Executive Director Naomi Starkman and I made a presentation to the Finance Committee on April 5 regarding the Commission's proposal on public financing of supervisorial election campaigns. I also testified at the April 12 meeting of the Committee. The Committee amended the legislation and will consider, at its April 19 meeting, the Commission's proposal, Supervisor Ammiano's Amendment to the Whole, and a third proposal by Supervisor Ammiano that will provide for public financing only in the case of independent expenditures. The Committee will decide which proposal(s) to refer to the full Board. The Board is expected to consider the Committee's proposal(s) on Monday, April 24 at 2:00 p.m. A side-by-side analysis of all three legislative proposals, the text of all three proposals and my testimony are enclosed.

    On April 11, Commissioner Paul Melbostad, Deputy City Attorney Claire Sylvia and I met with Finance Committee Member Sue Bierman to discuss her concerns about public financing.

    On April 4, at the request of Supervisor Barbara Kaufman, I appeared before the Audit and Government Efficiency Committee regarding her proposal to consolidate in the Administrative Code all of the laws regulating election campaigns, lobbying, the conduct of government officials and employees, and whistleblower protections. Although the Commission has not considered this legislation, I stated to the Committee that the consolidation of laws within the Commission's jurisdiction would facilitate public access. Currently these laws are scattered throughout the Administrative Code and the Appendix to the old Charter.

    For the April 17 agenda, the staff has prepared recommendations on the following: a proposal to provide an on-line forum for all candidates for local elective office in November; a proposal authorizing the Commission to require electronic filing of lobbyist and campaign consultant statements; and a proposal to revise the bylaws. The staff also prepared a report on auditing committees that make independent expenditures.

1390 Market Street, Suite 801 • San Francisco, CA 94102-5302 • Phone (415) 554-9510 • Fax (415) 554-8757
E-Mail Address: ethics_commission@ci.sf.ca.us          Web site: http://www.ci.sf.ca.us/ethics/

Executive Director's Report
for the meeting of April 17, 2000

3.  **Investigation and enforcement program.**  Since January 1, 2000, the Commission received a total of 5 complaints.  Since its last regular meeting on March 13, the Commission has not received a complaint.  Of the total number of complaints filed since June 1995, of those currently within our jurisdiction, 7 are currently unresolved, and the staff is conducting preliminary inquiries into those complaints.

Report on volume of calls received via the Whistleblower Hotline.  Since the Whistleblower Hotline was established on July 21, 1997, the Commission has received a combined total of 32 Whistleblower complaints via the Hotline, the main telephone line and by mail.  Since January 1, 2000, a total of 5 complaints, including 4 Whistleblower complaints, have been filed.  Since June 1995, a combined total of 128 Whistleblower and non-Whistleblower complaints have been filed with the Commission.

4.  **Campaign finance disclosure program.**

DTIS services.  Staff is meeting twice a month with DTIS staff to discuss delivery of technical services.  DTIS confirmed that it will implement the consolidated Form 460 by April 24, 2000, but the new CAL format will not be ready until June 21.  Joe Lynn and DTIS staff attended a Sacramento conference sponsored by the Secretary of State on March 23 to discuss the CAL format.  David Harris of the Political Reform Division demonstrated the proposed search engines which will facilitate web site searches of state-filed campaign finance reports.  The Commission staff hopes to incorporate the benefit of his work into the Commission's web site.

As I previously reported, the lobbyist/campaign consultant electronic filing program will not be implemented until the next fiscal year, and the funds allocated for this project for FY 00 will be transferred to the FY 01 budget.  (In anticipation of this project, the Commission's April 17 agenda includes a proposal authorizing the Commission to require electronic filing by lobbyists and campaign consultants.)  A third project, also scheduled for implementation early in FY 01, involves enhancing the On-Line Filing System to allow the public to search and sort campaign data posted on the web site; and to allow the Commission's auditor to perform audit functions on the internal office campaign database.  If the City adopts a public financing program, we will also explore with DTIS enhancements to the existing On Line Filing Program that will be needed.

Finally, if the Commission recommends, and the City adopts, a program to post candidate statements and photos on the Commission's web site, we will work with DTIS to implement a system for receiving and displaying candidate submissions.

Pre-Election statements.  A total of 15 committees filed 22 pre-election statements in January and February for the March 7 election.  Of these, 13 committees filed electronically, nine of which used the On-Line Filing System and four of which used NetFile.  The Commission is contacting committees that have not filed pre-election and semiannual statements and will assess fines against late filers.

5.  **Campaign finance audit program.**  The staff anticipates completing a total of ten audits in the current fiscal year, two less than anticipated.  The Commission's decision to focus on

committees with higher financial levels has required more auditing time per audit. Also, our auditor has virtually no clerical support.

Audit reports are published on the Commission's web site. In the current fiscal year, audits of two committees with high financial activity (over $500,000) and two committees with financial activity at lower levels (over $100,000) have been completed. Audit work on four other committees has commenced. The activity levels of these committees are over $100,000, over $50,000 and over $20,000.

6. **Lobbyist program.** There are currently 50 lobbyists registered with the Commission. The lobbyists will be filing their first quarter 2000 quarterly reports on April 17. On April 3, staff presented its quarterly lobbyist workshop to interested lobbyists. As of April 10, $25,287.50 has been collected in lobbyist fees and $2,050 has been collected in lobbyist late fines this fiscal year, for a total of $27,337.50.

7. **Campaign consultant program.** Seventeen campaign consultants filed quarterly reports on March 15. There are currently sixteen consultants registered with the Commission. The next quarterly filing is due June 15. Annual campaign consultant registration and client fees were due January 1. As of April 1, $8,850 has been collected in campaign consultant registration and client fees, and $750 has been collected in campaign consultant late fines, for a total of $9,600 in the current fiscal year.

8. **Statements of Economic Interests.** Annual Statements of Economic Interests were due Monday, April 3, 2000 from department heads and members of designated boards and commissions. To date, staff has logged 430 Statements of Economic Interests, including 417 Annual Statements and 13 Assuming Office or Leaving Office Statements. Of Annual Statements received, 396 were filed by the deadline and 21 after the deadline. Follow-up notices are being sent and phone calls made to persons who have not yet filed. The names of those who filed and who are required to file are being posted on the Commission's web site.

9. **Sunshine Ordinance Declaration.** To date, 319 Sunshine Ordinance declarations have been filed with the Ethics Commission. Department heads and members of boards and commissions certify in these statements that they have read the amended Ordinance and that they will attend a training session on the new Ordinance.

10. **Staffing.** On March 28, Frank Lester replaced David Riccomini as temporary Campaign Finance Assistant. We are pleased to welcome Mr. Lester to the Commission staff.

Respectfully submitted,

Ginny Vida , Executive Director

P:\SHARED\EDREPORT\2000\ED041700.doc

3

## SAN FRANCISCO ETHICS COMMISSION
### Whistleblower Complaints Registered with the Ethics Commission since 7/21/97

| TYPE OF COMPLAINT REGISTERED VIA WHISTLEBLOWER HOTLINE | DATE OF CALL |
|---|---|
| Theft of city funds | 7/21/97 |
| Harassment | 7/21/97 |
| Corruption; Misuse of City resources | 7/21/97 |
| Possible violation of Sunshine Ordinance; Mishandling of internal complaint | 7/22/97 |
| Conflict of interest re influencing gov decision re financial interest | 7/24/97 |
| Misuse of Government Property | 7/25/97 |
| Illegal search & seizure; Retaliation, Harassment; Cover-up | 8/19/97 |
| Racial discrimination; Unfair personnel practices re: promotion | 8/20/97 |
| Fraud re: personnel practices | 10/15/97 |

| WHISTLEBLOWER COMPLAINTS REGISTERED VIA THE MAIN LINE | DATE OF CALL |
|---|---|
| Gross Misconduct | 09/16/1997 |
| Gross Misconduct | 09/17/1997 |
| Bribery | 10/07/1997 |
| Corruption | 12/10/1997 |

| WHISTLEBLOWER COMPLAINTS REGISTERED VIA COMPLAINT FORM | DATE RECEIVED |
|---|---|
| Workplace Harassment; Retaliation | 9/10/97 |
| Workplace Harassment | 10/3/97 |
| Misuse of Government Property | 11/3/97 |
| Theft of City property | 11/10/97 |
| Unlawful Retaliation | 1/5/98 |
| Gross Misconduct | 1/7/98 |
| Gross Misconduct | 1/15/98 |
| Unlawful Retaliation | 1/27/98 |
| Fraud; Theft of City Property | 2/20/98 |
| Misuse of Government Property | 3/12/98 |
| Fraud; Theft of City Property | 3/13/98 |
| Unlawful Retaliation | 4/2/98 |
| Gross Misconduct; Bribery | 4/14/98 |
| Fraud; Theft of City Property | 7/24/98 |
| Workplace Harassment; Misuse of Government Property | 6/29/99 |
| Misuse of Government Property | 7/26/99 |
| Misuse of Government Property | 7/26/99 |
| Workplace Harassment; Corruption | 1/4/00 |
| Unlawful Retaliation | 1/25/00 |
| Misuse of Government Property | 2/24/00 |
| Misuse of Government Property | 3/7/00 |

| NON-WHISTLEBLOWER COMPLAINTS REGISTERED WITH THE HOTLINE | TOTAL |
|---|---|
| Conflict of Interest | 5 |
| Mismanagement in Hiring Practices | 1 |
| Violation of Sunshine Ordinance | 1 |
| Workplace Harassment | 3 |

| WHISTLEBLOWER COMPLAINT CATEGORIES | TOTAL |
|---|---|
| (Improper Government Activities Ordinance, S.F. Admin. Code Sec. 16.401) | |
| Bribery | 2 |
| Coercion | 0 |
| Corruption | 3 |
| Discrimination | 1 |
| Fraud | 4 |
| Gross Economic Waste | 1 |
| Gross Misconduct | 6 |
| Malfeasance | 0 |
| Misuse of Government Property | 6 |
| Racial Harassment | 1 |
| Sexual Harassment | 1 |
| Theft of City Property | 7 |
| Unlawful Retaliation | 5 |



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

DATE:        April 14, 2000

TO:          Members, Ethics Commission

FROM:        Ginny Vida  *G.V.*
             Executive Director

RE:          Three public financing proposals that will be considered by the Finance
             Committee on April 19, 2000

---

Three public financing proposals will be considered by the Finance Committee at its
April 19 meeting at 10:00 a.m., City Hall.

The first is the Commission's proposal, dated February 28, 2000.

The second is an Amendment to the Whole, proposed by Supervisor Ammiano.

The third is a new proposal by Supervisor Ammiano, Public Matching Funds and
Disclosure for Campaigns.

A side-by-side analysis and the text of all three proposals are enclosed for your
information.

1390 Market Street, Suite 801 • San Francisco, CA 94102-5302 • Phone (415) 554-9510 • Fax (415) 554-8757
E-Mail Address: ethics_commission@ci.sf.ca.us          Web site: http://www.ci.sf.ca.us/ethics/



**San Francisco
Ethics Commission**

1390 Market Street, Suite 801
San Francisco, CA 94102
Phone 554-9510 Fax 554-8757

Finance Committee Meeting
April 19, 2000
Public Financing of Election Campaigns
Comparison of Ethics Commission Proposal with Amendment of the Whole
and with Public Matching Funds for Independent Expenditures

A. **Eligibility Requirements**

| ETHICS COMMISSION PROPOSAL | AMENDMENT OF THE WHOLE | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES |
|---|---|---|
| Seek election to the Board of Supervisors and be eligible to hold the office sought. | Same. | Same. |
| Receive at least $5,000 in "qualifying contributions" between $10 and $100 each from at least 50 individual (non-corporate) contributors who are San Francisco residents. | Receive at least $5,000 in "qualifying contributions" of *$100 or less* from individual (non-corporate) contributors who are San Francisco residents. | Same as Amendment of the Whole. |
| Be opposed by another candidate who is eligible to receive public financing, or has received contributions or made expenditures which equal or exceed $5,000. | Be opposed by another candidate who is eligible to receive public financing, or has received contributions or made expenditures which equal or exceed *$10,000*. | |
| Agree to limit personal spending and loans to $10,000 per election. | Agree to limit personal spending and loans to $10,000 per election *(but this requirement does not apply if the voluntary spending limits are lifted)*. | Same as Amendment of the Whole. |
| Agree to limit campaign spending to $75,000 for the general election and $20,000 for the run-off election, if one is required. | Same. | Same. |
| Agree to participate in at least one debate. | Same. | Same. |

**B.   Disbursement of Public Funds in General Election**

| ETHICS COMMISSION PROPOSAL | AMENDMENT OF THE WHOLE | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES |
|---|---|---|
| The maximum amount of public funds a candidate would receive in the general election is $45,000. | The maximum amount of public funds a candidate would receive in the general election is *$37,500.* (Additional public funding would be provided if the spending limits are lifted.  See Item D below.) | See Item D below. |
| Upon certification of eligibility, the candidate would receive a payment of $5,000 from the Fund.  Thereafter, candidates would receive $4 from the Fund for every $1 of matching contributions raised by the candidate, up to an additional $20,000.  Thereafter, candidates would receive $1 from the Fund for every $1 of matching contributions raised by the candidate, up to an additional $20,000 in public funds. | Upon certification of eligibility, the candidate would receive *$2* from the Fund for every $1 in matching contributions raised by the candidate. *Until 15 days before the election, a candidate may submit a request for public funds each time the candidate raises $5,000 in matching contributions.  Within 15 days before the election, a candidate may submit a request for public funds every time the candidate raises $1,000 in matching contributions.* | Funds only disbursed if the voluntary spending limits are lifted due to independent expenditures.  (See Item D below.) |

**C.   Disbursement of Public Funds in Run-Off Election**

| ETHICS COMMISSION PROPOSAL | AMENDMENT OF THE WHOLE | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES |
|---|---|---|
| The maximum amount of public funds a candidate would receive for the run-off election is $17,000. | The maximum amount of public funds a candidate would receive for the run-off election is *$20,000.* (Additional public funding would be provided if the spending limits are lifted.  See Item D below. | Same as Amendment of the Whole. |
| Each candidate who qualifies for a run-off election would receive a payment of $5,000 from the Fund.  Thereafter, each candidate would receive $4 from the Fund for every $1 of matching contributions raised by the candidate, up to an additional $12,000 in public funds. | Each candidate who qualifies for a run-off election would receive a payment of *$20,000* within three days following the general election. | Funds only disbursed if the voluntary spending limits are lifted due to independent expenditures.  (See Item D below. below.) |

**D. Disbursement of Public Funds if the Spending Limits Are Lifted**

| ETHICS COMMISSION PROPOSAL | AMENDMENT OF THE WHOLE | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES |
|---|---|---|
| The Ethics Commission's proposal does not provide for a lifting of the voluntary spending limits or additional public funds in the case of a high-spending opponent. | If a nonparticipating candidate receives contributions, has cash on hand or makes qualified campaign expenditures in excess of the voluntary spending limit, the spending limit is lifted and the participating candidate is entitled to receive $1 in public funds for every $1 in private funds raised or spent by the nonparticipating candidate in excess of the spending limit. The maximum amount to be awarded under these circumstances in the general election may not exceed *$75,000* per candidate. The maximum amount to be awarded under these circumstances in the run-off election is *$40,000* per candidate. | This proposal does not provide additional public matching funds if the voluntary spending limits are lifted due to financial activity of a nonparticipating candidate. |
| The Ethics Commission's proposal does not provide for a lifting of the voluntary spending limits or additional public funds in the case of independent expenditures. | If independent expenditures against any participating candidate, or in support of any opposing candidate running in the same supervisorial district, exceed in the aggregate 25% of the spending limit, the spending limit is lifted and any targeted participating candidate is entitled to $1 in public funds for every $1 in independent expenditure above 25% of the spending limit. The maximum amount to be awarded under these circumstances in the general election may not exceed *$75,000* per candidate. The maximum amount to be awarded under these circumstances in the run-off election is *$40,000* per candidate. | If independent expenditures against any participating candidate, or in support of any opposing candidate running in the same supervisorial district, exceed in the aggregate 25% of the spending limit, the spending limit is lifted and any targeted participating candidate is entitled to $1 in public funds for every $1 in independent expenditure above 25% of the spending limit. The maximum amount to be awarded under these circumstances in the general election may not exceed *$37,500* per candidate. The maximum amount to be awarded under these circumstances in the run-off election is *$20,000* per candidate. |

E.  Projected Election Campaign Fund Budget

| ETHICS COMMISSION PROPOSAL[1] | | AMENDMENT OF THE WHOLE[2] *Please see footnote 2 below for more information about the cost of this program re: lifting of the voluntary spending limits.* | | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES[3] | |
|---|---|---|---|---|---|
| Year | Range of Costs | Year | Range of Costs | Year | Range of Costs |
| 2000 | $1,007,000 - $2,728,000 | 2000 | $845,000 - $2,090,000 | 2000 | $432,500 - $1,045,000 |
| 2002 | $467,000 - $1,240,000 | 2002 | $395,000 - $950,000 | 2002 | $207,500 - $475,000 |
| 2004 | $557,000 - $1,488,000 | 2004 | $470,000 - $1,140,000 | 2004 | $245,000 - $570,000 |

[1]In the 2000 general election, all 11 Board seats will be vacant.  After the 2000 general election, the clerk of the Board will determine by lot whether the supervisors elected from the even or odd-numbered districts will have terms expiring in two or four years  Accordingly, there will be either 5 or 6 vacant seats in 2002 and 2004.  For purposes of these estimates, it is assumed that there will be 5 vacant seats in the 2002 general election and 6 vacant seats in the 2004 general election.  Commission staff developed assumptions as to how many candidates will participate in the program in the next three general elections: 1) between 2 and 4 candidates per district will receive public financing in the general election; and 2) between 1 and 2 candidates per district will receive public financing in the run-off election.

[2]The Commission based the cost estimates of the Amendment of the Whole on the above-described assumptions.  The projected Fund budget for the Amendment of the Whole does not reflect additional public funds which could be disbursed if the voluntary spending limits are lifted.  These costs could vary dramatically and are difficult to determine.  However, if in the 2000 election, an average of 1 candidate per district qualifies for full funding in both the general and run-off elections to offset independent spending or high spending by an opponent, it could cost the City an additional total of **$1,265,000** for all 11 districts.

[3]Because the threshold to qualify for public funds in this proposal is quite high ($15,000), Commission staff estimate that fewer candidates will qualify for additional public funds.  For this reason, staff determined between 1 and 2 candidates per district will receive public financing in the general election and 1 candidate per district will receive public financing in the run-off election.  For purposes of these estimates, it is assumed that there will be 5 vacant seats in the 2002 general election and 6 vacant seats in the 2004 general election.

F.  Projected Administrative Costs to the Ethics Commission

| ETHICS COMMISSION PROPOSAL | | AMENDMENT OF THE WHOLE[4] | | PUBLIC MATCHING FUNDS FOR INDEPENDENT EXPENDITURES | |
|---|---|---|---|---|---|
| Item | Amount | Item | Amount | Item | Amount |
| Salaries of 2 FT professional employees | $100,000 | Salaries of 3 FT professional employees | $135,000 | Salaries of 3 FT professional employees | $135,000 |
| Salary of 1 FT clerical employee @ 6 months | $17,000 | Salary of 1 FT clerical employee @ 6 months | $17,000 | Salary of 1 FT clerical employee @ 6 months | $17,000 |
| Non-personnel costs | $20,000 | Non-personnel costs | $25,000 | Non-personnel costs | $25,000 |
| Total | $137,000 | Total | $177,000 | Total | $177,000 |

[4] These costs will be increased due to additional mandates proposed by the Amendment to the Whole.

LEGISLATIVE DIGEST
February 18, 2000

AMENDING THE SAN FRANCISCO ADMINISTRATIVE CODE TO PROVIDE FOR
PUBLIC FINANCING OF ELECTION CAMPAIGNS

Currently, San Francisco does not provide public funds to candidates to defray the costs of election campaigns. This ordinance would provide public funds to candidates for the Board of Supervisors who meet certain eligibility criteria and agree to certain conditions.

To be eligible to receive public financing of campaign expenses, a candidate must: (1) Be seeking election to the Board of Supervisors and be eligible to hold the office sought; (2) have received at least $5,000 in "qualifying contributions" from at least 50 contributors; and (3) be opposed by another candidate who is eligible to receive public financing, or has received contributions or made expenditures which equal or exceed $5,000. A "qualifying contribution" is a contribution of $10 to $100 that is made by an individual resident of San Francisco. Candidates may accept contributions up to the $500-per-contributor limit imposed by San Francisco's Campaign Finance Reform Ordinance, but only the first $100 counts as a "qualifying contribution."

Candidates who wish to receive public financing of campaign expenses must also agree to the following conditions. First, the candidate must agree to limit loans and contributions of personal funds to his or her campaign to a total of $10,000 per election. Second, the candidate must agree to limit his or her campaign spending to $75,000 for the general election and $20,000 for the run-off election, if one is required. Third, the candidate must agree to participate in at least one debate with his or her opponents. In addition, the candidate bears the burden of proving that each contribution relied upon to establish eligibility is a "qualifying contribution," and each expenditure made with public funds complies with the requirements imposed by the ordinance.

This ordinance would create a special Election Campaign Fund ("Fund"). Under the terms of the ordinance, the Mayor and Board would be "required" to appropriate enough money to the Fund on an annual basis to defray campaign expenses for candidates for the Board of Supervisors who may be eligible to receive the public funds. The ordinance also "requires" the Mayor and Board to appropriate funds to the Ethics Commission to pay for the costs of administration of the public financing program. This is not an enforceable requirement. If the Mayor and Board do not appropriate sufficient funds, the public financing program would not operate.

Candidates could apply for public funds on or after June 1 of the election year, but no later than the deadline for filing nomination papers (mid-August). The Executive Director of the Ethics Commission would review the candidate's application to determine whether the candidate is eligible to receive public funds. At the request of the Executive Director, the Controller would assist in this review process. If the Executive Director determines that a candidate is ineligible to receive public financing, the candidate would be permitted to resubmit the application and seek reconsideration. The candidate could also appeal the decision of the Executive Director to the Ethics Commission.

The maximum amount of public funds a candidate may receive to defray general election expenses under this Article is $45,000. Upon certification of eligibility, the candidate would receive a payment of $5,000 from the Fund. Thereafter, for each of the first $5,000 dollars of "matching contributions" raised by the candidate, the candidate would receive four dollars from

1

the Fund. Thereafter, for each additional dollar of matching contributions raised by the candidate, the candidate would receive one dollar from the Fund. A "matching contribution" is a contribution, other than a "qualifying contribution," that is made by an individual resident of San Francisco.

The maximum amount of public funds a candidate may receive to defray run-off election expenses under this Article is $17,000. Each candidate who qualifies for a run-off election would receive a payment of $5,000 from the Fund. Thereafter, for each dollar of matching contributions raised by the candidate, the candidate would receive four dollars from the Fund.

The ordinance imposes restrictions on the use of public funds. Candidates may use the funds to pay campaign expenses only. Candidates may not use public funds to pay administrative, civil or criminal fines, or to pay for inaugural activities or officeholder expenses. Equipment purchased with public funds that is worth $100 or more and has a useful life beyond the campaign would become City property after the election. Candidates who receive public funds but who withdraw or fail to qualify for the ballot would be required to repay the full amount received from the Fund. Candidates who receive public funds and who have surplus funds would be required to return the surplus to the Fund.

The Controller, who would be responsible for making payments to candidates from the Fund, would terminate payments to a candidate who withdraws or fails to qualify for the ballot, or fails to comply with the specified conditions and reporting requirements.

The ordinance would impose additional reporting and disclosure requirements on committees. First, any committee that makes contributions or independent expenditures totaling $500 or more in a calendar month during the six months immediately preceding an election, to support or oppose a candidate for local elective office at that election, would be required to disclose, prior to the date of the election, all contributions and loans received and all expenditures made. Second, any committee that makes independent expenditures in support of or in opposition to a candidate for local elective office that equal of exceed $5,000 would be required to file, within 24 hours of reaching this threshold, a statement with the Ethics Commission stating that fact. Thereafter, the committee would be required to file a supplemental statement with the Commission each time the committee makes independent expenditures in support of or in opposition to the candidate which equal or exceed an additional $5,000. The supplemental statements would be filed within 24 hours of reaching the spending threshold. The Ethics Commission would prescribe the form, content and filing deadlines for these statements, and could require that these statements be filed electronically. In addition, candidates who do not receive public funds would be required to notify the Commission if candidate receives contributions, makes expenditures or has funds in his or her campaign account that equal or exceed $5,000.

Violation of the ordinance could subject the violator to administrative, civil and criminal penalties. The Ethics Commission could impose an administrative penalty of up to $5,000 per violation. Any person who "willfully or knowingly" misused public funds would be guilty of a misdemeanor and punishable by a fine of at least $500 and at most $5,000 or three times the amount improperly spent, whichever is greater, or by imprisonment for up to six months, or both. Any person who willfully, knowingly or negligently misuses public funds would be liable in a civil action brought by the City Attorney for an amount up $5,000 or three times the amount improperly spent, whichever is greater.

In addition, any person who knowingly or willfully furnished false or misleading information to the Ethics Commission, or concealed information relevant to certification or an

2

audit, would be guilty of a misdemeanor punishable by a fine of up to $5,000, or by imprisonment for up to six months, or both.

The Ethics Commission would be required to audit all candidates who receive public funds. If the Ethics Commission determined that payments made to a candidate from the Fund exceeded the amount to which the candidate was entitled, or were used for an unauthorized purpose, the candidate would be required to repay the Fund the amount of the excess or the improper expenditure, in additional to other penalties that might apply.

The ordinance would require the Ethics Commission to report on the public financing program to the Mayor and Board of Supervisors. Following each election at which members of the Board of Supervisors are elected, the Ethics Commission would be required to report the amount of public funds used to pay for election campaigns in that election, and other information such as: the number of candidates who received public funds; the number of nonparticipating candidates; the amount of qualified campaign expenditures made by all candidates in that election; and the amount of independent expenditures made in connection with the election.

3

FILE NO. _____

ORDINANCE NO. _____

1   [Public Financing of Election Campaigns]

2   AMENDING THE SAN FRANCISCO ADMINISTRATIVE CODE TO ADD SECTIONS

3   16.549-1 THROUGH 16.549-18 TO PROVIDE FOR PUBLIC FINANCING OF ELECTION

4   CAMPAIGNS.

5           Note:       All text is new.

6       Be it ordained by the People of the City and County of San Francisco:

7       Section 1.  The San Francisco Administrative Code is hereby amended by adding

8   Article XIIE, Sections 16.549-1 through 16.549-18, to read as follows:

9

10                              **ARTICLE XIIE**

11              **PUBLIC FINANCING OF ELECTION CAMPAIGNS**

12

13      **SEC. 16.549-1.  TITLE.**  This Article may be cited as the Public Financing of Election

14   Campaigns Ordinance.

15

16      **SEC. 16.549-2.  FINDINGS.** (a)  NEED FOR LEGISLATION.  The people of the City

17   and County of San Francisco find that the current system of privately financed campaigns for

18   election to City offices undermines democracy in that it:

19              (1)     fuels the public perception of corruption and undermines public

20   confidence in the democratic process and democratic institutions;

21              (2)     presents the danger of actual corruption by encouraging elected officials

22   to take money from private interests that are directly affected by governmental actions;

23              (3)     diminishes elected officials' responsiveness to their constituents by

24   encouraging them to be especially responsive to the wealthy contributors who finance their

25   election campaigns;

SAN FRANCISCO ETHICS COMMISSION

REMARKS BY GINNY VIDA, EXECUTIVE DIRECTOR, SF ETHICS COMMISSION, BEFORE THE FINANCE COMMITTEE, SF BOARD OF SUPERVISORS, APRIL 12, 2000, REGARDING AMENDED PROPOSAL TO IMPLEMENT PUBLIC FINANCING IN SUPERVISORIAL ELECTION CAMPAIGNS

GOOD MORNING, MY NAME IS GINNY VIDA AND I AM THE EXECUTIVE DIRECTOR OF THE SAN FRANCISCO ETHICS COMMISSION. LAST WEEK I TESTIFIED BEFORE YOU ON BEHALF OF THE COMMISSION'S PROPOSAL FOR PUBLIC FINANCING OF ELECTION CAMPAIGNS FOR THE BOARD OF SUPERVISORS. AT LAST WEEK'S MEETING, THE COMMISSION'S PROPOSAL WAS AMENDED BY SUPERVISOR AMMIANO. ALTHOUGH THE MEMBERS OF THE ETHICS COMMISSION HAVE BEEN PROVIDED COPIES OF THE AMENDED LEGISLATION, THEY HAVE NOT HAD THE OPPORTUNITY TO MEET AND CONSIDER THE AMENDMENT OF THE WHOLE. FOR THIS REASON, I CANNOT COMMENT ON THE SUBSTANTIVE POINTS RAISED IN THE AMENDMENT. INSTEAD, I WOULD LIKE TO TAKE THIS OPPORTUNITY TO ADDRESS SOME OF THE CONCERNS RAISED LAST WEEK BY MEMBERS OF THE COMMITTEE AND PROVIDE SOME PRELIMINARY COST ESTIMATES REGARDING THE AMENDMENT.

SUPERVISORS, THE CAMPAIGN FINANCE SYSTEM IN SAN FRANCISCO IS IN A STATE OF CRISIS. LAST NOVEMBER, EIGHTY PERCENT OF THE VOTERS APPROVED A $75,000 VOLUNTARY SPENDING LIMIT FOR CANDIDATES FOR THE BOARD OF SUPERVISORS. THE VOTERS HAVE GIVEN A CLEAR DIRECTIVE; THEY WANT LIMITS ON CAMPAIGN SPENDING. SAN FRANCISCO HAD PREVIOUSLY ENCOURAGED CANDIDATES TO VOLUNTARILY LIMIT CAMPAIGN SPENDING BY ALLOWING THEM TO RECEIVE UP TO $500 PER CONTRIBUTOR IF THEY AGREED TO COMPLY WITH THE SPENDING LIMITS. CANDIDATES WHO DID NOT AGREE TO COMPLY WITH THE VOLUNTARY SPENDING LIMITS WERE LIMITED TO $150

PER CONTRIBUTOR. UNFORTUNATELY, A RECENT FEDERAL COURT DECISION INVALIDATED THESE VARIABLE CONTRIBUTION LIMITS—THE PRINCIPLE INCENTIVE FOR CANDIDATES TO ADOPT VOLUNTARY LIMITS ON CAMPAIGN SPENDING. NOW, <u>ALL</u> CANDIDATES CAN ACCEPT $500 CONTRIBUTIONS WHETHER OR NOT THEY ACCEPT THE SPENDING LIMIT. AND SO, IN FORWARDING ITS PROPOSAL TO THE BOARD, THE COMMISSION HAS SOUGHT TO OFFER CANDIDATES FOR THE BOARD AN ALTERNATIVE INCENTIVE TO LIMIT THEIR SPENDING: PARTIAL PUBLIC FINANCING OF THEIR CAMPAIGNS. IT IS THE ONLY MEANINGFUL INCENTIVE WE CAN OFFER CANDIDATES TO LIMIT SPENDING.

LAST WEEK, SUPERVISOR YEE INDICATED HIS CONCERN THAT PUBLIC FINANCING OF CAMPAIGNS RUNS COUNTER TO THE DEMOCRATIC PROCESS OF CONTRIBUTING MONEY ONLY TO CANDIDATES ONE SUPPORTS. WE APPRECIATE YOUR CONCERN. THE COMMISSION IS PERSUADED, HOWEVER, THAT PUBLIC FINANCING OF CAMPAIGNS ACTUALLY <u>ENHANCES</u> THE DEMOCRATIC PROCESS. PUBLIC FINANCING ALLOWS CANDIDATES TO SPEND MORE TIME COMMUNICATING WITH VOTERS AND LESS TIME RAISING MONEY. ELECTIONS WILL BECOME MORE COMPETITIVE BECAUSE MORE CANDIDATES WILL BE ABLE TO RUN FOR OFFICE AND BE ELECTED ON THE BASIS OF THEIR IDEAS, AND NOT ON THE BASIS OF THEIR BANK ACCOUNTS. VOTERS WILL GAIN GREATER ACCESS TO INFORMATION ABOUT THE CANDIDATES. WE THINK THAT PUBLIC FINANCING IS AN IMPORTANT STEP TOWARD RESTORING DEMOCRACY TO THE AMERICAN PEOPLE BY HELPING TO REINSTATE PUBLIC CONFIDENCE IN THE ELECTORAL PROCESS.

SUPERVISOR YEE ALSO EXPRESSED CONCERN ABOUT THE COSTS OF THE PROGRAM AT A TIME WHEN THE CITY HAS OTHER IMPORTANT FINANCIAL NEEDS. WE RECOGNIZE THAT THERE WILL ALWAYS BE IMPORTANT OTHER FINANCIAL NEEDS. HOWEVER, THE RESEARCH WE HAVE

CONDUCTED, AND THE TESTIMONY WE HAVE HEARD FROM PUBLIC OFFICIALS IN OTHER CITIES HAS PERSUADED US THAT THE BENEFITS OF PUBLIC FINANCING ARE SO IMPRESSIVE THAT IT SHOULD BE ESTABLISHED AS A BUDGETARY PRIORITY. LOS ANGELES, TUCSON, LONG BEACH AND NEW YORK CITY HAVE CARVED OUT A PLACE FOR PUBLIC FINANCING IN THEIR BUDGETS. UNDER THE AMENDMENT TO THE WHOLE, PUBLIC FINANCING OF ELECTION CAMPAIGNS WILL REPRESENT A SMALL PERCENTAGE OF THE CITY'S TOTAL BUDGET – SOMEWHERE BETWEEN .02 PERCENT AND .05 PERCENT FOR BASIC GRANTS TO CANDIDATES. EVEN IF MAXIMUM FUNDING IS GRANTED TO AN AVERAGE OF ONE CANDIDATE PER DISTRICT TO OFFSET INDEPENDENT SPENDING OR HIGH SPENDING BY A NONPARTICIPATING OPPONENT, THE TOTAL PROGRAM WOULD REPRESENT ONLY .08 PERCENT OF THE CITY'S BUDGET. THIS IS NOT TOO BIG A PRICE TO PAY FOR AN INCENTIVE TO CANDIDATES TO ADOPT THE VOLUNTARY SPENDING LIMITS THAT EIGHTY PERCENT OF THE VOTERS HAVE ESTABLISHED. IT IS NOT TOO BIG A PRICE TO PAY FOR A SIGNIFICANT INVESTMENT IN THE DEMOCRATIC PROCESS. I'LL BE DISCUSSING COST ESTIMATES IN GREATER DETAIL AT THE END OF THIS PRESENTATION.

SUPERVISOR YEE ALSO STATED THAT THE PUBLIC FINANCE PROPOSAL DOES NOT ADDRESS THE MOST SERIOUS PROBLEM IN SAN FRANCISCO CAMPAIGNS, THE LEVEL OF INDEPENDENT SPENDING. IT IS IMPORTANT TO NOTE THAT THE COURTS HAVE THUS FAR INVALIDATED THE EFFORTS OF MUNICIPALITIES TO LIMIT INDEPENDENT EXPENDITURES. IT IS THE COMMISSION'S POSITION THAT GIVEN THESE CONSTRAINTS, PUBLIC DISCLOSURE IS THE BEST WAY TO REDUCE THE IMPACT OF INDEPENDENT EXPENDITURES ON CAMPAIGNS. FOR THIS REASON, THE COMMISSION PROPOSED NEW RULES PROVIDING THAT ANY COMMITTEE THAT MAKES INDEPENDENT EXPENDITURES TOTALING $500 A MONTH IN THE SIX MONTHS PRIOR TO THE ELECTION MUST DISCLOSE ALL CONTRIBUTIONS

AND LOANS RECEIVED AND ALL EXPENDITURES MADE. THIS PROVISION
REMAINS INTACT IN THE AMENDMENT OF THE WHOLE. THE AMENDMENT
DIFFERS IN THAT PUBLICLY FINANCED CANDIDATES WILL RECEIVE
ADDITIONAL PUBLIC FUNDS IF A NON-PARTICIPATING CANDIDATE
SPENDS IN EXCESS OF THE $75,000 SPENDING LIMIT OR IF INDEPENDENT
EXPENDITURES EXCEED 25 PERCENT OF THE SPENDING LIMITS.

LAST WEEK, SUPERVISOR BIERMAN EXPRESSED CONCERN THAT ONE
GOAL OF THE COMMISSION IN PROVIDING FOR PUBLIC FINANCING IS TO
DIMINISH THE PUBLIC PERCEPTION OF CORRUPTION. SUPERVISOR
BIERMAN STATED THAT IN ALL OF HER YEARS AS A POLITICAL ACTIVIST,
NOT ONE PERSON HAS EVER MENTIONED CORRUPTION TO HER AS A
PROBLEM IN SAN FRANCISCO POLITICS. HOWEVER, AT NUMEROUS
MEETINGS OF THE ETHICS COMMISSION OVER THE PAST FOUR MONTHS,
MEMBERS OF THE PUBLIC HAVE EXPRESSED THEIR CONCERN ABOUT THE
APPEARANCE OR PERCEPTION OF CORRUPTION IN SAN FRANCISCO
POLITICS. AS MEMBERS OF THIS COMMITTEE MAY BE AWARE, THIS IS NOT
A PROBLEM UNIQUE TO SAN FRANCISCO. ACCORDING TO A NEW
NATIONAL SURVEY COMMISSIONED BY PUBLIC CAMPAIGN, MORE THAN
TWO-THIRDS OF THE PUBLIC FAVORS COMPREHENSIVE CAMPAIGN
FINANCE REFORM OFFERING SOME FORM OF PUBLIC FINANCING TO
CANDIDATES. THE SURVEY INDICATES THAT IN THE PUBLIC'S VIEW, THE
SYSTEM IS NOT ONLY BROKEN, BUT IS GETTING WORSE. AND THE
GREATEST CONCERN TO VOTERS IS THE PERCEIVED INFLUENCE OF
SPECIAL INTERESTS ON THE ELECTORAL SYSTEM AND THE PERCEPTION
THAT BIG MONEY AND BIG SPENDING MAY INFLUENCE THE
POLICYMAKING OF THOSE WHO ARE ELECTED.

FINALLY, WITH RESPECT TO THE COST OF THE PROGRAM, AS AMENDED
BY THE AMENDMENT OF THE WHOLE, THE COMMISSION STAFF HAS
DEVELOPED SOME PRELIMINARY ESTIMATES. THE COMMISSION STAFF

HAD PREVIOUSLY DEVELOPED ASSUMPTIONS AS TO HOW MANY
CANDIDATES WILL PARTICIPATE IN THE PROGRAM IN THE NEXT THREE
GENERAL ELECTIONS: 1) THAT AT LEAST <u>TWO</u> CANDIDATES PER DISTRICT
WILL RECEIVE PUBLIC FINANCING IN THE GENERAL ELECTION, AND 2) AT
LEAST <u>ONE</u> CANDIDATE PER DISTRICT WILL RECEIVE PUBLIC FINANCING
IN THE RUN-OFF ELECTION. RELYING ON THESE SAME ASSUMPTIONS,
THE STAFF WAS ABLE TO DETERMINE A RANGE OF COSTS FOR THE NEXT
THREE GENERAL ELECTIONS BASED <u>SOLELY</u> ON THE INITIAL AMOUNT OF
PUBLIC FUNDS TO BE DISBURSED TO PARTICIPATING CANDIDATES IN THE
GENERAL AND RUN-OFF ELECTIONS. THE ESTIMATES FOR THE <u>AMENDED</u>
PROPOSAL ARE AS FOLLOWS:

| YEAR | RANGE OF COSTS |
|------|----------------|
| 2000 | $845,000 - $2,090,000 |
| 2002 | $395,000 - $950,000 |
| 2004 | $470,000- $1,140,000 |



BECAUSE IT IS IMPOSSIBLE TO KNOW HOW MANY CANDIDATES WILL
RECEIVE ADDITIONAL PUBLIC FUNDS DUE TO THE LIFTING OF THE
SPENDING LIMITS, THESE ESTIMATES ARE BASED ONLY ON THE AMOUNT
OF PUBLIC FUNDS RELEASED TO CANDIDATES IN THE GENERAL AND RUN-
OFF ELECTIONS. IT IS IMPORTANT TO NOTE THAT THESE FIGURES COULD
BE DRAMATICALLY INCREASED, DEPENDING ON THE NUMBER OF
PARTICIPATING CANDIDATES WHO RECEIVE ADDITIONAL PUBLIC FUNDS
DUE TO A LIFTING OF THE SPENDING LIMITS. HOWEVER, TO GIVE YOU
SOME IDEA, IF AN AVERAGE OF ONE CANDIDATE PER DISTRICT QUALIFIES
FOR FULL FUNDING TO OFFSET INDEPENDENT SPENDING OR HIGH
SPENDING BY AN OPPONENT, THAT WOULD COST AN ADDITIONAL $115,000
PER CANDIDATE, OR AN ADDITIONAL TOTAL OF $1,265,000 FOR ALL 11
DISTRICTS. WE DO NOT HAVE A WAY OF ESTIMATING HOW MANY
CANDIDATES MIGHT QUALIFY PER DISTRICT AT THIS TIME.

AGAIN, WE APPRECIATE YOUR CONCERNS. BUT WE ALSO HOPE THAT THE
BOARD CAN AGREE TO IMPLEMENT SOME VERSION OF PARTIAL PUBLIC
FINANCING TO PROVIDE A MEANINGFUL INCENTIVE TO CANDIDATES TO
ABIDE BY THE $75,000 SPENDING LIMIT.

P:\SHARED\PUBLIC FINANCE\BOARD OF SUPERVISORS\FC4 12 00.DOC

REMARKS BY GINNY VIDA, EXECUTIVE DIRECTOR, SF ETHICS
COMMISSION, BEFORE THE FINANCE COMMITTEE, SF BOARD OF
SUPERVISORS, APRIL 5, 2000, REGARDING A PROPOSAL TO IMPLEMENT
PUBLIC FINANCING OF SUPERVISORIAL ELECTION CAMPAIGNS

GOOD MORNING SUPERVISORS. MY NAME IS GINNY VIDA AND I AM
EXECUTIVE DIRECTOR OF THE ETHICS COMMISSION. IT IS MY PRIVILEGE
TO SPEAK TO YOU TODAY ON A LEGISLATIVE PROPOSAL THAT WILL HAVE
A PROFOUND AND BENEFICIAL EFFECT ON SUPERVISORIAL CAMPAIGNS IN
SAN FRANCISCO.

LAST OCTOBER, THE BOARD OF SUPERVISORS ASKED THE ETHICS
COMMISSION TO FORWARD TO THE BOARD A PROPOSAL PROVIDING FOR
PUBLIC FINANCING OF CAMPAIGNS FOR ELECTIVE OFFICE IN SAN
FRANCISCO. FOR THE LAST FOUR MONTHS, THE COMMISSION HAS
DEVOTED VIRTUALLY ALL OF ITS POLICY WORK TO THIS VITAL ISSUE.
THE COMMISSION HAS CAREFULLY RESEARCHED PROGRAMS IN OTHER
JURISDICTIONS, HELD PUBLIC HEARINGS, PREPARED COST ANALYSES,
REVIEWED ALTERNATIVE SOURCES OF FUNDING, AND SPENT MANY
HOURS DELIBERATING DRAFT LEGISLATION AT A SERIES OF SPECIAL
MEETINGS HELD FROM NOVEMBER THROUGH MARCH. AT A PUBLIC
HEARING IN DECEMBER, THE COMMISSION HEARD TESTIMONY FROM
NOTABLE EXPERTS IN PUBLIC FINANCING, INCLUDING THE FORMER
MAYOR OF TUCSON. ALL OF THESE EXPERTS CITED THE BENEFICIAL
EFFECTS OF PUBLIC FINANCING ON THE ELECTORAL PROCESS.

AS YOU KNOW, LAST YEAR, A FEDERAL DISTRICT COURT TEMPORARILY
ENJOINED THE VARIABLE CONTRIBUTION LIMITS PROVIDED FOR IN THE
CAMPAIGN FINANCE REFORM ORDINANCE. THE VARIABLE LIMITS HAD
PROVIDED AN INCENTIVE FOR CANDIDATES TO ACCEPT THE $75,000
SPENDING LIMIT FOR SUPERVISORIAL RACES. THIS NEW SPENDING CAP
HAD BEEN APPROVED BY 80 PERCENT OF THE VOTERS LAST NOVEMBER.

BUT NOW THIS CRITICAL INCENTIVE TO ABIDE BY THE SPENDING LIMIT IS GONE.

THE COMMISSION HAS CLEAR GOALS IN PROPOSING THIS LEGISLATION. FIRST, THE COMMISSION ANTICIPATES THAT THE AVAILABILITY OF PUBLIC FUNDING WILL PROVIDE AN INCENTIVE TO CANDIDATES TO VOLUNTARILY LIMIT THEIR CAMPAIGN SPENDING—THAT IS, TO ACCEPT THE $75,000 SPENDING LIMIT. SECOND, THE COMMISSION EXPECTS THAT CANDIDATES WILL SPEND MORE TIME COMMUNICATING WITH VOTERS AND LESS TIME RAISING MONEY. THIRD, ELECTIONS WILL BECOME MORE COMPETITIVE BECAUSE MORE CANDIDATES WILL BE ABLE TO RUN FOR OFFICE. FOURTH, PUBLIC FINANCING WILL LIMIT THE INFLUENCE, OR THE APPEARANCE OF INFLUENCE, OF PRIVATE CONTRIBUTIONS ON POLICYMAKING. PUBLIC FINANCING WILL THUS HELP TO RESTORE PUBLIC CONFIDENCE IN THE ELECTORAL PROCESS. FINALLY, THIS PUBLIC FINANCING LEGISLATION WILL REQUIRE DISCLOSURE OF INDEPENDENT EXPENDITURES AFFECTING CANDIDATES, AT FREQUENT INTERVALS IN ADVANCE OF AN ELECTION, SO THAT THE VOTERS WILL HAVE ACCESS TO THIS INFORMATION BEFORE THEY CAST THEIR VOTES.

CAMPAIGN FINANCE REFORM IS A PROMINENT ISSUE AFFECTING ALL AMERICANS. SAN FRANCISCO, A CITY THAT IS NOTED FOR ITS PROGRESSIVE POLITICS, SHOULD JOIN OTHER CITIES IN ENSURING THE INTEGRITY OF THE DEMOCRATIC PROCESS BY PASSING THIS LEGISLATION. THOSE CITIES INCLUDE LOS ANGELES, TUCSON, NEW YORK, OAKLAND AND LONG BEACH.

\\ETHICS-01SVR\DATA\SHARED\Public Finance\FINANCE CMTE 4.5.00.doc