# EXHIBIT L

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

**Ethics Commission**



1390 Market Street, Suite 801
San Francisco, CA 94102
Phone 554-9510 Fax 703-0121

# SAN FRANCISCO ETHICS COMMISSION AGENDA

## for <u>REGULAR MEETING</u>

### <u>Monday, June 12, 2000, 5:00 p.m.</u>

### <u>City Hall, One Dr. Carlton B. Goodlet Place, Room 408</u>

I.    Call to order and roll call

II.   Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

III.  Discussion and possible approval of the minutes of the meeting of May 15, 2000.

IV.   Executive Director's report

    1. FY 00-01 budget
    2. Relocation of Commission office
    3. Public policy program
    4. Advice and opinions
    5. Investigation and enforcement program
    6. Report on volume of calls received via the Whistleblower Hotline
    7. Campaign finance disclosure program
    8. Campaign finance audit program
    9. Lobbyist program
    10. Campaign consultant program
    11. Statements of economic interests
    12. Declarations received re: amended Sunshine Ordinance

V.    Discussion and possible action re: Proposal to submit a ballot initiative, in the November 2000 election, amending the San Francisco Campaign and Governmental Conduct Code to provide for public financing of election campaigns. (The deadline for submission of a ballot measure is August 9, 2000.) Draft legislation will be available from the Commission office on Thursday, June 8.)

VI.   Discussion and possible action re: Items for future agendas.

VII.  Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

VIII. Adjournment

(Please turn over for page 2)

SF Ethics Commission Agenda – June 12, 2000

## Know Your Rights Under the Sunshine Ordinance

*Government's duty is to serve the public, reaching its decisions in full view of the public. Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business. This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review.*

*For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force, Donna Hall, Administrator, City Hall, Room 244, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102-4869. Office telephone: (415) 554-7724; Fax: (415) 554-5163; E-mail: Donna_Hall@ci.sf.ca.u.s. Copies of the Sunshine Ordinance can be obtained from the Clerk of the Sunshine Task Force, the San Francisco Public Library and on the City's web site at www.ci.sf.ca.us/bdsupvrs/ordinance.htm*

---

*This location is wheelchair accessible. In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products. Please help the City accommodate these individuals.*

---

*Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street, Suite 801, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site: www.sfgov.org/ethics.*

P:\SHARED\AGENDA\2000\061200.doc



sfgov | residents | business | government | visitors | online services | search    go !

Ethics Commission >> Meeting Information

# Ethics Commission

### June 12, 2000

Approved 7/31/00

### Minutes of the
### San Francisco Ethics Commission Meeting

#### City Hall, One Dr. Carlton B. Goodlett Place, Room 408

#### June 12, 2000, 5:00 p.m.

i. Call to order and roll call.

Chairperson Isabella H. Grant called the meeting to order at 5:19 p.m.

COMMISSION MEMBERS PRESENT: Isabella H. Grant, Chairperson; Henri E. Norris, Vice-Chairperson; Robert D. Dockendorff, Commissioner; Paul H. Melbostad, Commissioner; Carol M. Kingsley, Commissioner.

STAFF PRESENT: Ginny Vida, Executive Director; Katherine Havener, Ethics Investigator/Legal Analyst; Frank Lester, Staff Assistant.

OFFICE OF THE CITY ATTORNEY: Julia Moll, Deputy City Attorney.

OTHERS PRESENT: Robert Stern, Director of the Center for Governmental Studies; Jim Knox, California Common Cause; Steven Hill, Center for Voting and Democracy; Joan Mandel, Common Cause; Charles Marsteller, Common Cause; Phillip Babcock, Harvey Milk Gay and Lesbian Democratic Club; Anita Mayo, Pillsbury, Madison and Sutro; Steven Hill, Center for Voting and Democracy; Lucy Colvin, San Francisco Green Party County Council.

MATERIALS DISTRIBUTED:

S.F. Ethics Commission Agenda, June 12, 2000

Draft Minutes of the S.F. Ethics Commission Meeting of May 15, 2000

Minutes of the S.F. Ethics Commission Meeting of April 17, 2000

Executive Director's Report, June 12, 2000

Whistleblower Complaints Registered with the Ethics Commission since July 21, 1997

Letter dated June 6, 2000 from Aaron B. Chong, Campaign Reform Ad Hoc Staff, City of Sacramento, to Joe Lynn, re: Sacramento's interest in San Francisco's online filing system

Memorandum dated June 7, 2000 from Ginny Vida to Members, Ethics Commission re: Draft Legislation for "Fair Elections Ordinance" Ballot Initiative Providing for Public

Financing of Elections

Chart re: Recipient Committees That Made Independent Expenditures in San Francisco's 1999 Elections

Electronic mail dated June 7, 2000 from Jim Knox to Ethics Commission re: CFR Ordinance

"Taxpayer-Financed Campaign Measure Goes on S.F. Ballot," San Francisco *Chronicle*, May 16, 2000

"S.F. Voters to Decide on Campaign Finance Reform," San Francisco *Examiner*, May 16, 2000

"Oakland Reinstates Spending Cap: $250 Limit on State Political Action Committee Funds for Local Elections," San Francisco *Chronicle*, June 8, 2000

"Senate Backs Campaign Finance Measure," Washington *Post*, June 8, 2000

**II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.**

There was no public comment.

**III. Discussion and possible approval of the minutes of the meeting of May 15, 2000.**

**Motion 00-6-12-35 (Dockendorff/Kingsley) Moved, seconded and passed: That the minutes of the May 15, 2000 meeting be approved.**

**IV. Executive Director's Report.**

Executive Director Ginny Vida referred the Commission to her report in the agenda packet. She brought the Commission's attention to item number six in the report, referencing a letter received from the City of Sacramento about possible adoption and use of the Ethics Commission's Online Filing System for candidates and committees. Ms. Vida said that it was an exciting development that another jurisdiction has shown interest in implementing San Francisco's electronic filing system. She added that the interest displayed by Sacramento speaks well of the system's efficacy.

**V. Discussion and possible action re: Proposal to submit a ballot initiative, in the November, 2000 election, amending the San Francisco Administrative Code to provide for public financing of election campaigns.**

Commission Chair Isabella Grant briefly reviewed the procedural history of the proposal, including its consideration and rejection by the Board of Supervisors on a 10-1 vote on April 24, and the Commission's subsequent 4-1 vote at its May 15 meeting to place the proposed legislation on the November 2000 ballot. Commissioner Grant observed that the deadline for placing the initiative on the ballot is August 9, 2000.

Ms. Vida referred the Commission to the June 7 staff report summarizing the legislation. She stated that the draft legislation responds to concerns raised by Commissioner Melbostad regarding the county-versus-city loophole pertaining to pre-election disclosure of contributions by general purpose committees, and incorporates his proposal that contributions to independent expenditure committees be limited to $500.

SF Ethics Commission; June 12, 2000

Case 3:07-cv-03199-JSW    Document 21-14    Filed 08/27/2007    Page 6 of 18    Page 3 of ?

**Remarks from Commissioner Dockendorff.** Commissioner Dockendorff reiterated his concern that including in the legislation a provision to lift the spending limits would promote the flow of special interest money into local elections. He stated that given the choice between a candidate who agrees to voluntary expenditure limits without the possibility of lifting those limits, and a candidate who does not agree to such limits, the voter will choose the best candidate. He expressed concern that a provision to lift the spending limits would prevent the passage of the legislation in November. Commissioner Dockendorff stated that if the Commission places a measure on the ballot that includes a provision to lift the limits, the legislation should be split into three separate ballot initiatives:

1) an initiative placing contribution limits on independent expenditure committees; 2) an initiative providing for greater disclosure by "all entities involved in the public financing of local elections;" and

3) an initiative providing for the public financing of campaigns.

In a further comment on `lifting the limits,' Commissioner Dockendorff stated that there has been no evidence presented to this Commission to show that it is necessary, or even desirable, to add a provision for lifting the voluntary campaign limits to entice candidates to participate in public financing programs.

Ms. Vida responded that the Commission had invested a great deal of time in reaching its previous decision to provide for lifting the spending limits. She said that it was inadvisable to reverse what had already been decided after thorough debate. She also reiterated that without a provision lifting the spending limits, candidates would be less inclined to participate in the public financing program for fear that they might face candidates who could raise and spend unlimited amounts.

**Robert Stern.** The Commission heard testimony from Robert Stern, Director of the Center for Governmental Studies. He stated that the proposed legislation would improve the situation in San Francisco. He also suggested some changes that might be made to the legislation.

Mr. Stern stated that he believed that the $2,500 limit on contributions by individuals to committees supporting or opposing candidates for City office was high for a jurisdiction as small as San Francisco. In federal election law, according to Mr. Stern, the limit on contributions to committees ($5,000) is five times higher than the limit on contributions to individuals ($1,000) in order to parallel the amount of money a candidate can receive from a political action committee ("PAC"). In San Francisco, however, the limit is $500 whether the contribution is from an individual or a PAC. Mr. Stern stated that the rationale for limiting contributions to committees is that a committee could theoretically launder money to a candidate. He said that courts have upheld this rationale as a lawful restriction on contributions to PACs. Thus, San Francisco would be justified in lowering contributions to committees to $500, he said.

Mr. Stern said that the $12,500 overall spending cap is too large for San Francisco as well. Mr. Stern suggested that a reasonable solution would be to take the individual contribution limit of $500 and multiply it by the number of races in a given year and use that as the overall contribution ceiling. For example, in 2001, when there will be three races, the overall ceiling would be $1,500. In 2004, when there will be 16 races, the limit would be $8,000.

Mr. Stern advised that it would be an important addition to the legislation to have a provision restricting loans by candidates to their own campaigns. He pointed out that other jurisdictions have adopted such restrictions, and they have been upheld by the courts. He suggested that language be inserted in the legislation barring a candidate from personally making outstanding loans to his or her campaign or campaign committee which total at any one point in time more than $25,000, in the case of a candidate for a non-citywide office, or $50,000, in the case of a candidate for

Citywide office.

He also suggested including a provision on the retention of campaign finance statements from mayoral and supervisorial candidates for an indefinite period of time. He pointed out that state law mandates keeping all such records on file for five years.

Mr. Stern recommended the inclusion of safeguards against laundering campaign monies. He cited a San Diego ordinance, in effect since 1990, which requires recipients of contributions to obtain all disclosure information (contributor's occupation, employer, name and address) before the recipient may deposit the contribution. He added that before the implementation of this ordinance, San Diego had a 70% disclosure compliance rate, but since the law was implemented, compliance has been universal.

Mr. Stern also recommended a provision governing the dissemination of "issue ads." Under Connecticut law, he stated, any advertisement that clearly identifies a candidate and is broadcast or displayed on a billboard, magazine, newspaper, radio or television 90 days prior to an election is considered to be a disclosable campaign expenditure and subject to the same restrictions as any other campaign contribution or expenditure. He stated that such a provision would force candidates and committees to disclose the contributions that funded the ads. Mr. Stern said that he believed that an even better time frame would be 45 or 60 days prior to an election.

**Jim Knox.** Jim Knox of California Common Cause also suggested changes in the campaign finance reform initiative. Mr. Knox agreed with Robert Stern that the staff's changes to the initiative continue to move in the right direction. He encouraged the staff to incorporate provisions dealing with candidate loans and issue ads.

Mr. Knox said that Common Cause's preferred approach would be to provide additional public financing to candidates running against self-funded candidates and candidates benefiting from large amounts of independent expenditures. He said that absent additional funding in those circumstances, a provision to lift the ceilings is essential. Otherwise, such candidates would not run.

Mr. Knox questioned whether the language regarding time limits on acceptance of contributions in §1.118(a) of the draft legislation applies not only to solicitation and acceptance of funds during the runoff campaign but also to general election funds carried over to the runoff. He also questioned the purpose of establishing expenditure ceilings for offices not subject to public financing. He suggested that staff clarify section 1.138(d) as to whether the annual cost of administering the public financing program was to be averaged over four years or whether it would be allocated as a per-year draw from the general fund.

Mr. Knox stated that the 25 percent independent expenditure threshold is too low and would not deter candidates from spending money on another candidate's campaign in order to lift the expenditure ceilings. Mr. Knox said he believed that 75 percent would be a better deterrent than 25 percent.

Mr. Knox suggested that the Commission remove the provision in the draft legislation which states that the public financing program shall not apply in the case of insufficient funds in the Election Campaign Fund. Instead, he stated, San Francisco should provide for the pro-rata distribution of available funds to participating candidates.

Mr. Knox said that he believes the provision which gives individuals a private right of action for violations of the public financing provisions should be extended to allow an action for any violation of the Campaign Finance Reform Ordinance. He also suggested that a provision be included in the legislation allowing for amendment of the ordinance by a two-thirds vote of the Board of Supervisors if the amendment is

consistent with the original intent and purpose of the measure. He also suggested a "cooling-off" period of two to four years before the Board could propose any amendment to the legislation. Another suggestion would be to include language giving the Commission the right to preview any amendments the Board might make.

Mr. Knox stated that it will take at least 60 days to develop community support and to build momentum for the proposed legislation, and urged the Commission to take immediate action to finalize the proposed legislation.

Phillip Babcock of the Harvey Milk Democratic Club stated that the $2,500 contribution limit to committees supporting or opposing candidates for City elective office is excessive. He said a limit of $500 per year would be better. He also endorsed the idea of basing the overall contribution cap on the number of races in a given election year. He added that it would be good to see how the caps work in a real election cycle before coming to any final conclusions on whether to improve them.

Anita Mayo of Pillsbury, Madison and Sutro read a statement into the record about the inadvisability of the Commission pursuing a course that would be "constitutionally invalid." (See also attached letter from Frederick K. Lowell. Documents attached to Mr. Lowell's letter are available from the Ethics Commission office for public review.) Ms. Mayo said that placing a $12,500 cap on contributions to independent expenditure committees would hinder candidates from effectively "amplifying the voice of their adherents." She quoted from the U.S. Supreme Court decision in *Buckley v. Valeo* to the effect that any restriction on independent expenditure committee spending would be a prior restraint on First Amendment guarantees of political expression and freedom of association. She also said that any cap on independent expenditure committee spending would run afoul of U.S. Northern District Judge Claudia Wilken's September 1999 injunction enjoining enforcement of §16.508 of the San Francisco Administrative Code "to the extent that it limits the amount that an individual or entity may contribute to independent expenditure committees that have made and will make only independent expenditures in support of or in opposition to a candidate." Ms. Mayo urged the Commission to delete the constitutionally and legally suspect portions of the proposed legislation.

Joan Mandle of California Common Cause stated that limits on expenditures should not be confused with limits on contributions, and that limits on contributions are a legitimate and court-sanctioned avenue for political reform. She commended the Commission for its work and urged it to take speedy action on the proposed reform initiative.

Steven Hill of the Center for Voting and Democracy said that while he supported the general idea of adding disclosure requirements to the legislation, these requirements would not change current political practices. He urged the Commission to implement strong campaign finance reform. He said that spending limits would carry more meaning if participating candidates were provided additional public funds if the spending caps were lifted.

Lucy Colvin of the San Francisco Green Party County Council stated that it is essential that the Commission put the proposed legislation on the November ballot. She urged the Commission to leave the legislation intact and not split it or otherwise dilute it, and added that a comprehensive public financing package would include the mayoral race and not just the supervisorial races. She endorsed the idea of pro rata distribution in the case of an insufficient amount in the Election Campaign Fund.

The Commission then discussed whether to amend the draft legislation so as to eliminate the provision lifting the expenditure ceilings. The Commission also discussed whether to lift separately the ceiling for the general and run-off elections. However, after debate, it was agreed that it would be administratively difficult to lift the expenditure ceilings in the narrow time frame of a five-week run-off election.

The Commission then considered several proposals made by Messrs. Stern and Knox.

Motion 00-6-12-36 Passed by unanimous consent: That the Commission amend the proposed legislation to include a provision that in the event that there is an amount in the Election Campaign Fund insufficient to finance all participating candidates, a pro-rated share of the available campaign funds will be distributed.

Motion 00-6-12-37 Moved, seconded and not passed: That the Commission amend the proposed legislation to include lifting the spending limits if non-participating candidates or independent expenditures exceed 100 percent of the spending limit.

Aye: Grant, Norris; Nay: Melbostad, Kingsley, Dockendorff.

Motion 00-6-12-38 (Norris/Kingsley) Moved, seconded and passed: That the proposed legislation remain as is, wherein the spending limits are lifted if a non-participating candidate exceeds 100 percent of the spending limit, or if independent expenditures exceed 25 percent of the spending limit.

Aye: Kingsley, Norris, Grant; Nay: Dockendorff, Melbostad.

Motion 00-6-12-39 (Norris/Kingsley) Moved, seconded and passed unanimously: That the legislation include a donor cap prohibiting (a) individual contributions to candidates or committees in primary or general elections from exceeding $500 per calendar year (reducing the limit from $2,500) and (b) overall contributions to candidates and committees from exceeding an amount of $500 per calendar year multiplied by the number of races on the ballot in a given election (as opposed to a blanket cap of $12,500 per calendar year).

Motion 00-6-12-40 (Norris/Dockendorff) Moved, seconded, and passed unanimously: That no contribution of $100 or more be deposited into a campaign's bank account without obtaining the required disclosure data (contributor occupation, employer, name, address).

Motion 00-6-12-41 (Melbostad/Dockendorff) Moved, seconded, and failed: That there be a limit of $25,000 on personal loans by candidates to their own campaigns.

Nay: Grant, Norris, Kingsley. Aye: Melbostad, Dockendorff.

Robert Stern pointed out that Kentucky adopted a law limiting gubernatorial candidates from loaning more than $50,000 to their own campaigns, and that the law was challenged in court but upheld. Commissioner Norris stated that the issue of what amounts citywide and non-citywide candidates may loan to their own campaigns should be revisited at a point when closer and more comprehensive attention could be paid to it.

By general consensus, the Commission decided:

1. That the language in §1.138(d) regarding "cost" should be changed to "appropriation."

2. That the records retention requirements in the draft legislation, providing that campaign statements must be preserved for at least four years, should be deleted.

3. To insert a provision into the legislation allowing the campaign finance reform ordinance to be amended by a two-thirds vote of the Board of Supervisors.

The Commission decided that further staff study was needed on the following items:

1. Whether to adopt a framework similar to that in Connecticut state law applying contribution limits and disclosure requirements to any issue advocacy advertisements broadcast or disseminated within 90 days of an election (Robert Stern said that he would submit proposed language on this matter for staff's consideration); and

2. Whether §1.168 of the draft legislation should be expanded to include a private right of action for violations of *any* provisions of the CFRO, not merely violations of the public financing provisions.

**VI. Discussion and possible action re: Items for future agendas.**

The Commission decided to hold a special meeting during the last week of June to discuss in further detail items which were not discussed in tonight's session.

**VII. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission**

There was no public comment.

**VIII. Adjournment**

The meeting was adjourned at 8:15 p.m.

Respectfully submitted,

_____

Frank M. Lester

Staff Assistant

\\ETHICS-01SVR\DATA\SHARED\MINUTES\2000\06.12.00.doc



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

ISABELLA H. GRANT
CHAIRPERSON

HENRI E. NORRIS
VICE-CHAIRPERSON

ROBERT D.
DOCKENDORFF
COMMISSIONER

CAROL M. KINGSLEY
COMMISSIONER

PAUL H. MELBOSTAD
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

Date:        June 7, 2000

To:          Members, Ethics Commission

From:        Ginny Vida *G. V.*
             Executive Director

Re:          Draft Legislation for "Fair Elections Ordinance" Ballot Initiative
             Providing for Public Financing of Elections

At the Ethics Commission meeting on May 15, 2000, the Commission voted to submit a ballot measure to the voters at the November 7, 2000 election. The measure would provide limited public financing for Supervisorial candidates. The Commission agreed to modify the proposal it previously submitted to the Board of Supervisors by changing the qualification thresholds, and specifying circumstances in which participating candidates may be released from the spending limits.

The Commission also agreed to consider further modifications at its meeting scheduled for June 12, 2000. Specifically, Commissioner Melbostad asked the staff to report on the following possible additions or changes to the proposed measure:

   1) eliminating the county-versus-city loophole regarding pre-election disclosure of contributions by general purpose committees;
   2) requiring disclosure by non-profit, tax-exempt "527" organizations;
   3) limiting contributions to independent expenditure committees to $500;
   4) limiting loans by candidates to their own campaigns regardless of whether the candidates accept public financing; and
   5) defining "corruption," as that term is used in the findings.

Attached is a draft ballot measure that reflects the decisions made at the May 15 meeting, and several staff proposals that have *not* yet been discussed by the Commission. Some of the five issues raised by Commissioner Melbostad are addressed in this draft (numbers 1 and 3), and others (numbers 2 and 4) are discussed in a separate, attorney-client privileged memorandum from the City Attorney. What follows is a summary of the draft measure.

As discussed in greater detail below, the draft measure would eliminate the loophole regarding pre-election disclosure of contributions by general purpose committees (number 1, above). Specifically, each committee that makes contributions or

1390 Market Street, Suite 801 • San Francisco, CA 94102-5302 • Phone (415) 554-9510 • Fax (415) 554-8757
E-Mail Address: ethics_commission@ci.sf.ca.us        Web site: http://www.ci.sf.ca.us/ethics/

independent expenditures totaling $500 or more in a calendar month during the six months immediately preceding an election, to support or oppose a candidate for City elective office at that election, would be required to disclose, prior to the date of the election, all contributions and loans received and all expenditures made. The Ethics Commission could require that these statements be filed electronically. (Section 1.152.) In addition, the draft measure would create new contribution limits for all committees, including those that make independent expenditures (number 3, above). (Section 1.114.)

We look forward to discussing this with you and making any further modifications that you deem appropriate.

THE FAIR ELECTIONS ORDINANCE

**Amending the Campaign Finance Reform Ordinance,
San Francisco Campaign and Governmental Conduct Code,
Article I, Chapter I, Section 1.100, *et seq.***

## CONTRIBUTION LIMITS

San Francisco's Campaign Finance Reform Ordinance (CFRO) limits contributions to candidates for City elective office. Currently, any person may contribute up to $500 *to support or oppose* a candidate in the general election, and up to an additional $250 to *support or oppose* a candidate in a run-off election, if one is required. These limits apply to contributions made directly to candidates for City elective office, as well as to committees that support or oppose such candidates. Following litigation over its campaign ordinance, San Francisco agreed not to enforce these contribution limits with respect to contributions made to committees that make only independent expenditures.

This ordinance would establish new contribution limits. Under the ordinance, any person could contribute up to **$500** to each candidate in the general election, and up to an additional **$250** to the candidate in a run-off election. These limits apply to contributions made directly to candidates. Any person could contribute up to **$2,500** per calendar year to each committee that supports or opposes candidates for City elective office. This $2,500 contribution limit applies to all committees (other than a candidate's campaign committee), including committees that make only independent expenditures. In addition, the ordinance would impose an overall cap of **$12,500** per calendar year on the amount a person could contribute to all candidates for City elective office and all committees that support or oppose such candidates.

## PUBLIC FINANCING OF ELECTION CAMPAIGNS

San Francisco does not provide public financing for election campaigns. This ordinance would provide public funds to candidates for the Board of Supervisors who meet certain eligibility criteria and agree to certain conditions.

### Eligibility & Conditions

To be eligible to receive public financing of campaign expenses, a candidate must: (1) be seeking election to the Board of Supervisors and be eligible to hold the office sought; (2) have received at least **$7,500** in "qualifying contributions" from at least **75** contributors; and (3) be opposed by another candidate who is eligible to receive public financing, or has received contributions or made expenditures which equal or exceed $7,500. A "qualifying contribution" is a contribution of $10 to $100 that is made by an individual resident of San Francisco. Candidates could accept contributions up to the $500-per-contributor limit imposed by the CFRO, but only the first $100 counts as a "qualifying contribution."

Candidates who wish to receive public financing of campaign expenses must also agree to the following conditions. First, the candidate must agree to limit loans and contributions of personal funds to his or her campaign to a total of $10,000 per election. Second, the candidate must agree to limit his or her campaign spending to $75,000 for the general election and $20,000 for the run-off election, if one is required. Third, the candidate must agree to participate in at least one debate with his or her opponents. In addition, the candidate would bear the burden of proving that each contribution relied upon to establish eligibility is a "qualifying contribution," and each expenditure made with public funds complies with the requirements imposed by ordinance.

The ordinance imposes restrictions on the use of public funds. Candidates could use the funds to pay campaign expenses only. Candidates could not use public funds to pay administrative, civil or criminal fines, or to pay for inaugural activities or officeholder expenses. Equipment purchased with public funds that is worth $100 or more and has a useful life beyond the campaign would become City property after the election. Candidates who receive public funds but who withdraw or fail to qualify for the ballot would be required to repay the full amount received from the Fund. Candidates who receive public funds and who have surplus funds would be required to return the surplus to the Fund.

The Controller, who would be responsible for making payments to candidates from the Fund, would terminate payments to a candidate who withdraws or fails to qualify for the ballot, or fails to comply with the specified conditions and reporting requirements.

**Funding**

This ordinance would create a special Election Campaign Fund ("Fund"). The Mayor and Board would be authorized to appropriate money to the Fund for campaign expenses of candidates who may be eligible to receive the public funds. The ordinance also authorizes the Mayor and Board to appropriate funds to the Ethics Commission to pay for the costs of administration of the public financing program. If the Mayor and Board do not appropriate sufficient funds, the public financing program would not operate.

Candidates could apply for public funds on or after June 1 of the election year, but no later than the deadline for filing nomination papers (mid-August). The Executive Director of the Ethics Commission would review the candidate's application to determine whether the candidate is eligible to receive public funds. If the Executive Director determines that a candidate is ineligible to receive public financing, the candidate would be permitted to resubmit the application and seek reconsideration. The candidate could also appeal the decision of the Executive Director to the Ethics Commission.

The maximum amount of public funds a candidate could receive to defray general election expenses would be **$43,750**. Upon certification of eligibility, the candidate would receive a payment of $5,000 from the Fund. Thereafter, for each of the first $5,000 dollars of "matching contributions" raised by the candidate, the candidate would receive four dollars from the Fund. Thereafter, for each additional dollar of matching contributions raised by the

candidate, the candidate would receive one dollar from the Fund. A "matching contribution" is a contribution, other than a "qualifying contribution," that is made by an individual resident of San Francisco.

The maximum amount of public funds a candidate could receive to defray run-off election expenses is **$17,000**. Each candidate who qualifies for a run-off election would receive a payment of $5,000 from the Fund. Thereafter, for each dollar of matching contributions raised by the candidate, the candidate would receive four dollars from the Fund.

There would be an overall cap on the cost of this public financing program. The maximum amount of public funds the City could spend to administer and fund this program could not exceed **$2.00 per resident** of the City and County of San Francisco. At the request of the Ethics Commission, the Controller would estimate the number of residents of the City and County of San Francisco for purposes of this calculation.

### Release from the Spending Limit

Under limited circumstances, candidates who receive public financing would be released from their obligation to limit campaign spending. If a candidate who is not participating in the public financing program receives contributions or spends more than **100 percent** of the applicable spending limit, the spending limit would no longer be binding on any candidate running in the same supervisorial district. In addition, if a committee or committees in the aggregate make independent expenditures in support of or in opposition to a candidate which exceed **25 percent** of the applicable spending limit, the spending limit would no longer be binding on any candidate running in the same supervisorial district as the candidate who was the subject of the independent expenditures.

### Supplemental Reporting Requirements

The ordinance would impose additional reporting and disclosure requirements on committees and candidates. The Ethics Commission would prescribe the form, content and filing deadlines for these statements, and could require that these statements be filed electronically.

Any committee[1] that makes contributions or independent expenditures totaling $500 or more in a calendar month during the six months immediately preceding an election, to support or oppose a candidate for City elective office at that election, would be required to disclose, prior to the date of the election, all contributions and loans received and all expenditures made.

---

[1]  The supplemental reporting requirements for committees apply only to: committees formed or existing primarily to support or oppose candidates for City and County elective office; committees formed or existing primarily to support or oppose the qualification or passage of a City and County ballot measure; and City and County general purpose committees active only in San Francisco. This limitation was carefully drawn to avoid preemption by the Political Reform Act, which bars local jurisdictions from imposing additional filing requirements on other kinds of committees. *See* Gov't Code § 81009.5(b).

Any committee that makes independent expenditures totaling $5,000 or more to support or oppose a candidate for City elective office would be required to disclose this fact to the Ethics Commission within 24 hours of reaching this threshold. Thereafter, the committee would be required to file a supplemental statement with the Commission each time the committee makes independent expenditures of $5,000 or more to support or oppose the same candidate. The supplemental statements would be filed within 24 hours of reaching the spending threshold.

Any candidate who does not receive public funds would be required to notify the Commission if he or she receives contributions, makes expenditures or has funds in his or her campaign account that equal or exceed $7,500.

The ordinance would require the Ethics Commission to report on the public financing program to the Mayor and Board of Supervisors. Following each election at which members of the Board of Supervisors are elected, the Ethics Commission would be required to report the amount of public funds used to pay for election campaigns in that election, and other information such as: the number of candidates who received public funds; the number of nonparticipating candidates; the amount of qualified campaign expenditures made by all candidates in that election; and the amount of independent expenditures made in connection with the election.

### Enforcement & Penalties

Violation of the ordinance could subject the violator to administrative, civil and criminal penalties. The Ethics Commission could impose an administrative penalty of up to $5,000 per violation.

Any person who "willfully or knowingly" misused public funds would be guilty of a misdemeanor and punishable by a fine of at least $500 and at most $5,000 or three times the amount improperly spent, whichever is greater, or by imprisonment for up to six months, or both. Any person who willfully or knowingly furnished false or misleading information to the Ethics Commission, or concealed information relevant to certification or an audit, would be guilty of a misdemeanor punishable by a fine of up to $5,000, or by imprisonment for up to six months, or both.

Any person who willfully, knowingly or negligently misuses public funds would be liable in a civil action brought by the City Attorney or any San Francisco voter for an amount up to $5,000 or three times the amount improperly spent, whichever is greater. No voter could commence an enforcement action without first providing written notice to the City Attorney of intent to commence an action. In addition, no voter could commence an enforcement action if the Ethics Commission has issued a finding of probable cause that the defendant violated the public financing provisions of this ordinance, or if the City Attorney or District Attorney has commenced a civil or criminal action against the defendant, or if another voter has filed a civil action against the defendant. A court could award reasonable attorney's fees and costs to any voter who obtains injunctive relief to enforce the public financing provisions of this ordinance.

If the court finds that an action brought by a voter is frivolous, the Court could award the defendant reasonable attorney's fees and costs.

### Audits

The Ethics Commission would be required to audit all candidates who receive public funds. If the Ethics Commission determined that payments made to a candidate from the Fund exceeded the amount to which the candidate was entitled, or were used for an unauthorized purpose, the candidate would be required to repay the Fund the amount of the excess or the improper expenditure, in addition to other penalties that might apply.

### Miscellaneous Provisions

In addition to the provisions described above, the draft legislation would: cross reference applicable provisions of the San Francisco Charter; alphabetize the terms defined in Section 1.104; add definitions for the terms "Ethics Commission," Executive Director," "matching contribution," "qualifying contribution," and "surplus funds;" clarify the definitions of the terms "candidate," "measure," and "qualified campaign expenditure."

The most extensive changes are to the definition of "qualified campaign expenditure." These changes are designed to address problems with the current law that have been identified by the staff. The first suggested change would clarify that a candidate's expenditures count toward the spending ceiling only if made to support the candidate (or oppose candidates running for the same office). One might argue that the current language authorizes candidates to transfer campaign funds to other candidates (even though such transfers are prohibited by Section 1.122) as long as the transferred funds count toward the spending ceiling. Furthermore, the suggested change would be particularly important if the limitation on transfers in Section 1.122 is invalidated.

The second change would exempt litigation and other legal expenses from the spending limits. The CFRO already contemplates that there may be post-election legal expenses, and provides a separate contribution limit to enable candidates to raise money to pay those expenses (Section 1.120).

The third change would eliminate the word "officeholder" from the definition of "qualified campaign expenditure," which currently includes "contribution[s] provided to the candidate, *officeholder* or committee controlled by the candidate or *officeholder*." (Emphasis added.) The concept of "qualified campaign expenditures" is needed to describe those expenditures that are made toward the *election* of a candidate, and therefore count toward the expenditure limit. Once one is elected and holding office, however, leftover campaign money may be used for officeholder expenses without violating the spending limits.

Finally, the staff recommends other simplifications of language that do not affect substance.