# EXHIBIT N

**DECLARATION OF JOHN ST. CROIX IN SUPPORT OF DEFENDANTS'
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**



**Ethics Commission**

1390 Market Street, Suite 801
San Francisco, CA  94102
Phone 554-9510 Fax 703-0121

# SAN FRANCISCO ETHICS COMMISSION AGENDA
# FOR REGULAR MEETING
## Monday, November 13, 5:00 p.m.

## City Hall, One Dr. Carlton B. Goodlett Place, Room 408

I.   Call to order and roll call

II.  Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

III. Discussion and possible approval of the minutes of the meetings of September 11 and October 16, 2000.

IV.  Executive Director's report.

   1. Budget

   2. Public policy program

   3. Advice and opinions

   4. Investigation and enforcement program

   5. Report on volume of calls received via the Whistleblower Hotline

   6. Campaign finance disclosure program

   7. Campaign finance audit program

   8. Lobbyist program

   9. Campaign consultant program

   10. Statements of Economic Interests

   11. Declarations received re: amended Sunshine Ordinance

   12. Draft FY 99-00 annual report

V.   Discussion and possible action re:  Approval of proposed technical changes in the Bylaws. (See attached summary of current and proposed language for the Bylaws.)

   Motion:  That when the Commission occupies its new space at 30 Van Ness Avenue in the year 2001, Article I, Section 2 be amended to reflect the new address as 30 Van Ness Avenue, Suite 3900, San Francisco, CA 94102, and the Commission's new telephone number, if it is changed.

   Motion:  That the first sentence of Article IV, Section 3, be amended to read as follows: "The Chairperson shall preside at all meetings of the Commission and is an ex-officio non-

(Please turn over for page 2)

SF Ethics Commission Agenda – November 13, 2000                                                                2

voting member of all standing committees except a nomination committee, if one is convened."

<u>Motion:</u>  That the second sentence of Article VII, Section 4, be amended to read as follows: "Meetings shall be held at City Hall, One Dr. Carlton B. Goodlett Place, Room 408, in the City of San Francisco."

VI.    Discussion and possible action re:  In the event that Proposition O, the ballot initiative proposing public financing of election campaigns and campaign contribution limits, is approved by the voters on November 7, the Commission will consider the effective date of the Ordinance and implementation of the Ordinance. In the event that Proposition O is not approved, the Commission will consider whether to pursue alternative campaign finance proposals.

VII.   Discussion and possible action re:  In the event that Proposition J, concerning City contractor contributions,  is approved by San Francisco voters on November 7, the Commission will consider possible effective date of the Ordinance and implementation of the Ordinance.

VIII.  Discussion and possible action re:  Revised proposal to City of Sacramento regarding terms of an agreement authorizing Sacramento to purchase a license from San Francisco to adopt San Francisco's On Line Filing Program for electronic reporting of campaign reports for use by Sacramento's campaign committees.  A copy of the revised proposal to Sacramento will be available from the Ethics Commission office on Thursday, November 9.

IX.    Discussion and possible action re:  Proposal that the Chairperson appoint members to serve on a Personnel Committee and a Finance Committee.

X.     Discussion and possible action re:  Items for future agendas.

XI.    Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission

XII.   Possible closed session held pursuant to Charter section C3.699-13, Brown Act section 54956.9(c) and Sunshine Ordinance section 67.11 to discuss pending litigation

Conference with Legal Counsel:  Pending Litigation
Number of possible cases: 2

XIII.  Discussion and vote pursuant to Brown Act section 54957.1 and Sunshine Ordinance section 67.14 on whether to disclose action taken or discussions held in closed session.

Motion: The Ethics Commission finds that it is in the best interests of the public (not) to disclose its closed session deliberations re: pending litigation.

XIV.   Adjournment

---

### *Know Your Rights Under the Sunshine Ordinance*

*Government's duty is to serve the public, reaching its decisions in full view of the public.  Commissions, boards, councils and other agencies of the City and County exist to conduct the people's business.  This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review.*

*For more information on your rights under the Sunshine Ordinance (Chapter 67 of the SF Admin. Code) or to report a violation of the ordinance, contact the Sunshine Ordinance Task Force, Donna Hall, Administrator, City Hall, Room 244, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102-4869.  Office telephone: (415) 554-7724; Fax: (415) 554-5163; E-mail: Donna_Hall@ci.sf.ca.u.s.  Copies of the Sunshine Ordinance can be obtained from the Clerk of the Sunshine Task Force, the San Francisco Public Library and on the City's web site at www.ci.sf.ca.us/bdsupvrs/ordinance.htm*

--------------------------------------------------------------------------------------

SF Ethics Commission Agenda – November 13, 2000                                   3

*This location is wheelchair accessible. In order to assist the City's efforts to accommodate persons with severe allergies, environmental illnesses, multiple chemical sensitivity, or related disabilities, attendees at public meetings are reminded that other attendees may be sensitive to various chemical-based products. Please help the City accommodate these individuals.*

----------------------------------------------------------------------------------------------------

*Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance [SF Admin. Code §16.520 - 16.534] to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 1390 Market Street, Suite 801, San Francisco, CA 94102, telephone (415) 554-9510, fax (415) 554-8757 and web site: www.sfgov.org/ethics.*

P:\SHARED\AGENDA\2000\111300.doc

# Current and Proposed Language:
## Bylaws of the San Francisco Ethics Commission

**Article I, Section 2 - Office**

**Current language:**
1390 Market Street, Suite 801
City and County of San Francisco, California 94102
Or such address where the Commission may be located from time to time
Telephone Number: (415) 554-9510

**Proposed language:**
30 Van Ness Avenue, Suite 3900
City and County of San Francisco, California 94102
Telephone Number: *(indicate new number if it is changed)*

**Article IV, Section 3: Chairperson**

**Current language (first sentence):**
The Chairperson shall preside at all meetings of the Commission and is an
ex-officio non voting member of all standing committees except the Nomination
Committee.

**Proposed language:**
The Chairperson shall preside at all meetings of the Commission and is an
ex-officio non voting member of all standing committees except a nomination
committee, if one is convened.

**Article VII, Section 4 – Meetings**

**Current language (second sentence)**
Meetings shall be held in the mezzanine Conference Room of 1390 Market Street
in the City of San Francisco.

**Proposed language:**
Meetings shall be held at City Hall, One Dr. Carlton B. Goodlett Place, Room
408, in the City of San Francisco.

P:\SHARED\AGENDA\2000\111300 bylaws.doc



sfgov | residents | business | government | visitors | online services | search    go !

Ethics Commission >> Meeting Information

# Ethics Commission

## November 13, 2000

(Approved 11/21/00)

### MINUTES OF THE

### MEETING OF THE SAN FRANCISCO ETHICS COMMISSION

### City Hall, One Dr. Carlton B. Goodlett Place, Room 408

### Monday, November 13, 5:00 p.m.

**I. Call to order and roll call**

Chairperson Carol Kingsley called the meeting to order at 5:08 p.m.

COMMISION MEMBERS PRESENT: Carol M. Kingsley, chairperson; Paul H Melbostad, Vice Chairperson; Isabella H. Grant, commissioner, Sharyn Saslafsky, Commissioner, Commissioner Philip H. Ryan was excused.

STAFF PRESENT: Ginny Vida, Executive Director, Mabel Ng, Deputy Executive Director, Katherine Havener, Ethics Investigator/Legal Analyst; Oliver Luby, Law Clerk.

OFFICE OF THE CITY ATTORNEY: Julie Moll, Deputy City Attorney; Chad Jacobs, Special Assistant.

OTHERS PRESENT: Bob Boileau, San Francisco labor Council; Jim Reid; Anita Mayo, Pilsbury, Madison & Sutro; Fred Ridel, San Francisco Common Cause.

MATERIALS DISTRIBUTED:

S.F. Ethics Commission agenda, November 13, 2000

Revised draft minutes of the S.F. Ethics Commission meeting of September11,2000, including partial transcript of the September 11, 2000 meeting.

Draft minutes of the S.F. Ethics Commission Meeting of October 16, 2000

Executive Director's Report for the Meeting of November 13, 2000

Memorandum dated November 13, 2000, "SF Ethics Commission Announces That the Voluntary spending Limit Has Been Lifted for Board Of Supervisors Candidates in District Eight"

Press Release Dated November 8, 2000, SF Ethics Commission hails Passage Of Proposition O"

November 3, 2000 Letter from Ginny Vida to Aaron B. Chong, City Of Sacramento

October 4, 2000 Letter from Ginny Vida to Aaron B. chong, City of Sacramento

Editorial, S.F. Chronicle, October 27, 2000, "O-Campaign Finance Reform Yes"

News Article, S.F. Chronicle, October 27, 2000, "developers Give $2 Million Plus To Defeat Prop. L; Backers, in contrast, Have Tiny Fund"

News Article, S.F. Examiner, October 28, 2000, "Soft Money flows in the City"

News Article, Associated Press, October 28, 2000, "San Francisco Growth Battle Could Break Soft Money Record"

News Article, S.F. Chronicle, October 30, 2000, "High Stakes For Players In Convoluted S.F. Elections"

News Article, S.F. Bay Guardian November 1, 2000, "S.F.'s Prop. O would Limit Soft Money"

Guest Opinion, S.F. Examiner, November 1, 2000 "Prop O Is Real Reform For S.F."

News Article, S.F. Bay Guardian, November 1, 2000, "Face Time: Which Supervisors Spend the Most Time Being Lobbied?"

News Article, S.F. Bay Guardian, November 1, 2000, "Follow the Money: The Real Estate Industry's Top 10 Candidates For Supervisor

News Article, S.F. Chronicle, November 2, 2000, "San Francisco Developers Bolster Anti-Prop. L Campaign"

News Article, S.F. Chronicle, November 2, 2000, "S.F. Campaign Measure Could Aid Dark Horses: One of Two Election Reform Propositions"

News Article, S.F. Examiner, November 2, 2000, "City Charter Muddles Campaign for Prop. O"

News Article, S.F. Examiner, November 6, 2000, "Punks, Politicos in Last-Minute Campaign Blitz"

News Article, S. F. Chronicle, November 7, 2000, "Spending Limits Canceled in District 8 Supervisor Race"

News Article, S.F. Examiner, November 8, 2000, "Big Support for Libraries, Kids, Campaign Spending Limits, Hunter's Point Cleanup"

News Article, S.F. Chronicle, November 8, 2000, "Props. J And O Ahead in S.F. - Election Reform Promise"

News Article, S.F. Chronicle November 8, 2000, "Runoff for Most Supervisor Spots: Newsom, Ammiano Easily Win Re-Election"

News Article, S.F. Chronicle, November 9, 2000, "S.F. Measure To Fund Supervisors' Races May Cut Reliance on Big Money"

**II. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiciton of the Ethics Commission.**

Commissioner Kingsley welcomed Commissioner Sharyn Saslafsky to the Commission. She also expressed her appreciation to Commissioner Isabella Grant for her service as Chairperson.

**III. Discussion and possible approval of the minutes of the meetings of September 11 and October 16, 2000.**

MOTION 00-11-13-63 (Grant/Melbostad). Moved, seconded and unanimously passed: that the minutes and the partial transcript of the September 11, 2000 meeting be approved as revised.

Executive Director Ginny Vida stated that page two of the minutes to the October 16, 2000 meeting had been revised to read as follows:

> Anita Mayo called the Commission's attention to Section VI of the September 11, 2000 minutes, which she said incorrectly represented electronic filing obligations of state committees that make independent expenditures in San Francisco elections. She noted that according to Government Code §84605(e), any general purpose committees receiving cumulative contributions or making expenditures of $50,000 or more to support or oppose state candidates or state ballot measures are required to file electronically. She said this includes state committees that make independent expenditures in San Francisco elections. Ms. Vida confirmed that Ms. Mayo's representation is correct.

Commissioner Melbostad asked that Section IX of the minutes from the meeting of October, 16, 2000 be amended as follows (deleted text in ~~strikethrough~~; new text underlined):

> Commissioner Melbostad asked that the procedural issues raised by Commissioner Ryan not defer the very important efforts being pursued by staff and the City Attorney's office to recommend amendments to the ~~conflict of interest rules of City Departments within the Commission's purview and to deal with investigating and enforcing laws and regulations on complaints that are pending~~ laws in our jurisdiction so that the Commission can take action on certain types of improper activities brought to our attention via complaints but that currently do not constitute a technical violation of the law, and other items on our public policy priority list.

**MOTION 00-11-13-64 (Melbostad/Grant).** Moved, seconded and unanimously passed: **That the revised minutes of the October 16, 2000 meeting be approved as amended by Commissioner Melbostad.**

### III. Executive Director's report

Ms. Vida referred the Commission to her report in the agenda packet.

### IV. Discussion and possible action re: Approval of proposed technical changes in the Bylaws.

**MOTION 00-11-13-65 (Melbostad/Grant).** Moved, seconded and unanimously passed: **That when the Commission occupies its new space at 30 Van Ness Avenue in the year 2001, Article I, Section 2 be amended to reflect the new address as 30 Van Ness Avenue, Suite 3900, San Francisco, CA 94102, and the Commission's new Telephone number , if it is changed**

**MOTION 00-11-13-66 (Grant/Saslafsky).** Moved, seconded and unanimously passed: That **the first sentence of Article IV, Section 3, be amended to read as follows: "The Chairperson shall preside at all meetings of the Commission and is an ex-offcio non-voting member of all standing committees except a nomination committee, if one is convened.**

**MOTION 00-11-13-67 (Melbostad/Saslafsky).** Moved, seconded and unanimously passed: **That the second sentence of Article VII, Section 4, be amended to read as follows: "Meetings shall be held at City Hall, One Dr. Carlton B. Goodlett Place, Room 408, in the City of San Francisco."**

### V. Discussion and possible action re: Implementation of Proposition O

Ms. Vida informed the Commission that Proposition O passed by 53.4 percent. She stated that the Commission needs to determine when Proposition O should go into effect. She directed the Commission to her memorandum dated November 13, 2000 regarding implementation of Propositions O and J, wherein she recommends that both Propositions O and J not be implemented during the runoff election. She stated that because committees are already raising money for the December runoff election, it would cause confusion to implement Proposition O prior to the runoff.

Commissioner Melbostad stated that he agreed with Ms. Vida's proposal that Proposition O not

be implemented during the runoff period. He stated that during the Commission's hearings and discussion on Proposition O, it was never suggested that the measure be implemented prior to the December runoff election.

There was some discussion as to whether the measure should be implemented "commencing on " January 1, 2001, or "not earlier than " January 1, 2001.

Bob Boileau of the San Francisco Labor Council asked whether contributions to labor organizations will be limited by Proposition O to $500. Ms. Vida suggested that Mr. Boileau pose his question in writing to the Commission so that staff could issue a formal opinion. Mr. Boileau also stated that he believed that both ordinances would be effective whenever the law said they were effective.

Fred Ridel of San Francisco Common Cause stated that implementation after the runoff election was reasonable. He stated that staff should develop guidelines for committees regarding Proposition O as soon as possible.

MOTION 00-11-13-68 (Melbostad/Grant). Moved, seconded and unanimously passed: that Propositions O and J be implemented commencing o January 1, 2001.

**MOTION 00-11-13-69 (Melbostad/Grant). Moved, seconded and unanimously passed: That the staff be directed to promptly develop regulations and guidelines for implementation of Proposition O.**

Bob Boileau of the San Francisco Labor Council asked the the Labor Council be give the opportunity to provide input before the Commission implements regulations.

Ms. Vida stated that staff will begin to prepare a budget for administering Propositions O and J. She stated that she plans to make a budget request for the FY 01-02 budget allowing the Commission sufficient funds to administer the Ordinance and to provide grants to candidates in the 2002 supervisorial election. She indicated that staff would need to review Proposition J'' fiscal implications. She assured the Commission that staff is fully committed to working with the Commission to prepare to implement both measures.

Commissioner Kingsley asked staff to prepare a report for the December meeting outlining a timetable and any initial recommendations for the implementation of the Ordinance.

**VI. Discussion and possible action re: Implementation of Proposition J, concerning City contractor contributions**

Ms Vida stated that Proposition j was approved by the voter s o November 7, 2000. Commissioner Kingsley indicated that the Commission had just approved January 1, 2001 as the implementation date of the measure. Ms. Vida stated that Staff's Plans for implementation of the Ordinance would include an educational program to advise contractors and City officers about their new obligations. She stated that staff will look into the fiscal implications of the measure, including the impact it will have on the Commission's investigations and enforcement program.

Commissioner Melbostad asked staff to talk with representatives of the Labor Council and other interested parties in drafting regulations for both Propositions O and J. Ms. Vida indicated that she would be pleased to receive the Council's input.

Jim Reid asked whether the Commission plans to ask for additional appropriations this fiscal year to administer the Ordinances. Ms. Vida indicated that she planned to make a budget request for the 2001-2002 annual budget.

**MOTION 00-11-13-69 (Grant/Saslafsky). Moved, seconded and unanimously passed: That the staff be directed to prepare a report on implementation of PropositionJ.**

**VII. Discussion and possible action re: Revised proposal to City of Sacramento regarding terms of an agreement authorizing Sacramento to purchase a license from San Francisco to adopt San Francisco's On Line Filing Program for electronic reporting of campaign**

**reports for use by Sacramento's campaign committees.**

Ms. Vida indicated that the staff is close to an informal agreement on the terms of a contract with the City of Sacramento. She indicated that the City of Sacramento has requested some changes in the staff's original proposal. She referred the Commission to her letter dated November 3, 2000 to Aaron B. Chong of the City of Sacramento. She stated that when the terms of a contract have been agreed upon, she will ask the City Attorney's Office to prepare a contract.

**IX. Discussion and possible action re: Proposal that the Chairperson appoint members to serve on a Personnel Committee and a Finance Committee.**

Commissioner Kingsley explained that the Personnel Committee will conduct the performance evaluation of the Executive Director and will recommend an evaluation for the Commission's approval. In addition, the Personnel Committee will review the existing Executive Director performance evaluation form to ensure that it complies with Department of Human Resources requirements. The Committee will also discuss with the Executive director a process for evaluating the performance of staff investigators and auditors, and make recommendations to the full Commission. Commissioner Kingsley asked Commissioner Melbostad and Grant to serve on the Personnel Committee. Both agreed to do so.

Commissioner Kingsley explained that the Finance Committee will work with staff to propose the Commission's annual budget, including a special request for implementation of Propositions O and J. Commissioner Kingsley asked Commissioner Melbostad to chair the Committee, and Commissioner Saslafsky to serve on the Committee. Both agreed to do so. Commissioner Kingsley stated that she would also ask Commissioner Ryan to serve on the Finance Committee.

**X. Discussion and possible action re: items for future agendas**

No future agenda items were discussed.

**XI. Public comment on matters appearing or not appearing on the agenda that are within the jurisdiction of the Ethics Commission.**

Jim Reid asked the commission to consider legislation that woul preserve the voluntary spending limits in runoff elections even if the limits were lifted during the general election.

Fred Ridel of San Francisoc Common Cause suggested that the staff be directed to compile a summary of election statistics, including the number of committees and total contributions and expenditures made. Commissioner Melbostad added that it would be good to know how many candidates would have qualified for public financing had Proposition O been I place during this election.

**MOTION 00-11-13-70 (Grant/Melbostad). Moved, seconded and unanimously passed: That Mr. Ridel's suggestion that staff prepare a report analyzing money spent during the November 200-0 general and runoff elections be placed on the December 11, 2000 agenda.**

**XII. Possible closed session held pursuant to charter section C3.699-13, Brown Act section 54956.9© and Sunshine Ordinance section 67.11 to discuss pending litigation.**

There was no closed session.

**XIII. XIII Discussion and vote pursuant to Brown Act section 54957.1 and Sunshine Ordinance section 67.14 on whether to disclose action taken or discussions held in closed session.**

There was no closed session.

**XIV. Adjournment.**

**MOTION 00-11-13-71 (Melbostad/Grant). Moved and seconded: That the meeting be adjourned.**

The meeting was adjourned at 6:06 p.m.

The Commission's next meeting will be held on December 11, 2000.

# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

CAROL M. KINGSLEY
CHAIRPERSON

PAUL H. MELBOSTAD
VICE-CHAIRPERSON

ISABELLA H. GRANT
COMMISSIONER

PHILIP S. RYAN
COMMISSIONER

SHARYN SASLAFSKY
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

### EXECUTIVE DIRECTOR'S REPORT
### TO THE SAN FRANCISCO ETHICS COMMISSION
#### For the Meeting of November 13, 2000

**1. Budget.**
The Commission's final approved budget for the current fiscal year is $727,787. Our budget was previously recorded as $902,789 because of a $175,002 coding mistake which has now been corrected. I called the error to the attention of the Mayor's Budget Office.

**2. Public policy program.**

**Proposition O (Fair Elections Ordinance).** Proposition O, the Commission's ballot measure, was passed with a 53.4 percent approval of the voters. Staff issued a press release, a copy of which was faxed or sent to Commissioners.

**Proposition J (Taxpayer Protection Amendment of 2000).** Proposition J, which bans City officials from accepting gifts, payments, or campaign contributions from a person or group if the official previously approved granting the donor a contract or special benefit, also passed. Copies of the digest and text of Proposition J are attached to this report.

**Electronic filing legislation.** The new ordinance authorizing the Commission to require electronic filing by lobbyists and campaign consultants has been posted to the Commission's web site at www.sfgov.org/ethics/legislate.htm.

**Misuse of City resources legislation.** Supervisor Barbara Kaufman has introduced a proposal providing for a civil remedy for misuse of City resources. She has introduced her proposal as a substitute for similar draft legislation submitted by the Ethics Commission. The Audit and Governmental Efficiency Committee will consider only the substitute proposal on December 5.

**3. Advice and opinions.** A request for formal advice on election-related matters will soon be issued. Three additional requests for advice are pending.

**4. Investigation and enforcement program.** Since January 1, 2000, the Commission has received a total of 24 complaints. Since its last regular meeting on October 16, 2000, the Commission has received three complaints. Of the total number of complaints filed since June 1995, of those currently within our jurisdiction, 13 are currently unresolved, and the staff is conducting preliminary

inquiries into those complaints. Since the Commission's last meeting, two complaints have been submitted by staff for the Commission's review.

Report on volume of calls received via the Whistleblower Hotline. Since the Whistleblower Hotline was established in July 1997, the Commission has received a combined total of 38 Whistleblower complaints via the Hotline, the main telephone line and by mail. Since January 1, 2000, a total of 21 complaints, including nine Whistleblower complaints, have been filed. Since June 1995, a combined total of 149 Whistleblower and non-Whistleblower complaints have been filed with the Commission.

## 5.  Campaign finance program.

Second pre-election filing for the November 7 election. October 26, 2000, was the deadline for filing the second pre-election reports for the November election. Campaign finance data was posted timely to the web site. Articles from the local press are enclosed. Staff continues the process of logging the filings, identifying candidates and committees that did not file, and providing appropriate follow-up notices to filers. Fines are being assessed on late-filed statements. The staff is also reviewing all campaign statements filed, requesting appropriate amendments from filers and responding to the many inquiries from filers and the press. The amount of work for our campaign finance staff has been enormous in this election.

As with the first pre-election filing, the second pre-election filing reflects this unusually large election season. In the second pre-election report for last year's November election, the Commission received 80 reports, 33 of which were electronic. This year, the Commission received 181 reports of which 83 were electronic.

Lifting of the Voluntary Spending Limits. In accordance with the Campaign Finance Reform Ordinance, the Commission has continued to lift the voluntary spending limits in supervisorial districts when candidate spending and/or independent expenditures reach threshold amounts. The limits were lifted in 9 of 11 districts, primarily because of independent spending. The enclosed press release dated November 5, 2000 provides details for each district. The elimination of spending limits in this election contrasts dramatically with the two previous supervisorial elections (in the 1996 and 1998 Citywide elections), in which all viable candidates agreed to the spending limits and the limits were not lifted. In the 1996 and 1998 Citywide elections, the general election spending limit was $250,00 (as compared with $75,000 in this year's district elections), there were contribution limits in place affecting independent committees, and there was a financial incentive (two-tiered contribution limits) for candidates to accept the voluntary spending limits.

As of November 7, 17 committees have filed a Form 465 Supplemental Independent Expenditure Report, and 12 have filed a Late Independent Expenditure Report disclosing a combined total of $1,019,338 in independent expenditures. In addition, the Commission received 9 Major Donor/Independent Expenditures reporting $55,754. These totals include spending in support of, or opposition to, candidates and ballot measures.

First Semiannual Report of 2000. Staff had previously identified 27 committees that did not file semiannual reports due July 31, and five additional committees that have not filed their

Executive Director's Report for the Meeting of November 13, 2000

required electronic files. On two separate occasions, staff notified each committee that did not file paper statements that the Commission will forward the names and addresses of non-compliant committees to the FPPC for possible enforcement action. Eleven of the committees have now filed. Staff is preparing the paperwork to forward the remaining 16 committees to the FPPC for appropriate action.

Electronic filing. Committees with $5,000 or more in annual activity were required to file their second pre-election statements electronically. The submission of electronic files via the Commission's On Line Filing System and posting of campaign data to the web site went smoothly, except for a few hours when the campaign finance data on our web site was inaccessible. The problem was promptly fixed by DTIS. For the second pre-election filing, all campaign data filed electronically was posted to the web site within 24 hours. Staff is now concentrating on improving the display of the data on the Commission's web site.

Commission staff will conduct a demonstration for the public and members of the press on November 16, 2000, from 10:00 a.m. to 12:00 p.m. at the offices of DTIS, 5th Floor of 875 Stevenson St. The workshop will demonstrate how to search electronic campaign data posted to the Commission's web site. Commission members are welcome to attend.

City of Sacramento. The Ethics Commission staff and DTIS are continuing to negotiate with the City of Sacramento the terms of an agreement that would allow Sacramento to adopt the Commission's On Line Filing System for campaign filings. The enclosed letter, dated November 3, 2000, to Aaron B. Chong of the City of Sacramento, provides a response from the Ethics Commission staff and DTIS to the City of Sacramento's request for changes in the terms of an agreement. The Mayor's Budget Office reviewed the terms proposed in the Ethics/DTIS response. Mr. Chong has tentatively advised that these terms are acceptable. We will now ask the San Francisco City Attorney to prepare a contract for approval by the Ethics Commission, DTIS, and the City of Sacramento.

6.  **Campaign finance audit program.** Audits have commenced on two of the ten 1999 committees selected for audit in the current fiscal year.

7.  **Lobbyist program.** There are currently 44 lobbyists registered with the Commission. In the current fiscal year, $2,650 has been collected in lobbyist registration fees and $350 in late fines, for a total of $3,000. The next quarterly lobbyist filing is due on January 15, 2001. Staff issued its Third Quarter Summary of Earnings and Expenses of Lobbyists Registered with the City on October 27, 2000. Contract lobbyists reported earning $1,167,481 in payments during the quarter, down from last quarter's all time high of $1,343,491. Business and Organization and Expenditure Lobbyists reported making $171,671 in payments to influence local legislative or administrative action during the quarter. Political contributions made by registered lobbyists during the third quarter totaled $85,607.

8.  **Campaign consultant program.** There are currently 25 campaign consultants registered with the Commission. In the current fiscal year, $4,740 in fees and $850 in fines have been collected, for a total of $5590. The next campaign consultant quarterly filing is due December 15.

Executive Director's Report for the Meeting of November 13, 2000

9. **Statements of Economic Interests**. Since January 5, 2000, staff has logged 514 SEI's, including 475 Annual Statements and 39 Assuming Office, Leaving Office, or Amendment Statements. Of Annual Statements received, 396 were filed by the April 1, 1999 deadline and 79 after the deadline. Staff continues its annual survey of City boards and commissions to identify persons who have not filed SEIs. Staff continues to contact City department heads who have not filed a required Filing Officer Report indicating whether designated departmental employees have filed their SEIs with their respective departments. Of the 71 City departments reporting to the Ethics Commission last year, 57 have submitted Filing Officer Reports, and one is no longer an independent department. There is also one new department reporting to the Commission, the Local Agency Formation Commission. Staff also sent fine letters to 47 late filers for a total assessment of $4,140 in late fines and has to date collected a total of $180 in late fines.

10. **Sunshine Ordinance Declaration.** To date, 385 Sunshine Ordinance declarations have been filed with the Ethics Commission. Department heads and members of boards and commissions certify in these statements that they have read the amended Ordinance and that they will attend a training session on the new Ordinance.

11. **Staffing.** The Ethics Commission currently has seven full time staff. In addition, we have two temporary campaign finance staff assistants for the election season and two law clerks. One law clerk, Oliver Luby, is assisting with investigations into complaints filed with the Commission. Another law clerk, Mu-En Chen, is reviewing late-filed campaign statements and preparing documentation for a project to collect late fines in Small Claims Court.

12. **Move to 30 Van Ness.** I have notified the Mayor's Budget Office that the Ethics Commission may not be able to occupy its new space at 30 Van Ness Avenue on December 1 because of delays in construction of other City offices at that address. We are currently paying $13.50 per square foot in our two spaces at Fox Plaza. It is likely that our rent in this space will increase to about $54 per square foot for a few weeks until the move can be completed. We will not be required to pay rent in the new space until it is ready for our occupation.

13. **Draft FY 99-00 annual report.** A draft of the Commission's 1999-00 Annual Report is almost completed and will be ready for inclusion on the December 11 agenda for review and approval.

Respectfully submitted,

*Ginny Vida*

Ginny Vida
Executive Director

P:\SHARED\EDREPORT\2000\111300.doc

4

# City Contractor Contributions 

## PROPOSITION J

**Shall the City ban officials from accepting gifts, payments, or campaign contributions from a person or group if the official previously approved granting the donor a contract or special benefit?**

YES 
NO 

## Digest
### by Ballot Simplification Committee

**THE WAY IT IS NOW:** Under state and local law, public officials may not participate in decisions in which they have a financial interest. For example, officials may not vote to give a contract to a company that they own in whole or in part.

Officials must report all gifts they receive worth more than $50, and may not accept more than $300 in gifts per year from any single source. An official may not participate in making a government decision affecting anyone who has given $250 or more in gifts or income to the official in the past year. Campaign contributions to an official are not considered gifts or income.

**THE PROPOSAL:** Proposition J is an ordinance that would ban any City official from accepting a gift, payment, job offer, or campaign contribution from a person or group, if the City official previously had approved granting a contract, lease, franchise, land use variance, special tax benefit, or monetary payment to that person or group. This ban would apply from the date of approval of the benefit until two years after the official's term of office ended or the official otherwise left office, or six years after the approval, whichever came first.

**A "YES" VOTE MEANS:** If you vote yes, you want to ban City officials from accepting gifts or campaign contributions from a person or group where the official has previously approved granting a contract or special benefit to that person or group.

**A "NO" VOTE MEANS:** If you vote no, you do not want to ban City officials from accepting gifts or campaign contributions from a person or group where the official has previously approved granting a contract or special benefit to that person or group.

## Controller's Statement on "J"

City Controller Edward Harrington has issued the following statement on the fiscal impact of Proposition J:

Should the proposed ordinance be adopted, in my opinion, it would have a minor effect on the cost of government.

## How "J" Got on the Ballot

On June 30, 2000 the Department of Elections certified that the initiative petition, calling for Proposition J to be placed on the ballot, had qualified for the ballot.

9,735 signatures were required to place an ordinance on the ballot.

This number is equal to 5 % of the total number of people who voted for Mayor in 1999. A random check of the signatures submitted on June 1, 2000 by the proponent of the initiative petition showed that more than the required number of signatures were valid.

THIS MEASURE REQUIRES 50%+1 AFFIRMATIVE VOTES TO PASS.

ARGUMENTS FOR AND AGAINST THIS MEASURE IMMEDIATELY FOLLOW THIS PAGE. THE FULL TEXT BEGINS ON PAGE P-133
SOME OF THE WORDS USED IN THE BALLOT DIGEST ARE EXPLAINED ON PAGE P-2

# TEXT OF PROPOSED INITIATIVE ORDINANCE
## PROPOSITION J

mendment to San Francisco Administrative
ode

hapter 16 of the San Francisco Administrative
ode shall be amended by the addition of the
llowing Article:

RTICLE XX. TAXPAYER PROTECTION

ection 16.990. Title
his Article shall be known as the City and
ounty of San Francisco Taxpayer Protection
mendment of 2000.

ection 16.991. Findings and Declarations
) The people of the City and County of San
rancisco ("City and County") find that the use
r disposition of public assets is often tainted
y conflicts of interest among local public offi-
ials entrusted with their management and con-
ol. Such assets, including publicly owned real
roperty, land use decisions conferring substan-
al private benefits, conferral of a franchise
ithout competition, public purchases, taxa-
on, and financing, should be arranged strictly
n the merits for the benefit of the public, and
respective of the separate personal or finan-
ial interests of involved public officials.
b) The people find that public decisions to sell
r lease property, to confer cable, trash hauling
nd other franchises, to award public construc-
ion or service contracts, or to utilize or dispose
f other public assets, and to grant special land
se or taxation exceptions have often been
nade with the expectation of, and subsequent
eceipt of, private benefits from those so assist-
d to involved public 'decision' makers'. The
eople further find that the sources of such cor-
uptive influence include gifts and honoraria,
uture employment offers, and anticipated cam-
aign contributions for public officials who are
ither elected or who later seek elective office.
he trading of special favors or advantage in
e management or disposal of public assets
nd in the making of major public purchases
ompromises the political process, undermines
onfidence in democratic institutions, deprives
neritorious prospective private buyers, lessees,
nd sellers of fair opportunity, and deprives the
ublic of its rightful enjoyment and effective
se of public assets.
:) Accordingly, the people declare that there is
compelling state interest in reducing the cor-
uptive influence of emoluments, gifts, and
rospective campaign contributions on the
ecisions of public officials in the management
f public assets and franchises, and in the dis-
osition of public funds. The people, who com-
ensate public officials, expect and declare that
a condition of such public office, no gifts,
romised employment, or campaign contribu-
ons shall be received from any substantial

beneficiary of such a public decision for a rea-
sonable period, as provided herein.

## Section 16.992. Definitions
(a) As used herein, the term public benefit does
not include public employment in the normal
course of business for services rendered, but
includes a contract, benefit, or arrangement
between the City and County and any individ-
ual, corporation, firm, partnership, association,
or other person or entity to:
(1) provide personal services of a value in
excess of $50,000 over any 12 month period;
(2) sell or furnish any material, supplies or
equipment to the City and County of a value in
excess of $50,000 over any 12 month period;
(3) buy or sell any real property to or from
the City and County with a value in excess of
$50,000, or lease any real property to or from
the City and County with a value in excess of
$50,000 over any 12 month period;
(4) receive an award of a franchise to conduct
any business activity in a territory in which no
other competitor potentially is available to pro-
vide similar and competitive services, and for
which gross revenue from the business activity
exceeds $50,000 in any 12 month period;
(5) confer a land use variance, special use
permit, or other exception to a pre-existing
master plan or land use ordinance pertaining to
real property where such decision has a value in
excess of $50,000;
(6) confer a tax abatement, exception, or
benefit not generally applicable of a value in
excess of $5,000 in any 12 month period;
(7) receive cash or specie of a net value to the
recipient in excess of $10,000 in any 12 month
period.
(b) Those persons or entities receiving public
benefits as defined in Section 16.992(a)(l)-(7)
shall include the individual, corporation, firm,
partnership, association, or other person or
entity so benefiting, and any individual or per-
son who, during a period where such benefit is
received or accrues,
(1) has more than a ten percent (10%) equity,
participation, or revenue interest in that entity; or
(2) who is a trustee, director, partner, or offi-
cer of that entity.
(c) As used herein, the term personal or cam-
paign advantage shall include:
(1) any gift, honoraria, emolument, or personal
pecuniary benefit of a value in excess of $50;
(2) any employment for compensation;
(3) any campaign contributions for any elec-
tive office said official may pursue.
(d) As used herein, the term public official
includes any elected or appointed public offi-
cial acting in an official capacity.

## Section 16.993. Prohibitions
(a) No City and County public official who has

exercised discretion to approve and who has
approved or voted to approve a public benefit
as defined in Section 16.992(a) may receive a
personal or campaign advantage as defined in
Section 16.992(c) from a person as defined in
Section 16.992(b) for a period beginning on the
date the official approves or votes to approve
the public benefit, and ending no later than
(1) two years after the expiration of the term
of office that the official is serving at the time
the official approves or votes to approve the
public benefit; `
(2) two years after the official's departure
from his or her office whether or not there is a
pre-established term of office; or
3) six years from the date the official
approves or votes to approve the public benefit;
whichever is first. ;
(b) Section 16.993(a) shall also apply to the
exercise of discretion by any such public offi-
cial serving in his or her official capacity
through a redevelopment agency, or any other
public agency, whether within or without the
territorial jurisdiction of the City and County
either as a representative or appointee of the
City and County.

## Section 16.994. Responsibilities of City and
County Public Officials and Advantage
Recipients
(a) City and County public officials shall prac-
tice due diligence to ascertain whether or not a
benefit defined under Section 16.992(a) has
been conferred, and to monitor personal or
campaign advantages enumerated under
Section 16.992(c) so that any such qualifying
advantage received is returned forthwith, and
no later than ten days after its receipt.
(b) City and County public officials shall pro-
vide, upon inquiry by any person, the names of
all entities and persons known to them who
respectively qualify as public benefit recipients
under the terms of Sections 16.992 and 16.993.

## Section 16.995. Disclosure of the Law
The City and County shall provide any person,
corporation, firm, partnership, association, or
other person or entity applying or competing
for any benefit enumerated in Section
16.992(a) with written notice of the provisions
of this Article and the future limitations it
imposes. Said notice shall be incorporated into
requests for 'proposal,' bid invitations, or other
existing informational disclosure documents to
persons engaged in prospective business with,
from, or through the City and County.

## Section 16.996. Penalties and Enforcement
(a) In addition to all other penalties which
might apply, any knowing and willful violation

(Continued on next page)

P-133

## LEGAL TEXT OF PROPOSITION J (CONTINUED)

of this Article by a public official constitutes a criminal misdemeanor offense.

(b) A civil action may be brought under this Article against a public official who receives a personal or campaign advantage in violation of Section 16.993. A finding of liability shall subject the public official to the following civil remedies:

(1) restitution of the personal or campaign advantage received, which shall accrue to the General Fund of the City and County;

(2) a civil penalty of up to five times the value of the personal or campaign advantage received;

(3) injunctive relief necessary to prevent present and future violations of this Article;

(4) disqualification from future public office or position within the jurisdiction, if violations are willful, egregious, or repeated.

(c) A civil action under subdivision (b) of this section may be brought by any resident of the City and County. In the event that such an action is brought by a resident of the City and County and the petitioner prevails, the respondent public official shall pay reasonable attorney's fees and costs to the prevailing petitioner. Civil penalties collected in such a prosecution shall accrue 10% to the petitioner and 90% to the General Fund of the City and County.

(d) Any person who believes that the provisions of this Article have been violated may file a complaint with the Ethics Commission. Upon receipt of a complaint, or upon its own initiative, the Commission may investigate alleged violations of this Article and may enforce the provisions of this Article pursuant to Charter Section C3.699-13 and to the rules and regulations adopted pursuant to Charter Section 15.102.

### Section 16.997. Effect of Article

The provisions of this Article are intended to supplement, and not to replace, any provisions of the San Francisco Charter and Administrative Code that relate to campaign finance, lobbying, conflicts of interest or governmental ethics.

### Section 16.998. Severability

If any provision of this Article is held invalid, such invalidity or unconstitutionality shall not affect other provisions or applications which can be given effect without the invalidated provision, and to this end the provisions of this Article are severable.

## SAN FRANCISCO ETHICS COMMISSION
### Whistleblower Complaints Registered with the Ethics Commission since 7/21/97

| TYPE OF COMPLAINT REGISTERED VIA WHISTLEBLOWER HOTLINE | DATE OF CALL |
| --- | --- |
| Theft of city funds | 7/21/97 |
| Harassment | 7/21/97 |
| Corruption; Misuse of City resources | 7/21/97 |
| Possible violation of Sunshine Ordinance; Mishandling of internal complaint | 7/22/97 |
| Conflict of interest re influencing gov decision re financial interest | 7/24/97 |
| Misuse of Government Property | 7/25/97 |
| Illegal search & seizure; Retaliation; Harassment; Cover-up | 8/19/97 |
| Racial discrimination; Unfair personnel practices re: promotion | 8/20/97 |
| Fraud re: personnel practices | 10/15/97 |

| WHISTLEBLOWER COMPLAINTS REGISTERED VIA THE MAIN LINE | DATE OF CALL |
| --- | --- |
| Gross Misconduct | 09/16/1997 |
| Gross Misconduct | 09/17/1997 |
| Bribery | 10/07/1997 |
| Corruption | 12/10/1997 |

| WHISTLEBLOWER COMPLAINTS REGISTERED VIA COMPLAINT FORM | DATE RECEIVED |
| --- | --- |
| Workplace Harassment; Retaliation | 9/10/97 |
| Workplace Harassment | 10/3/97 |
| Misuse of Government Property | 11/3/97 |
| Theft of City property | 11/10/97 |
| Unlawful Retaliation | 1/5/98 |
| Gross Misconduct | 1/7/98 |
| Gross Misconduct | 1/15/98 |
| Unlawful Retaliation | 1/27/98 |
| Fraud; Theft of City Property | 2/20/98 |
| Misuse of Government Property | 3/12/98 |
| Fraud; Theft of City Property | 3/13/98 |
| Unlawful Retaliation | 4/2/98 |
| Gross Misconduct; Bribery | 4/14/98 |
| Fraud; Theft of City Property | 7/24/98 |
| Workplace Harassment; Misuse of Government Property | 6/29/99 |
| Misuse of Government Property | 7/26/99 |
| Misuse of Government Property | 7/26/99 |
| Workplace Harassment; Corruption | 1/4/00 |
| Unlawful Retaliation | 1/25/00 |
| Misuse of Government Property | 2/24/00 |
| Misuse of Government Property | 3/7/00 |
| Wrongful termination, workplace harassment | 4/11/00 |
| Misuse of Government Property | 6/20/00 |
| Discrimination, forgery | 7/12/00 |
| Retaliation | 8/17/00 |
| Retaliation | 9/27/00 |

| NON-WHISTLEBLOWER COMPLAINTS REGISTERED WITH THE HOTLINE | TOTAL |
| --- | --- |
| Conflict of Interest | 5 |
| Mismanagement in Hiring Practices | 1 |
| Violation of Sunshine Ordinance | 1 |
| Workplace Harassment | 3 |

| WHISTLEBLOWER COMPLAINT CATEGORIES | TOTAL |
| --- | --- |
| (Improper Government Activities Ordinance, S.F. Admin. Code Sec. 16.401) | |
| Bribery | 2 |
| Coercion | 0 |
| Corruption | 3 |
| Discrimination | 2 |
| Fraud | 4 |
| Gross Economic Waste | 1 |
| Gross Misconduct | 6 |
| Malfeasance | 0 |
| Misuse of Government Property | 6 |
| Racial Harassment | 1 |
| Sexual Harassment | 1 |
| Theft of City Property | 7 |
| Unlawful Retaliation | 8 |



# ETHICS COMMISSION
# CITY AND COUNTY OF SAN FRANCISCO

CAROL M. KINGSLEY
CHAIRPERSON

PAUL H. MELBOSTAD
VICE-CHAIRPERSON

ISABELLA H. GRANT
COMMISSIONER

PHILIP S. RYAN
COMMISSIONER

SHARYN SASLAFSKY
COMMISSIONER

VIRGINIA E. VIDA
EXECUTIVE DIRECTOR

## PRESS RELEASE

**Contact:**
**Ginny Vida**
**(415) 554-9510**

**For release:**
**November 5, 2000**

**SF ETHICS COMMISSION ANNOUNCES THAT THE VOLUNTARY SPENDING LIMIT HAS BEEN LIFTED FOR BOARD OF SUPERVISORS CANDIDATES IN DISTRICT EIGHT; THE SPENDING LIMITS ARE NOW LIFTED IN 9 OF 11 DISTRICTS**

The San Francisco Ethics Commission announced today that San Francisco's $75,000 voluntary spending limit for candidates for the Board of Supervisors in District 8 in the November general election has been lifted because of high levels of independent expenditures made to influence the election in that district. The Commission has notified all supervisorial candidates that the spending limit is no longer in effect in District 8. The lifting of the District 8 spending cap brings to nine the number of districts in which the voluntary limit has been eliminated, either because of candidate spending or independent spending. The limit has been lifted in districts 1, 3, 4, 5, 6, 7, 8, 10, and 11. They remain in effect only in districts 2 and 9.

Under the City's Campaign Finance Reform Ordinance, the voluntary spending limit for candidates for the office of Board of Supervisors is lifted in a particular district if committees that make independent expenditures spend, in the aggregate, more than 25 percent of the applicable spending limit in support of, or in opposition to, a candidate.

The spending limit was lifted in District 8 because two committees, the Alice B. Toklas Club Independent Expenditure PAC and the San Francisco Late Night Coalition, made

(more)

1390 Market Street, Suite 801 • San Francisco, CA  94102-5302 • Phone (415) 554-9510 • Fax (415) 554-8757
E-Mail Address:  ethics_commission@ci.sf.ca.us        Web site:  http://www.ci.sf.ca.us/ethics/

independent expenditures exceeding the 25 percent threshold of $18,750. The committees spent a combined total of $21,620 in support of supervisorial candidate Mark Leno. The Alice B. Toklas Club Independent Expenditure PAC spent $13,350 and the San Francisco Late Night Coalition spent $8,270 in support of Mark Leno.

In August, the Commission announced that the spending limit had been lifted in districts 3 and 7 because of candidate spending. The limit was lifted because a candidate in each district (Michael DeNunzio in District 3 and Tony Hall in District 7) declined to comply with the $75,000 spending limit and also accepted contributions exceeding 50 percent of the spending limit (or $37,500).

Later, the Commission announced that the limit in District 4 had been lifted because Chinese Americans for a Better San Francisco had made independent expenditures in support of Tom Hsieh, Jr. in the amount of $33,286, exceeding the 25 percent threshold. The Commission then announced that the limit in districts 1, 5, 10, and 11 had been lifted because independent expenditures made by San Franciscans for Sensible Government and the Willie Brown Leadership PAC in support of supervisorial candidates in those districts had exceeded the 25 percent threshold of $18,750. San Franciscans for Sensible Government spent $25,212.69 in support of supervisorial candidate Michael Yaki in District 1; $25,077.22 in support of supervisorial candidate Juanita Owens in district 5, $48,717.34 in support of supervisorial candidate Linda Richardson in District 10; $33,202.17 in support of supervisorial candidate Amos Brown in District 11; and $28,188.50 in support of supervisorial candidate Mabel Teng in District 7 (the spending limit in District 7 had already been lifted because of candidate spending – see above). The Willie Brown Leadership PAC also spent $23,891 in support of Amos Brown in District 11.

In supervisorial districts, the lifting of the $75,000 voluntary limit in the general election also triggers a lifting of the $20,000 voluntary limit in the runoff election. However, the lifting of the spending limits in one district does not affect the limits in other districts. As noted above, the voluntary spending limits in districts 2 and 9 are still in effect.

(more)

All candidates running for Supervisor, Board of Education or Community College Board who agreed last August to comply with the voluntary spending limits have been acknowledged in the Voter Information Handbook distributed to San Francisco voters.

Ginny Vida, Executive Director of the Ethics Commission, said: "In last November's election, San Francisco voters approved the voluntary spending limits for supervisorial candidates by a vote of nearly 80 percent. Clearly, the voters want candidates to limit their spending. It is my hope that candidates for the Board of Supervisors in districts 1, 3, 4, 5, 6, 7, 8, 10, and 11 who agreed to the voluntary limits will continue to comply with them, although they are no longer obligated to do so. The Ethics Commission also encourages all other candidates for elective office in November to observe the voluntary limits, whether or not the limits remain in effect."

- - - - - - -

The Ethics Commission, established in November 1993, serves the public, City employees and officials and candidates for public office through education and enforcement of ethics laws. Its duties include: filing and auditing of campaign finance disclosure statements, lobbyist and campaign consultant registration and regulation, administration of the Whistleblower program, conflict of interest reporting, investigations and enforcement, education and training, advice giving and statistical reporting.

# # # # #

\\ETHICS-01SVR\DATA\SHARED\PRESS\CFRO\lift BOS limits 11.05.00.doc

3



**⚡SF Gate**    www.sfgate.com    Return to regular view

## Soft money flows in The City
By Rachel Gordon and Ilene Lelchuk
OF THE EXAMINER STAFF
October 28, 2000
©2000 San Francisco Examiner

URL: http://www.sfgate.com/cgi-bin/article.cgi?file=/examiner/hotnews/stories/28/money.dtl

### Special interests continue cash flood to Willie Brown's picks

Downtown interests continued their flood of soft money spending on behalf of Board of Supervisors candidates backed by Mayor Willie Brown.

The cash flowing from special interest groups — which are operating soft money campaigns by law independently and without consent or knowledge of the candidates' campaigns — has muddied the directive of San Francisco voters to cap spending by candidates.

The committees have spent nearly $400,000 to boost the mayor's favored candidates in the Nov. 7 election, according to new campaign finance reports filed this week with The City's Ethics Commission. The money has paid for mailings, television ads, polling, billboards, opposition research, field operations and phone banks.

San Franciscans for Sensible Government, which spent hundreds of thousands of dollars to help re-elect the mayor last fall, was among the biggest spenders.

More than $80,000 has been spent on behalf of District 10 candidate Linda Richardson. Her big boosters include San Franciscans for Sensible Government and the Willie Brown Leadership Political Action Committee.

Other soft money beneficiaries include:

District 5 candidate Juanita Owens, $69,362;

District 6 candidate Chris Dittenhaffer, $53,875;

Supervisor Amos Brown running in District 11, $48,171;

District 4 candidate Tom Hsieh Jr., $45,494;

Supervisor Mabel Teng running in District 7, $28,607;

Supervisor Michael Yaki running in District 1, $20,133;

Alicia Becerril running in District 3, $6,030.

Many of the same candidates are top fund-raisers on their own. Becerril has raised $96,036 to date with $31,696 left to spend. However, challenger Mike DeNunzio, who all along said he'd bust the campaign spending cap of $75,000 because of the anticipated soft-money influx, raised $205,177. He loaned about half to himself.

Yaki raised $80,285 and still has $48,993 left. One of his challengers, Rose Tsai, raised $23,704 and has a little under half still in the bank. Richardson raised $58,539, with $24,537 remaining. One of her chief rivals, Sophie Maxwell, raised $58,734 but reports an outstanding debt of $38,656.

Supervisor Gavin Newsom, who faces only a write-in candidate in District 2, still has a good chunk of change left — $86,565.P>

©2000 San Francisco Examiner



SF Gate

# news

**SF Gate Home**

**Today's News**

**Sports**

**Entertainment**

**Technology**

**Live Views**

**Traffic**

**Weather**

**Health**

**Business**

**Bay Area Travel**

**Columnists**

**Classifieds**

**Conferences**

**Search**

**Index**

## High Stakes for Players in Convoluted S.F. Elections

Phil Matier, Andrew Ross

If politics were a card game, next month's supervisorial race in San Francisco would be a crazy game of 11-card gin rummy -- being dealt by the same cast and crew that battled it out in the last mayoral race.

For Mayor Willie Brown, the goal is to somehow win the six votes he needs to continue his majority on the board.

For his opponents, it's somehow to amass a set of winners who will at least block Willie's control. And at this point, opponents don't seem to be overly concerned about who these winners are -- just as long as they aren't solidly in the Brown camp.

``With what I've had to put up with these past couple of years, I'd be happy with anything to change the constipation that's been going on," says lefty-progressive board President (and former mayoral candidate) Tom Ammiano.

In addition to running for re-election, Ammiano is backing Aaron Peskin, Beryl Magilavy, Jake McGoldrick, Matt Gonzalez, Marie Harrison and Eileen Hansen -- plus one other incumbent, Leland Yee.

Like Ammiano, Clint Reilly (another former mayoral candidate) is supporting progressives Peskin and Magilavy. But then he's also supporting middle-of-the-roader Gerardo Sandoval, conservatives Rose Tsai and Tony Hall, plus incumbents Mark Leno and Gavin Newsom.

On the personal side, Reilly is also backing his own former campaign worker, Ron Konopaski.

Like Reilly, ``conservative" former Mayor Frank

---

Monday, October 30, 2000

San Francisco Chronicle

CHRONICLE SECTIONS

· Printer-friendly version
· Email this article to a friend

Backflip this page
to find it again

* RELATED ARTICLES
powered by Autonomy

10/08/2000 - THE CHRONICLE RECOMMENDS.

08/14/2000 - Some Supervisor Hopefuls Left Out Amid Rivalry.

08/12/2000 - Big Lineup Jockeys for Position in District Supervisors Race.

>>more related articles...

High Stakes for Players in Convoluted S.F. Elections

Jordan (yet another former mayoral candidate) has also drawn a mixed hand: Ammiano, Peskin and Magilavy from the left; Tsai and Hall from the right; and Sandoval, Newsom and Yee up the middle.

``The whole idea is to support those who will bring balance to the board,'' says Jordan.

As for Mayor Brown, when he looks around the table, he sees the faces of everyone he beat in the last mayor's race.

And he plans to beat them again with a hand that includes incumbents Alicia Becerril, Amos Brown, Mabel Teng, Michael Yaki, Mark Leno and Gavin Newsom

--as well as former Planning Commissioner Linda Richardson out in the Bayview, Chris Dittenhafer from South of Market and Maria Martinez out of Bernal Heights.

Plus, just to cover his bets, the ever-wily Willie is also handing out ``dual endorsements'' to both Agar Jaicks and Juanita Owens in District 5, and Tom Hsieh Jr. and Ron Dudum in District 4.

And speaking of bets, standing in the shadows are the town's developers, big businesses, small businesses, real estate agents, labor unions and just about everyone else with a financial stake in the outcome -- pumping hundreds of thousands of dollars of ``soft money'' into their picks.

For instance, as of late last week, the mayoral-friendly San Franciscans for Sensible Government PAC had spent $183,000 on mayoral-friendly candidates, according to records filed with the city Ethics Commission.

Nobody expects a clean sweep on Nov. 7. In fact, most camps would be happy just to get their picks into the runoff election in December that will follow if no one wins a majority the first time out.

And in those races where their cards don't play?

Well, they'll just ``discard'' and make another

*SF Bay Guardian*

# S.F.'s Prop. O would limit soft money

### By Tali Woodward

Anyone who still thinks electing supervisors by district will liberate San Francisco politics from the influence of big money clearly hasn't been paying attention. The voluntary spending cap has already been exceeded in seven of the city's 11 district races. Money is pouring in from nefarious committees with innocuous-sounding names. And there's still no way to trace much of the campaign cash until after the ballots are counted.

Fortunately, the November ballot offers voters an outlet for their campaign finance frustration. Proposition O would finally put limits on soft money donations. It would also give candidates a real incentive to stay within voluntary spending caps: partial public financing.

Under Prop. O, donors would be required to disclose how they were spending money *during* the election. Right now there's no way of knowing who's ponying up for the final campaign blasts until weeks after voters have gone to the polls.

Ethics Commission executive director Ginny Vida would only speak to us about the technicalities and the history of Prop. O, because, as a commission employee, she is forbidden to advocate on the issue. Vida said that last year's mayor's race – which was dominated by individual contributions of up to $50,000 – led the commission to pursue alternate reforms. "The commission was concerned about the influence of these committees on the election and on [policy]," Vida said.

Prop. O, which applies only to Board of Supervisors races, would preserve current contribution limits: $500 in general elections and $250 in runoff races. But donors would only be permitted to make as many contributions as there are races. And Prop. O would extend donation limits to independent expenditure committees, which have become an increasingly powerful force in city races. Half of the money used to finance Mayor Willie Brown's reelection campaign last year came from independent expenditure committees (see "The Best Mayor Money Can Buy," 2/16/00). Prop. O would make that sort of

11/01/2000 1:28 PM

Money Can Buy," 2/16/00). Prop. O would make that sort of thing harder, because an individual or group could only give $500 to a single committee, with a total annual limit of $3,000 in political action committee donations.

Under Prop. O, only candidates who raised $7,500 and agreed to spend no more than $75,000 would qualify for public funds. They would also have to agree to debate opponents and face actual competition. Each candidate could receive a maximum of $43,750 in public financing.

Jim Knox, executive director of California Common Cause, said that public financing is "really the only way to get them to abide by spending limits." And this year's district elections have certainly shown how ineffective voluntary spending caps can be when they aren't coupled with any sort of incentive.

Finance reformers, who have united behind Prop. O, expected opponents to attack the public financing provision as a drain on public coffers. And indeed that's the main line taken in the ballot arguments against the measure, submitted by the local Republican Party, the San Francisco Chamber of Commerce, the Alice B. Toklas Club, and a couple of conservatives who are running for supervisor. But supporters say Prop. O would cost each San Francisco resident? a maximum of $2 a year.

Every supervisor but Tom Ammiano voted against a very similar proposal by the Ethics Commission back in April.

"I think it's urgent that Prop. O pass," Ammiano told us. "I think public financing is the only way we can really guarantee clean elections. And if you look at the latest Ethics reporting, you'll see how many thousands and thousands – and it's going to total millions – are going to go into soft-money stuff for district elections. It's a very pernicious attempt to corrupt and pollute district elections."

**E-mail Tali Woodward at Tali_Woodward@sfbg.com.**

# Follow the money

The real estate industry's top 10 candidates for supervisor

**By Gabriel Roth**

In the brawling world of San Francisco politics, no group defends its interests more stridently than the real estate lobby.

Landlords, developers, and contractors know how to work the system, and their influence starts before officials are elected. Groups like the San Francisco Apartment Association, the Building Owners and Managers Association, and the Residential Builders Association spend big bucks to win seats for sympathetic candidates, and that money is shored up by numerous individual contributions from real estate companies, developers, and others with an interest in keeping property values high.

"We're looking for candidates who have an appreciation for the problems that affect property owners," says Ken Cleaveland, government affairs director for BOMA, which represents commercial landlords. Cleaveland cited rent control, taxation, and zoning among such problems.

Of all the candidates in this year's race for supervisor, Sup. Amos Brown has benefited the most from real estate contributions. As of Oct. 21, Brown's campaign had taken in at least $24,385 from developers, realty companies, and other property-lobby sources – more than a quarter of Brown's reelection war chest. Brown didn't return calls for comment.

Eight of the top 10 supervisors on the list – all but Leland Yee and Tony Hall – are endorsed by Mayor Willie Brown. (Opponents of both Yee and Hall also made the top 10.)

Contributions to supervisorial campaigns are capped at $500. As a result, spending by individual campaigns pales in comparison to the unlimited soft money spent by independent groups. But contributions totaling in the $20,000 range certainly get candidates' attention – and you can bet they'll remember they're benefactors after election night.

The chart below ranks the district supervisor candidates receiving the most contributions from real estate interests, based on the latest filings available from the Ethics Commission Oct. 30.

11/01/2000 1:24 PM

latest filings available from the Ethics Commission Oct. 30.

We examined the contribution reports of the 28 candidates who have raised the most money. Our chart shows the top 10 beneficiaries of the property lobby's largesse.

To calculate these figures, we totaled the contributions from individuals whose occupation, as listed on campaign finance reports, reflects an interest in San Francisco's real estate market, including developers, real estate agents, and property managers. We added corporate contributions from firms in the real estate industry, similarly defined, and donations from organizations such as the San Francisco Apartment Association and the Building Owners and Managers Association. The figures don't include small-time landlords, who typically list a different occupation on contribution forms.

These are minimum figures: It's likely we failed to identify some real estate contributions.

| Candidate | District | Real-estate contributions | Total contributions | Percent from real-estate |
|-----------|----------|---------------------------|---------------------|--------------------------|
| Amos Brown | 11 | $24,385 | $94,989 | 25.7 |
| Leland Yee | 4 | $21,600 | $166,564 | 13.0 |
| Mabel Teng | 7 | $18,700 | $206,650 | 9.0 |
| Michael Yaki | 1 | $17,750 | $80,125 | 22.2 |
| Tony Hall | 7 | $15,977 | $80,830 | 19.8 |
| Alicia Becerril* | 3 | $12,400 ($14,939) | $92,955 | 13.34 (16.07) |
| Tom Hsieh | 4 | $12,300 | $116,875 | 10.5 |
| Linda Richardson* | 10 | $10,350 ($14,145) | $57,750 | 17.9 (24.5) |
| Juanita Owens* | 5 | $6,000 ($9,690) | $43,399 | 13.8 (22.3) |
| Ron Dudum | 4 | $5,750 | $61,995 | 9.3 |

* Becerril, Owens, and Richardson all failed to report the occupations of a substantial number of their contributors. It's very likely those contributions include some from real estate interests; for instance, we found Mission developer Curtis Eisenberger's name, with no occupation listed, in both Owens's and Richardson's filings. That means the figures for real estate contributions to those candidates will likely be especially low.

So we also calculated projected figures for those candidates. Development interests represent 24 percent of identifiable contributions from individuals (not corporations or groups) to Becerril's campaign. If the same percentage applies to Becerril's unidentified contributors, there's $3,795 in real estate money hiding in her campaign treasury. So, to correct for the campaigns' reporting lapses, the numbers in parentheses after those

candidates' figures represent projected total real estate
contributions.

**E-mail Gabriel Roth at gabriel@sfbg.com**

**return to top | discuss this article in altcity**

**news | · · · | sf life | extra | sfbg.com**
PERSONALS | CLASSIFIEDS | FREE STUFF | MOVIE CLUB | SEARCH



**SF Gate Home**

**Today's News**

**Sports**

**Entertainment**

**Technology**

**Live Views**

**Traffic**

**Weather**

**Health**

**Business**

**Bay Area Travel**

**Columnists**

**Classifieds**

**Conferences**

**Search**

**Index**



## S.F. Campaign Measure Could Aid Dark Horses
## One of 2 election reform propositions

Jonathan Curiel, Chronicle Staff Writer

Thursday, November 2, 2000

San Francisco Chronicle

CHRONICLE SECTIONS

· Printer-friendly version
· Email this article to a friend


**Backflip** this page
to find it again


**RELATED ARTICLES**
powered by Autonomy

10/27/2000 - THE
CHRONICLE
RECOMMENDS.

10/27/2000 - THE
CHRONICLE
RECOMMENDS.

06/28/2000 - Voters to Weigh
Soft-Money Limits for S.F..

10/28/1999 - S.F. vote on
campaign spending limits .

>>more related articles...

For campaign finance reformers and longshot supervisor candidates, Proposition O is a fantasy come true.

If San Francisco voters pass the measure on Tuesday, every supervisor hopeful who raises $7,500 could get upwards of $60,000 in public funding. The proposition also limits how much a supervisorial candidate can lend his or her campaign and how much a person or group can give to city office seekers and political committees.

Proposition O, say supporters, will muzzle the influence of wealthy candidates and their backers and give lesser-known candidates a better chance to voice their ideas.

Advocates of election reform are also pushing a second San Francisco ballot initiative, Proposition J, that they say would eliminate the potential for donor kickbacks. The measure would bar a city official from taking gifts, payments, job offers and contributions from anyone who previously benefited from the official's vote or approval.

``It's a no-brainer," Jane Morrison, president of the urban conservation group San Francisco Tomorrow, says of Proposition J. ``Who could be against it?"

The San Francisco Planning and Urban Research Association, a public policy think tank, opposes both measures, saying they are unfairly restrictive.

Jim Chappell, president of the organization, says

the era of a election reform propaganga...to http://www.sfgate.com/cgi-bi...chronicle/archive/2000/11/02/MN108227.DT

Proposition J would penalize long-serving city officials who have voted on hundreds of measures, forcing them to scrutinize every new campaign contribution they get. He says Proposition O would encourage too many fringe candidates to seek office knowing their campaigns might receive public funding.

``I'm personally disappointed that we couldn't support (both propositions),'' says Chappell. ``There is probably no subject more important in American politics today than getting the money situation under hand.''

Different organizations spearheaded the two initiatives. The San Francisco Ethics Commission, which enforces the city's ethics laws, voted unanimously to place Proposition O on the ballot. A volunteer organization, the Oaks Project, gathered enough signatures to create Proposition J in San Francisco and four similar initiatives in other California cities.

Proposition O has drawn much more opposition than Proposition J because its passage would dramatically alter the way election campaigns are funded in San Francisco.

Besides creating public financing of supervisorial candidates, the measure would curtail the large amounts of ``soft money'' that go to noncandidate committees.

Under the city's current system, wealthy donors funnel tens of thousands of dollars to those committees, which then blanket a race with ads and brochures. If Proposition O passes, donor contributions to noncandidate committees would be limited to $3,000 a year, and a loophole would be closed that allows some of these committees to disclose their donors after an election.

Critics of ``soft money'' often point at Gap Chairman Donald Fisher, who actively supports such pro-business groups as San Franciscans for Sensible Government -- groups that, in turn, bankroll election campaigns.

``If Donald Fisher or another wealthy individual

or corporation wanted to spend $100,000 to help a candidate out, they could (under Proposition O) -- but they'd have to form their own individual expenditure committee, and if they did that, they'd have to call their committee, say, the Donald Fisher Committee," said Michael Mooney, organizer of the Proposition O campaign. ``It's one of the positive consequences of Prop. O -- it helps you see what the money trail really is. Right now, Donald Fisher can give to one committee, which gives to another committee, that produces a mailer that looks like it is paid for by a (neighborhood group). The funding source is often murky until the election is over."

Proposition O would also restrict the total amount a donor can give to candidates. Contributions to a single candidate would be limited to $500 for general elections and $250 for runoffs, with a cap on donations to all candidates determined by the number of contested offices. For example, if there are six supervisor seats open, a donor could dole out a maximum of $3,000 (six times $500) in the general election and $1,500 (six times $250) in a runoff.

Public financing has similar restrictions. To be eligible, a supervisorial candidate would have to raise $7,500 from at least 75 different donors, from donor amounts between $10 and $100; agree to debate opponents; and agree to limit spending to $75,000 in a general election and to $20,000 in a runoff. Eligible candidates would get upward of $43,750 in campaign funding for the general election and $17,000 for any runoff.

If the measure passes, the finance program's annual cost could not exceed $2 per resident in San Francisco. City Controller Ed Harrington estimates that it would cost at least $1.6 million annually.

Its supporters say that is a small price to pay for campaign finance reform. ``It's not a huge amount of money," says Morrison. ``They should be spending that kind of money on something like this."

The Ethics Commission held months of public hearings and worked with the city attorney's office before creating Proposition O, which could face legal challenges.

A series of recent court rulings struck down previous campaign limits in San Francisco. Last year, a lawsuit by San Franciscans for Sensible Government challenged the city's limit on contributions to noncandidate committees. Clint Reilly, who ran for mayor against Willie Brown, also sued last year, saying the city's donation limit to candidates was a violation of free speech. At the time, mayoral candidates who agreed to spend no more than $600,000 in a general election could receive individual contributions of up to $500. For candidates who didn't agree to the $600,000 cap, contributions were limited to $150.

Facing court rulings that favored both lawsuits, the city agreed to rewrite its campaign ordinances, leading to public hearings that begat Proposition O.

Barbara Kaufman is the supervisor most vocally opposed to Proposition O, saying that taxpayer dollars shouldn't be used to finance supervisorial campaigns and that candidates shouldn't run if they can't raise the necessary financial support.

Supervisor Tom Ammiano, Assembly Majority Leader Kevin Shelley and Holli Thier, president of the League of Women Voters of San Francisco, are among the supporters of Proposition O.

Because of the Ethics Commission's mandate to be a neutral body, it can't actually campaign for passage of its own measure. Instead, ethics commissioners are limited to explaining what prompted their June 26 decision to create the proposition.

``The commissioners decided to consider public financing (of campaigns) to make races more competitive and to encourage candidates to spend more time communicating with voters and less time raising money," says Ginny Vida, executive director of the Ethics Commission.

Few people are actively opposing Proposition J, and no ballot arguments were submitted against the measure.

Paul Herzog, organizer of the Proposition J campaign, said the initiative would ensure that no payoffs or kickbacks are given to elected officials who vote a certain way.

The measure and its companion initiatives around the state are the first in recent memory to be put on the ballot by an all-volunteer group that went door to door. Herzog said the controversy surrounding former state Insurance Commissioner Chuck Quackenbush persuaded many people to sign the ballot argument.

Quackenbush resigned in July after revelations that his department had reached secret settlements requiring insurance companies accused of mishandling claims from the 1994 Northridge earthquake to contribute $12.8 million to foundations he created.

``The influence of money after a vote is huge," says Herzog. ``To think otherwise is to have your head in the sand."

*E-mail Jonathan Curiel at jcuriel@sfchronicle.com.*

©2000 San Francisco Chronicle   Page A22



~~Get~~





**SF Gate Home**

**Today's News**

**Sports**

**Entertainment**

**Technology**

**Live Views**

**Traffic**

**Weather**

**Health**

**Business**

**Bay Area Travel**

**Columnists**

**Classifieds**

**Conferences**

**Search**

**Index**



## City Charter muddles campaign for Prop. O

By Ilene Lelchuk
OF THE EXAMINER STAFF

November 2, 2000



EXAMINER SECTIONS

### Ethics Commission is not permitted to promote its own political reform plan

The City's Ethics Commission, which oversees campaign spending, is learning exactly how tricky winning an election can be.

The commission, allowed by city law to create ballot measures aimed at improving San Francisco's election system, can't campaign for them.

Commissioners are forced into silence when it comes to Proposition O, their campaign finance measure designed to slow the tidal wave of political spending. It would give local San Francisco candidates public financing for their campaigns, limit contributions to candidates and independent expenditure committees that work on the candidates behalf, and tighten the financial disclosure requirements for those committees.

"The Charter specifically says the executive director and members of the commission can't advocate for any candidate or ballot measure," Ethics Commission Executive Director Ginny Vida said in declining to answer why voters should say yes to Prop. O, one of 18 local measures on the Nov. 7 ballot.

Voters created the Ethics Commission in 1993 as an independent, unbiased body to watch over campaign spending. "But it seems the authors of the measure that created the Ethics Commission didn't think ahead for this," Vida said.

California Common Cause, a political watchdog group, has taken up the cause and is supplying modest campaign financing and rhetoric.

· Printer-friendly version
· Email this article to a friend



**Backflip** this page
to find it again

**RELATED ARTICLES**
powered by Autonomy

10/22/1999 - Reilly's record spending .

10/22/1999 - Reilly's record spending .

10/14/1999 - Judge lifts S.F. election cash cap .

>>more related articles...

Meanwhile, the commission doesn't know what kind of opposition Prop. O faces. The committee formed to fight Prop. O, No Tax Money for Political Campaigns - No on O, hasn't filed a campaign finance report with the Ethics Commission yet.

Campaign treasurer Jim Sutton, a lawyer who often represents downtown business interests and also specializes in election law, said No on O hadn't filed any paper work because the group had formed after the last reporting deadline Oct. 21.

No on O produced at least one glossy mailer so far featuring Supervisor Barbara Kaufman.

"I don't want my tax money going for candidates who I don't want in office," Kaufman said this week. "If you can't find enough people who are willing to invest money in your campaign, you don't belong in the job."

Prop. O would give campaign cash to Board of Supervisors candidates who have raised $7,500 on their own from at least 75 contributors, as long as they promise not spend more than $75,000 in the general election and $20,000 in a run-off. They'd receive up to $43,750 for the general election and up to $17,000 for a run-off.

Prop. O could cost taxpayers about $1.6 million a year, according City Controller Ed Harrington, although the No on O mailer maintains it could cost up to $5 million a year.

Mike Mooney of San Francisco Common Cause, who is running the pro-Prop. O campaign, said public campaign financing leveled the playing field for candidates who weren't wealthy or backed by rich special interest groups.

"We think that San Francisco, like the rest of country, is basically having its democracy and political process undermined by huge campaign contributions and spending," Mooney said.

Independent expenditure committees, mostly financed by downtown's big business interests,

Case 3:07-cv-03199-JSW    Document 21-16    Filed 08/27/2007    Page 39 of 56

have spent nearly $400,000 to boost Mayor
Willie Brown's favored Board of Supervisors
candidates in Tuesday's election, according to
campaign finance reports filed with the Ethics
Commission in October. The so-called soft
money - which can be contributed in unlimited
amounts - has paid for mailings, TV ads, polling,
billboards, opposition research, field operations
and phone banks.

"Prop. O isn't meant to favor anyone in the
political machine or the wealthy," Mooney said.
"It's to help folks who don't have a chance to
have their voices heard run an effective
campaign."

Kaufman doesn't believe you need just cash to
run a successful campaign, and she pointed to
past, low-budget, but triumphant races by
Supervisors Tom Ammiano and Sue Bierman.

"There is proof," she said.

Ammiano was the only supervisor to approve
Prop. O when the Ethics Commission brought it
to the Board of Supervisors to review earlier this
year. But the board's 10-1 vote against placing it
on the ballot was only advisory.

Kaufman said she didn't like it that the Ethics
Commission could ignore the supervisors' veto.

"They are doing it contrary to what people who
were elected want," she complained.

The commission - one member each appointed
by the mayor, Board of Supervisors president,
district attorney, city attorney and controller -
also faces new resistance from within its ranks.
Brown's new appointee, Philip Ryan, started his
tenure this fall by chastising the panel's
aggressive efforts to reform campaign finance
laws. In September, Ryan told the commission
he was troubled that commission staff and
commissioners had appeared before civic and
political groups to talk about Prop. O.

The commission and staff now stick to providing
only facts about Prop. O, without giving
opinions. But Commissioner Paul Melbostad

resents having his hands tied.

"I do not think it makes sense for commissioners not to be able to explain why they recommended a measure to the voters," Melbostad said.

If voters pass Prop. O, there is a good chance opponents will sue to overturn it on constitutional grounds, and history shows that city attorneys will have an uphill battle defending the measure.

Local and federal judges last year affirmed a challenge by San Franciscans for Sensible Government, a pro-Brown independent expenditure committee, against a previous city law capping contributions to independent expenditure committees to $500. They argued that the limit violated free speech rights.

"This is what makes people so cynical," Sutton said. "They vote for these campaign finance measures, and they get thrown out by the courts."

Prop. O would again try to limit individual contributions to independent expenditure committees to $500, with a total contribution limit of $3,000 per year. Contributions to candidates would be limited to $500 in general elections and $250 in run-offs.

Candidates also couldn't lend themselves more than $15,000.

In last year's mayoral race, candidate Clint Reilly lent his campaign more than $2 million, which helped push that race to become the most expensive in San Francisco history.

Robert Stern, president of the Center for Governmental Studies in Los Angeles and who helped the Ethics Commission draft Prop. O, acknowledged the measure treaded in legally gray area, but he said the growing influence of soft money in San Francisco elections should be enough evidence to sway a judge.

"Probably the Supreme Court is going to have to rule on this," Stern said.

# Prop. O is real reform for S.F.

ON TUESDAY, San Franciscans will vote in district elections for the first time in many years. And already we are seeing a disturbing trend that threatens to undermine these elections.

An explosion of soft money and independent expenditures from outside the districts is endangering the integrity of our electoral process.

I believe this is wrong.

San Franciscans passed district elections because we wanted politics returned to our neighborhoods. For this reason, 80 percent of San Franciscans also passed Proposition K in 1999, which lowered voluntary spending limits within the districts to $75,000.

But a trend of massive independent expenditures is threatening to undermine the spirit of district elections.

To deal with this threat, the Ethics Commission of San Francisco has placed Proposition O on next week's ballot.

Prop. O is reasonable, well-designed campaign finance reform. It was drafted by the city attorney's office with the advice of leading national experts.

First, Prop. O will restrict to $500 the size of donations that may be given to these independent expenditure committees.

Right now, a person or organization can contribute an unlimited amount — $50,000, $100,000 – the sky is the limit.

Reducing the amount of money that can be donated will help level the playing field. That's fair and reasonable.

Second, Prop. O will close the loophole about disclosing who is donating to these independent expenditure committees.

Right now, the committees can hide the identities of their donors until after the election.

Under Prop. O, these committees will have to disclose who their donors are before the election, so voters will know who is bankrolling which campaigns.

*Kevin Shelley, the Assembly majority leader, represents the 12th district in San Francisco and San Mateo counties.*



TOM TEAGUE / PEN TIP

That's also fair and reasonable.

Third, Prop. O will reinstate incentives for candidates to abide by the $75,000 spending limit that was passed overwhelmingly by San Francisco voters.

Previously, the incentive was that if a candidate agreed to the spending limit, he or she was allowed to collect larger donations — $500 instead of $150. But these variable donation limits were struck down by the courts last year, making the spending cap merely symbolic.

Prop. O will restore these incentives by granting partial public financing to candidates who agree to the spending limits.

The public financing is in the form of matching funds — if you raise a dollar, you receive about a dollar and a quarter. That's reasonable and fiscally sound.

To qualify, candidates must raise a minimum of $7,500, which will weed out non-serious candidates. (This year, only about a third of candidates running for 11 district seats would qualify.)

The obligation to taxpayers would be capped by law at $2 per resident. That's a small amount to pay for ensuring the integrity of San Francisco's elections.

Partial public financing will allow serious candidates to spend more time on voter outreach and talking to their neighbors in their district, and less time

fund-raising from special interests.

Prop. O enhances free speech and the public debate of issues by allowing more than just wealthy candidates to run for office. The cities of Tucson, Long Beach, Los Angeles, New York, and, most recently Oakland, have similar partial public financing programs.

By all accounts, these programs are popular, fiscally sound and doing the job they were designed to do.

As a former president of the Board of Supervisors, I fought hard to create the Ethics Commission and to put some teeth into it. The commission was given the power to place measures on the ballot.

This feature of the Ethics Commission is unique in the nation, and something for which San Franciscans should be proud.

The commission did its job by holding public hearings, soliciting expert testimony and ultimately placing Prop. O on the ballot.

Now San Franciscans can do our job by voting for Prop O. This measure will enact campaign finance reform that will be good for the working families and residents of San Francisco.

Please join me, the League of Women Voters, Common Cause, the Sierra Club, the San Francisco Democratic Party, and the American Association of Retired Persons in supporting Proposition O.

**SF Gate news**

SF Gate Home
Today's News
Sports
Entertainment
Technology
Live Views
Traffic
Weather
Health
Business
Bay Area Travel
Columnists
Classifieds
Conferences
Search
Index

# S.F. Measure to Fund Supervisors' Races May Cut Reliance on Big Money

Thursday, November 9, 2000

**San Francisco Chronicle**

CHRONICLE SECTIONS

Tom Zoellner, Chronicle Staff Writer

**San Francisco** -- The down-ballot measure to provide taxpayer money for San Francisco supervisor candidates may have been overshadowed by attention-grabbing growth-control initiatives, but backers say it has just as much chance of leaving a lasting mark on the city.

``Proposition O was the stealth story of this election," said Gabriel Metcalf, deputy director of the San Francisco Planning and Urban Research Association.

The measure provides matching funds for qualified supervisor candidates, starting with the 2004 elections.

To be eligible for public financing, a supervisor candidate would have to raise $7,500 from at least 75 different donors in amounts between $10 and $100, and agree to debate opponents and limit spending to $75,000 in a general election and $20,000 in a runoff. Eligible candidates would get upward of $43,750 in campaign funding for the general election and $17,000 for any runoff.

Supporters promoted the measure as a reform initiative that would make officeholders more independent of big-money backers. Proposition O limits donor contributions to soft-money committees, which played major roles both in Tuesday's election and the 1999 mayor's race, to $3,000 a year.

Metcalf said Proposition O continues the city's move toward bringing Board of Supervisors races closer to neighborhood politics. Tuesday's supervisor elections were the first district-based

· Printer-friendly version
· Email this article to a friend

**Backflip** this page to find it again

**RELATED ARTICLES**
powered by Autonomy

11/06/2000 - THE EXAMINER'S POSITIONS ON S.F. PROPOSITIONS .

10/27/2000 - THE CHRONICLE RECOMMENDS .

10/27/2000 - THE CHRONICLE RECOMMENDS .

>>more related articles...

contests in 22 years.

``Supervisor candidates will now have to raise money from more people, but in smaller amounts,'' he said. ``The playing field will be leveled.''

Another ballot initiative bucking the status quo appears to be heading for a court fight. Proposition H, which passed easily, places limits on the ability of landlords to raise their tenants' rent for capital improvements.

Lawyers for the pro-landlord Coalition for Better Housing were drafting a brief yesterday to ask a Superior Court judge to rule the measure illegal. That motion will be filed in a matter of weeks, said Brook Turner, the coalition's executive director.

He said Proposition H does not allow landlords to collect the legally mandated fair rate of return on their rentals.

Tenant rights advocates said the ``pass-throughs'' are often used as excuses to price lower-income residents out of their rent-controlled units.

The other tenant-backed initiative on the ballot, Proposition N, was shot down, thanks largely to opposition from new homeowners who said the initiative would have made them subject to a $10,000 fine for selling their tenancy-in-common apartment units.

The proposed amendments lumped the increasingly popular tenancy-in-common arrangements in the city's annual cap of condominium conversions. Currently, only 200 rental units every year may be converted to condos.

The San Francisco Tenants Union had helped spearhead the measure limiting the conversion of apartments into tenancies-in-common, saying real estate speculators were using such conversions to evict renters.

But many tenancy-in-common owners called that form of property the only way for middle-class

San Franciscans to own a home in the city's hot
real estate market.

``This is the only way I can stop renting," said
John Maimone, 33, who bought a Mission
District duplex with a friend several months ago
for a price significantly lower than that of a
condominium.

Voters also said no to a measure that would have
empowered the Taxi Commission to issue special
cab permits to taxi companies.

Proposition M resoundingly failed despite heavy
spending by cab companies, which said the
ordinance would have created more licensed
cabs dedicated to exclusive service to outlying
neighborhoods of the city such as Hunters Point
or the Richmond, where cruising taxis are a rare
sight.

But cab drivers contended that Proposition M
would have kept the coveted permits, or
medallions, out of the hands of individual drivers
and benefited taxi companies.

Supervisor Gavin Newsom called the measure a
sham dedicated to preserving cab companies'
monopoly.

``The public saw through the money and the
advertising," he said. ``It's an affirmation of that
old maxim not to underestimate the intelligence
of the public."

*E-mail Tom Zoellner at
tzoellner@sfchronicle.com.*

©2000 San Francisco Chronicle    Page A26

Sections ▼ GO





SF Gate

**NEWS**

**SF Gate Home**
**Today's News**
**Sports**
**Entertainment**
**Technology**
**Live Views**
**Traffic**
**Weather**
**Health**
**Business**
**Bay Area Travel**
**Columnists**
**Classifieds**
**Conferences**
**Search**
**Index**



## Runoff for Most Supervisor Spots Newsom, Ammiano Easily Win Re-Election

Edward Epstein, Jonathan Curiel, Chronicle Staff Writers

Wednesday, November 8, 2000

**San Francisco Chronicle**

CHRONICLE SECTIONS

· Printer-friendly version
· Email this article to a friend

**Backflip** this page to find it again



**ELECTION NIGHT**

**ELECTION 2000**
More stories, resources...

**ELECTORAL MAP**
Popular vote, who's projected in what states.

**TALK ABOUT IT**
Share your thoughts on Tuesday's events.

SAN FRANCISCO RACES

Matier & Ross: Brown's clout shows signs of faltering.

SF supes: most get runoffs except Ammiano, Newsom.

Slow growth measure pulls ahead.

Pier 45 plan rebuffed.

Local election reform props ahead.

Plan to raise payroll tax defeated.

SF library bonds pass.

No fleet permits for taxi firms.

San Francisco's latest excursion into electing supervisors by district produced only a handful of winners last night, meaning that voters in as many as nine districts will vote in runoffs Dec. 12 that will determine whether Mayor Willie Brown will keep his iron control of the board.

In the old 11-member board, Brown could usually count on eight or nine solid votes, and he and his allies in the labor and business communities mounted a spirited and well-funded effort to keep a board majority under the new district setup. Arrayed against them were reform-minded candidates grouped around the grass-roots politics of Supervisor Tom Ammiano.

Two incumbent supervisors waltzed to victory yesterday in an election marked by a projected record turnout among the city's 486,636 voters. Gavin Newsom was unopposed in District 2 in Pacific Heights and the Marina, and Ammiano was easily re-elected over four challengers in District 9, his longtime home in Bernal Heights and the Mission.

In other races, the result was less clear in early returns, although there was a possibility that Supervisor Mark Leno, who was just below the majority vote in District 8 needed to avoid a runoff, would win outright.

With most of the city's votes counted, Supervisors Michael Yaki in District 1, Mabel Teng in District 7, Amos Brown in District 11,

and Leland Yee in District 4 seemed headed for runoffs.

Among the incumbents, only Supervisor Alicia Becerril, a Brown appointee, was doing poorly, running fifth in a field of eight candidates in District 3, which includes North Beach, Chinatown and Nob, Telegraph and Russian hills. In that district, neighborhood leader Aaron Peskin had about one-third of the vote, with four candidates bunched together in the race for a runoff spot.

``This result says voters are very interested in having a representative at City Hall who has done what the neighborhood wants done. It's about having a track record,'' said Peskin, who had the endorsement of Ammiano, former Mayor Frank Jordan and Clint Reilly, a former mayoral candidate.

Returns from districts in which no incumbent supervisor was running showed the volatile nature of a wild and often-confusing exercise in democracy that saw 87 candidates competing in 11 races. The fields varied from Newsom's one-man run to a 17-candidate free-for-all in District 6 South of Market.

In District 5, which snakes from the Inner Sunset to the Western Addition, deputy public defender Matt Gonzalez, running with Ammiano's backing, was in first place, leading Mayor Brown's candidate, school board member Juanita Owens in second place. With a field of 11 candidates splitting the vote, a runoff seemed a certainty.

Gonzalez said anti-Brown sentiment helped his candidacy.

``There's no question that that's been the theme out there,'' he said. ``And I don't think it's limited to candidates supported by Tom Ammiano. . . . All the candidates have been hitting that same theme.''

In District 6, the field of 17 candidates saw tenant activist Chris Daly in first place, followed by Brown's candidate Chris Dittenhafer and

Park measure rejected.

The morning-after ballot blues.

SF precinct worker dies on job.

GOP's lonely mission in SF.

Some left out at polls die to DMV mistake.

Tenant advocates' props split.

Board of Ed incumbents lead.

Health care to retirees OK'd.

**National Races**

**State & Bay Area**

**More Stories, Raw Data...**

former Supervisor Carol Ruth Silver. Again, a
runoff appeared certain.

Among the incumbents, Yaki was followed in
District 1 in the Richmond District by Jake
McGoldrick, who had Ammiano's support, and
community activist Rose Tsai, who had the
strong support of Reilly.

In Yee's District 4 in the Sunset, longtime
political aide John Shanley was running a
surprise second, ahead of Tom Hsieh Jr. and Ron
Dudum, both of whom had Brown's backing.

In District 7 in the southwestern part of the city,
Teng was trailed by Tony Hall, a court
administrator who ran an aggressive campaign in
a field of six.

Hall said he would begin campaigning today if he
made a runoff. As he did throughout the general
election campaign, Hall complained that soft
money contributions tied to the mayor unfairly
aided the incumbent supervisor.

``Without a doubt -- Mabel would not be where
she is without soft money," Hall said.

In Leno's District 8, the incumbent was leading
Ammiano-backed Eileen Hansen and four other
candidates. Leno, a Brown appointee who ran a
campaign stressing his independence from the
mayor, said he built his lead through a grassroots
campaign that included 75 election-day
volunteers.

``Our whole game plan was to run a strong
precinct operation, and I would like to think our
lead will hold," Leno said from his Castro
campaign headquarters.

``We got 80 percent of our identified voters to
the polls," he said.

In District 10, Brown-backed candidate Linda
Richardson and independent Sophie Maxwell
were headed for a runoff.

And in Amos Brown's District 11, encompassing
Crocker-Amazon and the Outer Mission, the

supervisor was trailing deputy public defender Gerardo Sandoval in a field of nine candidates.

``I feel pretty good,'' Sandoval said at City Hall. ``If with the hundreds of thousands of dollars Amos Brown threw at me he only got a few hundred more absentee votes than I did, then I'm in good shape.''

Although district elections were supposed to mark a return to grassroots politics with a $75,000 spending cap for candidates in the general election, it did not work out that way.

Soft-money campaigns poured in tens of thousands of dollars in support of candidates, mainly those tied to Mayor Brown. That led the city Ethics Commission to lift the voluntary $75,000 cap in seven of the districts by election day.

In two other districts, 3 and 7, the limits were scrapped because candidates said they would not abide by the voluntary limits.

Ammiano criticized the soft money that poured into the general election races -- and that will pour into the runoff campaigns.

``There will be some interesting and crucial runoffs,'' he said. ``People need to judge the candidates on their merits and stand up to the soft money obsfucation and the sleaze.''

Yesterday's voting marked a return to an experiment in district elections after two decades of at- large voting for supervisors. Supervisors were last elected by district in 1979, but that system was scrapped by ballot initiative in 1980.

The district-elected board of the 1970s was marked by lots of neighborhood squabbling among board members, which made it hard for business to get done. But the district voting was probably doomed by the actions of Dan White, the former police officer who was elected to the board from a district that included the Excelsior District.

In November 1978, he assassinated Mayor

George Moscone and Supervisor Harvey Milk in City Hall, after failing to persuade Moscone to reappoint him to the seat he had just quit.

Those running for supervisor this year for the job that pays $37,585 universally said that although they would serve the needs of their constituents, they would also serve the entire city. Getting legislation through for any one district will require building coalitions with at least five other members who also want things for their districts.

Those finally elected to the board will be sworn in Jan. 8. The clerk of the board will draw lots to determine which five supervisors will serve two-year terms, meaning that they will have to seek re-election in 2002, and which six will serve four- year terms, until 2004.

Unlike the previous at-large set- up where the top citywide finisher among the supervisors became board president, the 11 new supervisors will elect one of their own to serve as president. The president appoints members of the board's committees and runs the supervisors' weekly meeting.

*E-mail Edward Epstein at eepstein@sfchronicle.com and Jonathan Curiel at jcuriel sfchronicle.com.*

©2000 San Francisco Chronicle   Page A12

Sections ▼ GO

The





SF Gate Home
Today's News
Sports
Entertainment
Technology
Live Views
Traffic
Weather
Health
Business
Bay Area Travel
Columnists
Classifieds
Conferences
Search
Index



# Punks, politicos in last-minute campaign blitz

Ilene Lelchuk
OF THE EXAMINER STAFF

## Musicians, supe candidates stump in S.F. neighborhoods

Creativity and a hint of desperation kicked in for the final campaign push in San Francisco, where candidates for the Board of Supervisors and ballot measure advocates threw a free concert featuring a multiplatinum punk band, campaigned from rented cable cars, stumped with church-goers and pestered shoppers outside markets.

Independent spending committees supporting supervisor hopefuls spent so much cash on their behalf that they busted voluntary spending caps in several of The City's 11 districts.

This last-minute hustle for votes before Tuesday's election wasn't just about changing voters' minds or helping undecided voters choose between the 86 supervisors candidates and 18 local ballot measures.

It might be too late for that.

The flurry of candidates' appearances and campaign mailers over the weekend was about reminding likely voters to hit the polls Tuesday because, as the saying goes, every vote counts.

"We've identified thousands of voters who pledged to support me in the last six months and our goal is to make sure they get out to vote," said Tom Hsieh Jr., supervisor candidate for District 4, who was out in the Sunset on Sunday courting members of the area's growing population of Russian Jewish immigrants.

Touting the ticket

Nov. 06, 2000

San Francisco Examiner
EXAMINER SECTIONS

· Printer-friendly version
· Email this article to a friend

Backflip this page
to find it again

At a rally at a community center where he was joined by a local Russian-American rabbi, Hsieh distributed his campaign literature as well as buttons touting the Democratic presidential ticket.

"This is an emerging immigrant community that's not plugged into the whole system yet, so we are paying a whole lot of attention to them," said Hsieh, who is running against six other contenders.

In the same district, candidate John Shanley courted the area's big Irish and Catholic community. He attended church while a supporter drove through the neighborhoods in a pick-up covered with Shanley signs. His passenger, who had the accent of an Irishman, shouted through a bullhorn "Shanley for supervisor!"

Local musicians in the Mission District and punk success story Green Day rallied for Proposition L, a measure that would limit how

many and where dot-com offices develop in San Francisco.

The measure has been under fire by the better-funded campaign for Prop. K, a competing and less strict measure put on the ballot by Mayor Willie Brown and supported by many downtown business interests.

Sunday's event was the latest in a series of creative rallies and protests staged to call attention to the high rents and office developments that are driving out rehearsal and art studios.

"We are very nervous but very optimistic (about the passage of Prop. L)," said marcher and musician Brad Kopp. "To us this is artists' last stand."

'Million Band March'

The daylong rally started with the "Million Band March" as about 300 people banging drums and

Folks, politicos in last-minute campaign blitz.                                                    wysiwyg://5/http://www.sfgate.com/cgi-bin.../examiner/archive/2000/11/06/NEWS8387.d

shaking tambourines walked from the Mission
District to the Civic Center. The crowd grew to
more than 3,000 people by the time Green Day,
hailing from the East Bay, took the stage.

"You know why we're here, right? Because I
don't think any band has played in office space,"
lead singer Billie Joe Armstrong told the
cheering crowd. He also dedicated a song to the
mayor that included the lyric "The world loves
me, so f--- you."

While bands played at the Civic Center,
supervisor candidate Gerardo Sandoval in
District 11 tried to meet voters at grocery stores
and Crocker Amazon Park, usually packed on
Sundays with soccer kids and moms.

Sandoval, who faces eight other candidates, said
the big challenge in these final days has been
finding enough volunteers to help him get out
the vote.

"There are so many other people running and so
many ballot measures that it's drawn away a lot
of activists," he said.

In the Bayview, where 11 people are running,
candidate Sophie Maxwell met voters while
riding a motorized cable car. Her campaign
coordinator, Pat Cleveland, said the final focus is
on reminding people to vote.

Maxwell and her volunteers are campaigning in
neighborhoods known for high voter turnout
such as Potrero Hill, as well as in the Bayview's
public housing projects, where many residents
registered to vote for the mayoral race last fall

but failed to turn out at the polls, Cleveland said.

Tuesday's election marks the return of district
elections in San Francisco for the first time in 20
years. Supervisorial candidates in recent years
ran in citywide campaigns rather than in one of
11 districts.

But scaling down the races hasn't cost candidates
any less to campaign.

Limit lifted

Ethics Commission Executive Director Ginny
Vida announced Sunday that the voluntary
spending limit of $75,000 has been lifted in nine
of 11 district races, either because candidates
raised large amounts of cash or independent
groups spent big money on candidates' behalf.

The spending caps remain only in District 2, the
Marina and Pacific Heights neighborhoods where
Supervisor Gavin Newsom is challenged only by
write-in candidates, and in District 9, the Mission
and Bernal Heights areas where Supervisor Tom
Ammiano is expected to win easily.

Under the limit, participating candidates are
required to keep spending to $75,000 in the
November general election and another $20,000
if they make the December runoff.

The cap is lifted in a race if so-called soft money
expenditures by independent groups exceed 25
percent of the $75,000 limit in support of, or in
opposition to, any one of the candidates. That
threshold of $18,750 in soft money has been
reached in districts 1, 5, 8, 10 and 11.

Most recently, Vida announced that the Alice B.
Toklas Club and San Francisco Late Night
Coalition made independent expenditures,
including mailers, totaling $21,620 in support of
Mark Leno in District 8, the Castro and Noe
Valley.

The spending cap was first lifted this summer in
Districts 3 and 7. Candidates Michael DeNunzio
in District 3 and Tony Hall in District 7 declined
to stick to the $75,000 cap and pulled in
contributions large enough to trigger lifting the
spending limit.

Vida said Sunday that more than 80 percent of
voters last November approved the voluntary
spending limits. "Clearly, the voters want
candidates to limit their spending. It is my hope
that candi

dates for the Board of Supervisors in districts 1,
3, 4, 5, 6, 7, 8, 10 and 11 who agree to the

voluntary limits will continue to comply with them, although they are no longer obligated to do so."

©2000 San Francisco Examiner    Page A1

Sections ▾ GO



news

**SF Gate Home**

**Today's News**

**Sports**

**Entertainment**

**Technology**

**Live Views**

**Traffic**

**Weather**

**Health**

**Business**

**Bay Area Travel**

**Columnists**

**Classifieds**

**Conferences**

**Search**

**Index**

# Spending Limits Canceled In District 8 Supervisor Race

Edward Epstein, Chronicle Staff Writer

**San Francisco** -- Voluntary candidate spending limits in San Francisco supervisor District 8 were lifted over the weekend, leaving only two of the 11 districts with the caps intact.

The last-minute decision by the city Ethics Commission came about because of spending by the San Francisco Late Night Coalition, a group that represents nightclubs, and the Alice B. Toklas Democratic Club Independent Expenditure Political Action Committee to boost the candidacy of Supervisor Mark Leno. Together, the two groups have spent $21,620 to support Leno in the district that includes the Castro, Noe Valley and other areas.

The Toklas club is associated with Mayor Willie Brown in the gay community and is backing Leno, a Brown appointee. Leno has worked with the dance club coalition on several issues.

The Ethics Commission lifts the caps when independent expenditures reach 25 percent of the $75,000 voluntary general election spending limits for the supervisor candidates themselves. The cap was also lifted in districts where supervisor candidates said they would not comply with the voter-approved limits.

With the commission's latest ruling, the caps remain in force only in District 2, where Supervisor Gavin Newsom is running unopposed, and in District 9, where Supervisor Tom Ammiano is heavily favored to win re-election without a runoff.

After today's election, there will be runoffs in any district where a candidate doesn't win a majority of the vote. The voluntary cap for the five-week campaign is $20,000, but the unregulated independent expenditure campaigns can spend all

Tuesday, November 7, 2000

**San Francisco Chronicle**

CHRONICLE SECTIONS

· Printer-friendly version
· Email this article to a friend



**Backflip this page to find it again**



11/17/2000 - District 8 Race a Proxy for Brown-Ammiano Clash

11/06/2000 - Punks, politicos in last-minute campaign blitz .

10/30/2000 - 800-pound gorilla of political spending .

03/28/2000 - S.F. District Elections in Fall Promise to Be a Wild Ride .

>>more related articles...

independent expenditure campaigns can spend all
they can raise, so it is likely that the limits will be
scrapped in some or all of the races.

*E-mail Edward Epstein at
eepstein@sfchronicle.com.*

©2000 San Francisco Chronicle   Page A17