DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE K. SNODGRASS, State Bar #148137
JONATHAN GIVNER, State Bar #208000
ANN O'LEARY, State Bar #238408
Deputy City Attorneys
#1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:    (415) 554-4694
Facsimile:    (415) 554-4675
E-Mail:       jon.givner@sfgov.org

Attorneys for Defendants
DENNIS J. HERRERA and CITY AND COUNTY
OF SAN FRANCISCO, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMITTEE ON JOBS CANDIDATE ADVOCACY FUND and BUILDING OWNERS AND MANAGERS ASSOCIATION OF SAN FRANCISCO INDEPENDENT EXPENDITURE POLITICAL ACTION COMMITTEE, political action committees organized under the laws of California and of the City and County of San Francisco,<br><br>        Plaintiffs,<br><br>        vs.<br><br>DENNIS J. HERRERA, in his official capacity as City Attorney of the City and County of San Francisco, KAMALA D. HARRIS, in her official capacity as District Attorney of the City and County of San Francisco, the SAN FRANCISCO ETHICS COMMISSION of the City and County of San Francisco, and CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Defendants. | Case No. C 07 3199 JSW<br><br>**DECLARATION OF CHARLES M. MARSTELLER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:   September 17, 2007<br>Time:   1:30 p.m.<br>Place:   Courtroom 2<br><br>Trial Date: |

I, Charles M. Marsteller, declare as follows:

1. I have personal knowledge of the matters set forth herein, except as to matters I have specifically indicated are based on information and belief, which I believe to be true.

## BACKGROUND INFORMATION

2. I have resided in the City and County of San Francisco ("the City") for 25 years, and have closely observed local campaign practices throughout that time. For approximately the past nine years, I regularly have attended public meetings of the City's Ethics Commission ("the Commission") on behalf of Common Cause California ("CCC"), and have provided testimony before that body and the City's Board of Supervisors on many occasions regarding the City's Campaign Finance Reform Ordinance, which is codified in Article I of the City's Campaign and Governmental Conduct Code.

3. Between approximately 1997 and 2000, I served as the San Francisco Coordinator for CCC. CCC is a non-profit, non-partisan citizens' lobby organization that works to strengthen public participation in campaigns and elections, to ensure that the political process serves the public interest, and to make public officials and public institutions accountable and responsive to citizens. Among other policy achievements, CCC championed California's Political Reform Act in 1974, which enacted statewide ethics, campaign and disclosure laws, California Government Code §§ 81000, et seq.

4. Between 1998 and 2000, CCC operated a local chapter board in San Francisco, known as San Francisco Common Cause. The board of San Francisco Common Cause was comprised of 16 members recruited by CCC from the approximately 2,000 Common Cause members in San Francisco. CCC is a 501(c)(4) and 501(c)(3) organization, and San Francisco Common Cause operated under that authority.

5. In or about 1997, prior to the creation of the board of San Francisco Common Cause, the Board of CCC officially designated me as Coordinator of Common Cause for San Francisco. In this role between 1997 and 2000, I was responsible for all local activities of San Francisco Common Cause, including monitoring governmental activities pertaining to the organization's mission, working in coalition with other non-profit organizations, speaking to the media, testifying at public hearings, and monitoring media reports and public discourse. San Francisco Common Cause had no paid staff

1  at that time, but I worked closely with board members and volunteers to monitor activities in the 1999
2  and 2000 San Francisco elections.

### CCC'S EVALUATION OF CAMPAIGN FINANCE IN SAN FRANCISCO

4       6.     CCC created the San Francisco chapter and appointed its board in response to my reports to the CCC Board that there was a large amount of unusual campaign activity in the 1998 contest for the position of President of the City's Board of Supervisors, including the alleged use of non-profit organizations to funnel campaign contributions to candidates. CCC instructed the board of San Francisco Common Cause to monitor campaign spending in local elections in the City, particularly in the upcoming 1999 mayoral election, to assess the existence of corruption or the public appearance of corruption as a result of campaign spending.

11       7.     During the months leading to the 1999 election, particularly following the October 1999 decision of the Ninth Circuit Court of Appeals in *San Franciscans for Sensible Government v. Renne*, Case No. 99-16995, San Francisco Common Cause carefully monitored campaign activities and spending related to City elections. To that end, we collected press and other reports regarding campaign spending and reviewed numerous public filings maintained by the Ethics Commission. We continued these monitoring activities through the 2000 election, when all eleven seats on the City's Board of Supervisors were up for election.

18       8.     Common Cause kept a public phone number, and during the period from late 1999 through 2000 we received numerous calls from members of the public and people involved in local campaigns. These calls provided information, sometimes from confidential sources, regarding campaign spending and actual or perceived benefits given to people making or helping to pay for independent expenditures in support of or opposition to candidates.

23       9.     Members of the San Francisco Common Cause and I compiled and maintained detailed files for San Francisco Common Cause including the press reports described above, records of the phone conversations described above, and public documents received from the City, including campaign finance disclosures required by state and local law. These files reflected the public discourse in the City regarding funds spent to support or oppose mayoral and supervisorial candidates – most notably independent expenditures funded by wealthy individuals and large businesses in the

City – and the perceived corruption that flowed from those expenditures. We organized the files according to subject matter. San Francisco Common Cause has continued to maintain the files in the years since. A true and correct copy of the log describing the press clippings kept in the files is attached hereto as Exhibit A. The log is organized according to subject area (for example, particular contributors to independent expenditure committees and the benefits that those contributors received from the elected officials after making the contributions). Within each subject area, we noted the date of the article, the periodical in which the article appeared, the title of the article or a brief description of its contents, and the author of the article in most cases. A key to the abbreviations used in the log appears in smaller font at the bottom of the last page.

10. Based on this compilation of information, it was apparent to me that there was a public perception of corruption as a result of unlimited contributions to independent expenditure committees supporting or opposing candidates for City elective office in 1999 and 2000. The press and members of the public commonly noted that many of the contributions to committees making independent expenditures were very large (in the tens of thousands) and that many were from persons or entities seeking contracts, permits, leases etc. with the City.

**THE SAN FRANCISCO VOTERS' ADOPTION OF PROPOSITION O IN 2000**

11. I understand that the plaintiffs in this lawsuit challenge Sections 1.114(c)(1) and 1.114(c)(2) of San Francisco's Campaign and Governmental Conduct Code, as well as Regulation 1.114-2 of the Regulations to the Campaign Finance Reform Ordinance. Sections 1.114(c)(1) and 1.114(c)(2) were enacted in to law by the San Francisco voters through the adoption of Proposition O in 2000.

12. Between November 1999 and June 2000, the City's Ethics Commission held 13 regular and special meetings at which the Commission discussed and considered a number of proposals regarding submitting to the voters a measure to amend the City's Campaign Finance Reform Ordinance and adopt a public financing program. At its June 26, 2000 meeting, the Commission voted to place the measure that became Proposition O on the ballot for the November 2000 election.

13. At some of these meetings, the Commission accepted testimony from members of the public and relevant experts from around the country regarding the content of the various proposals.

1  On behalf of San Francisco Common Cause, I attended the Commission's meetings on November 8, 1999; December 1, 1999; December 2, 1999; February 7, 2000; February 15, 2000; March 13, 2000; April 17, 2000; May 15, 2000; June 12, 2000; and June 26, 2000.  At these meetings, I was often accompanied by other members of San Francisco Common Cause.  The few meetings during this period that I did not attend were attended by other representatives of San Francisco Common Cause. To the best of my recollection, San Francisco Common Cause also testified at the Board of Supervisors' Finance Committee hearing in April 2000 regarding the same proposals.

14.     I spoke publicly as a member of San Francisco Common Cause at each of the meetings I attended except the June 12, 2000 meeting.  On May 4, 2000, I submitted a memorandum to the Ethics Commission regarding the proposals the Commission was considering.  In that memorandum, I explained that as a member of San Francisco Common Cause, I supported applying reasonable contribution limits to independent expenditure committees to address the San Francisco public's concern regarding the appearance of corruption in local government.  A true and correct copy of that memorandum is attached hereto as Exhibit B.  At the Commission's May 15, 2000 public meeting, I further explained to the Commission my position that local law should include a $500 per-person per-committee limit on contributions for the purpose of making independent expenditures.

15.     My written and oral comments to the Commission throughout this period were based on my understanding of the public perception of corruption as a result of spending, including spending for large independent expenditures, in local elections.  This understanding was based on my personal observations as a long-time resident of San Francisco and as a member of San Francisco Common Cause, as well as my review of the extensive files and press reports described above.

16.     In advance of the November 2000 election, the Board of San Francisco Common Cause submitted to the Department of Elections a ballot argument supporting Proposition O.  The argument explained that "[s]oft money (also known as independent expenditures) is flooding and overwhelming San Francisco.  $2.6 million in soft money was spent in last year's election.  As Supreme Court Justice David Souter said in the majority opinion upholding limits on contributions (Nixon v. Shrink Missouri), 'Democracy only works if people have faith in those who govern' not if voters believe that 'large donors call the tune.'"  I also submitted my own ballot argument urging

1 voters to vote yes on Proposition O. Both arguments appeared in the Voter Information Pamphlet
2 distributed by the City for the November 2000 election.
3     17.    I declare under penalty of perjury, under the laws of the State of California, that the
4 foregoing is true and correct.
5     Executed this 24th day of August, 2007 at San Francisco, California.

_____
CHARLES M. MARSTELLER