1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   FREDERICK K. LOWELL #66641
2  BRUCE A. ERICSON  #76342
   ANITA D. STEARNS MAYO #142749
3  MARC H. AXELBAUM #209855
   AUGUST O. STOFFERAHN #229957
4  50 Fremont Street
   Post Office Box 7880
5  San Francisco, CA  94120-7880
   Telephone: (415) 983-1000
6  Facsimile: (415) 983-1200

7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12  COMMITTEE ON JOBS CANDIDATE          No. C-07-3199 JSW
    ADVOCACY FUND and BUILDING
13  OWNERS AND MANAGERS                  **REPLY MEMORANDUM IN**
    ASSOCIATION OF SAN FRANCISCO         **SUPPORT OF PLAINTIFFS'**
14  INDEPENDENT EXPENDITURE              **MOTION FOR PRELIMINARY**
    POLITICAL ACTION COMMITTEE,          **INJUNCTION**
15  political action committees organized
    under the laws of California and of the   Date:  September 17, 2007
16  City and County of San Francisco,        Time:  1:30 p.m.
                                              Judge:  Hon. Jeffrey S. White
17                          Plaintiffs,        Courtroom:  2

18       vs.                               Filed herewith:

19  DENNIS J. HERRERA, in his official    1.  Supplemental Declaration of
    capacity as City Attorney of the City and     Nathan Nayman
20  County of San Francisco, KAMALA D.   2.  Plaintiffs' Objections to
    HARRIS, in her official capacity as           Defendants' Evidence
21  District Attorney of the City and County
    of San Francisco, the SAN FRANCISCO
22  ETHICS COMMISSION of the City and
    County of San Francisco, and CITY AND
23  COUNTY OF SAN FRANCISCO,

24
                            Defendants.
25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                                        **Page**

3  I.     INTRODUCTION. .................................................................................................1

4  II.    ARGUMENT. .......................................................................................................1

5         A.    Limits on Contributions to Independent Expenditure Committees Are
6               Subject to Strict Scrutiny...............................................................................1

7               1.     The Cases Cited by the City for a Lesser Standard of
                       Review Did Not Involve Limits on Independent
8                      Expenditure Committees. ....................................................................1

9               2.     Cases Actually Dealing with Limits on Independent
                       Expenditure Committees Apply Strict Scrutiny. ...............................4

10        B.    Section 1.114(c) is Not Closely Drawn to Match a Sufficiently
                Important Interest Or Narrowly Drawn to Serve a Compelling
11              Government Interest. ......................................................................................6

12              1.     The City has a heavy evidentiary burden to justify
                       Section 1.114(c)...................................................................................6
13
                2.     The City's "evidence" does not establish that Section
14                     1.114(c) matches a sufficiently important interest. ...........................6

15              3.     Section 1.114(c) is not closely drawn or narrowly
                       tailored to an anti-corruption purpose. ............................................12
16
17        C.    The Loss of First Amendment Freedoms Constitutes Irreparable Injury
                and the Balance of Hardships Weighs in Favor of Plaintiffs. ......................13

18              1.     The First Amendment has no expiration date.....................................13

19              2.     Plaintiffs have established First Amendment violations. ..................13

20              3.     The balance of hardships weigh in favor of Plaintiffs.......................14

21  III.   CONCLUSION. ..................................................................................................15

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2                                                                                                  **Page**

3                                                        **Cases**

4     *Buckley v. Valeo,*
          424 U.S. 1 (1976) ........................................................................................ passim
5
      *California Medical Association v. FEC,*
6         453 U.S. 182 (1981) ............................................................................................ 3

7     *Carman v. Alvord,*
          31 Cal. 3d 318 (1982) ....................................................................................... 12
8
      *Citibank v. Citytrust,*
9         756 F.2d 273 (2d Cir. 1985) ............................................................................ 13

10    *Citizens Against Rent Control v. City of Berkeley,*
          454 U.S. 290 (1981) ......................................................................................... 14
11
      *Day v. Holohan,*
12        34 F.3d 1356 (8th Cir. 1994) ........................................................................... 12

13    *Elrod v. Burns,*
          427 U.S. 347 (1976) ......................................................................................... 13
14
      *FEC v. Beaumont,*
15        539 U.S. 146 (2003) ........................................................................................... 4

16    *FEC v. Massachusetts Citizens for Life,*
          479 U.S. 238 (1986) ........................................................................................... 4
17
      *FEC v. Nat'l Conservative PAC,*
18        470 U.S. 480 (1985) ........................................................................................... 4

19    *FTC v. Affordable Media LLC,*
          179 F.3d 1228 (9th Cir. 1999) ......................................................................... 15
20
      *Kennedy Wholesale v. State Bd. of Equalization,*
21        53 Cal. 3d 245 (1991) ....................................................................................... 12

22    *Legal Aid Soc'y v. Legal Servs. Corp.,*
          961 F. Supp. 1402 (D. Haw. 1997),
23        *rev'd in part on other grounds,* 145 F.3d 1017 (9th Cir. 1998) ............................. 13

24    *Lincoln Club v. City of Irvine,*
          292 F.3d 934 (9th Cir. 2002) ........................................................................ 4, 5
25
      *Lydo Enterprises, Inc. v. City of Las Vegas,*
26        745 F.2d 1211 (9th Cir. 1984) ......................................................................... 13

27    *McConnell v. FEC,*
          540 U.S. 93 (2003) .................................................................................. 1, 2, 3, 5
28

*Mont. Right to Life Ass'n v. Eddleman*,
    343 F.3d 1085 (9th Cir. 2003) ................................................................ 11, 14

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ............................................................................... 14

*Nixon v. Shrink Mo. Gov't PAC*,
    528 U.S. 377 (2000) ............................................................................. 6, 11

*Oakland Tribune, Inc. v Chronicle Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) .............................................................. 13

*OakPAC v. City of Oakland*,
    No. 06-CV-06366-MJJ (N.D. Cal. Oct. 19, 2006) ............................... 4, 5

*Randall v. Sorrell*,
    126 S. Ct. 2479 (2006) .......................................................................... 6

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) .............................................................. 14

*San Franciscans for Sensible Government v. Renne*,
    No. C-99-02456-CW (N.D. Cal. 1999) .................................................. 4

*San Jose Silicon Valley Chamber of Commerce PAC v. City of San Jose*,
    No. C 06-04252-JW, 2006 WL 3832794 (N.D. Cal. Sept. 20, 2006) .................... 4, 5

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ................................................................ 13

**Constitution**

United States Constitution
    First Amendment ................................................................... 10, 11, 13, 15

**Statutes and Codes**

Bipartisan Campaign Reform Act of 2002 ...................................................... 1, 3

California Government Code
    Section 82031 ........................................................................................ 2
    Section 84301 ...................................................................................... 10
    Section 84302 ...................................................................................... 10

San Francisco Campaign and Governmental Conduct Code
    Section 1.114(c) ......................................................................... 3, 5, 6, 15
    Section 1.126 ....................................................................................... 12
    Section 1.162 ....................................................................................... 14
    Section 1.163 ....................................................................................... 14

United States Code
    Title 15, section 53(b)......................................................................... 15

1

**Rules and Regulations**

2

Federal Rules of Civil Procedure
        Rule 65(c) ................................................................................................ 15

3

**Other Authorities**

4

11A Wright, Miller & Kane,
        Federal Practice and Procedure § 2948.1 (2007)...................................... 13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **I.        INTRODUCTION.**

2           The City's principal legal arguments rest on cases about contributions to political

3   parties, not independent expenditures.  The City's principal factual arguments rest on

4   newspaper clippings and conjecture.  Neither provide a constitutionally valid basis for

5   limiting free speech.  This Court should reject these erroneous arguments and instead

6   follow the lead of the Ninth Circuit and three other judges in this District.

7   **II.       ARGUMENT.**

8   **A.        Limits on Contributions to Independent Expenditure Committees Are Subject**

9   **           to Strict Scrutiny.**

10          The Ninth Circuit and two judges in this District have held that limits on

11  contributions to independent expenditure ("IE") committees such as Plaintiffs trigger strict

12  scrutiny—the most exacting form of judicial review required by the Constitution.  *See*

13  Motion for Preliminary Injunction (Dkt. 11) ("Motion") at 10-14.  The City attempts to

14  evade strict scrutiny by retreating to inapposite cases where contributions to and

15  expenditures by IE committees were simply not at issue.

16  **1.        The Cases Cited by the City for a Lesser Standard of Review Did Not Involve**

17  **           Limits on Independent Expenditure Committees.**

18          The City principally relies on *McConnell v. FEC*, 540 U.S. 93 (2003).  It is not a

19  case about IE committees.  Instead, it is about something very different—the use of "soft

20  money" by political parties.  The Bipartisan Campaign Reform Act of 2002 ("BCRA")

21  limits flows of "soft money" in and out of political parties.  "Soft money" is money not

22  used in direct support of candidates for federal office, but rather to fund state candidates,

23  voter registration drives, get-out-the vote efforts and other "electioneering" activities.  *See*

24  540 U.S. at 122-23, 142-61.  The Court applied a lower standard of review ("closely drawn

25  scrutiny") to limits on "soft money," asking whether they were "closely drawn to match a

26  sufficiently important interest."  *Id.* at 136 (internal quotations omitted).   It applied the

27  lower standard because political parties typically work hand-in-hand with candidates and

28  had used this close relationship to undermine direct "hard money" limits and peddle access,

1   creating the appearance of corruption.  *Id.* at 151-52; *see generally id.* at 146-64.[1]

2        *McConnell*'s holding does not apply to IE committees.  IE committees do not work

3   hand-in-hand with candidates, do not peddle access and do not facilitate corruption.  By

4   law, independent expenditure committees must be "independent" and cannot coordinate

5   expenditures with candidates.  *See* Cal. Gov't Code § 82031.  Otherwise, their expenditures

6   are deemed campaign contributions and subject to any applicable limits.

7        The City says *McConnell* "construed the government's interest broadly enough to

8   justify regulation beyond 'contributions made directly to, contributions made at the express

9   behest of, and expenditures made in coordination with' candidates."  Mem. Pts. & Auths.

10  in Opp. to Mot. for Prelim. Inj. (Dkt. 19) ("Opp."), at 12 (quoting *McConnell*, 540 U.S. at

11  152).  That's wrong.  The City tellingly omits half of the first sentence it quotes—cutting

12  words showing that the Court was talking about political parties, not IE committees:

13         *Despite this evidence and the close ties that candidates and officeholders*
           *have with their parties*, Justice KENNEDY would limit Congress' regulatory

14         interest only to the prevention of the actual or apparent quid pro quo
           corruption 'inherent in' contributions made directly to, contributions made

15         at the express behest of, and expenditures made in coordination with, a
           federal officeholder or candidate.

16

17  _____

18    [1]    The Court devoted pages to describing this close relationship.  For example:

19         The record in the present case is replete with similar examples of
           national party committees peddling access to federal candidates and

20         officeholders in exchange for large soft-money donations.  So pervasive is
           this practice that the six national party committees actually furnish their own

21         menus of opportunities for access to would-be soft-money donors, with
           increased prices reflecting an increased level of access.  For example, the

22         DCCC offers a range of donor options, starting with the $10,000- per-year
           Business Forum program, and going up to the $100,000-per-year National

23         Finance Board program.  The latter entitles the donor to bimonthly
           conference calls with the Democratic House leadership and chair of the

24         DCCC, complimentary invitations to all DCCC fundraising events, two
           private dinners with the Democratic House leadership and ranking members,

25         and two retreats with the Democratic House leader and DCCC chair in
           Telluride, Colorado, and Hyannisport, Massachusetts.  Similarly, "the RNC's

26         donor programs offer greater access to federal office holders as the
           donations grow larger, with the highest level and most personal access
           offered to the largest soft money donors."

27

      540 U.S. at 151-52 (citations omitted); *see generally id.* at 146-64.

28

1   *McConnell*, 540 U.S. at 152 (italics mark the words the City omits).  Because IE

2   committees do not present the same risk of corruption that political parties do, the lesser

3   scrutiny that the Court employed in *McConnell* is inappropriate here.[2]

4         The City also misconstrues the plurality opinion in *California Medical Association*

5   *v. FEC*, 453 U.S. 182 (1981) ("*CMA*").  Like *McConnell*, *CMA* did not address IE

6   committees.  Rather, *CMA* upheld limits on contributions to multi-candidate PACs that

7   received contributions from at least 50 sources and contributed directly to at least five

8   candidates for federal office.  *Id.* at 184-85 & n.1, 195-99.  The swing vote, Justice

9   Blackmun, wrote separately to clarify that the limits being upheld did not apply to

10  contributions to IE committees and that "a different result would follow" if they had.  *Id.* at

11  203 (Blackmun, J., concurring in part and concurring in the judgment).

12        The City erroneously argues that contributions to IE committees constitute "'speech

13  by proxy,' which is not the sort of political advocacy that this Court in *Buckley* found

14  entitled to full First Amendment protection.'"  Opp. at 7 (quoting *CMA*, 453 U.S. at 195-

15  96).  The argument is wrong because the Supreme Court applies the "speech by proxy"

16  rationale to contributions to candidates, not contributions to IE committees.  As held in

17  *Buckley v. Valeo*, 424 U.S. 1, 21 (1976), the expression conveyed by a candidate

18  contribution "rests solely on the undifferentiated, symbolic act of contributing."  The

19  distinction between contributions to IE PACs and contributions to candidates or parties is

20  the difference between citizens banding together to fund directly the expression of *their*

21  *own* views, and merely facilitating a candidate's expression of *the candidates'* views.  As

22  the Supreme Court put it in *FEC v. Nat'l Conservative PAC* ("*NCPAC*"), 470 U.S. 480, 495

23  _____

24  [2]      The *McConnell* Court offered an additional reason for not applying strict scrutiny to
         the soft-money restrictions in BCRA:  "*Buckley*'s 'closely drawn' scrutiny . . . shows
25       proper deference to Congress' ability to weigh competing constitutional interests in an
         area in which it enjoys particular expertise."  540 U.S. at 137.  With all due respect to the
26       residents of San Francisco, the voters who passed Prop. O (of which Section 1.114(c) was
         a small part) cannot be said to have the "particular expertise" in campaign finance law
27       that the United States Congress has.  *See id.*; *see also id.* at 115-33 (describing a century's
         worth of federal campaign finance legislation).

28

1    (1985), "the 'proxy speech' approach is not useful in this case [because] the contributors

2    obviously like the message they are hearing from these organizations and want to add their

3    voices to that message; otherwise they would not part with their money."[3]

4    **2.    Cases Actually Dealing with Limits on Independent Expenditure Committees**

5          **Apply Strict Scrutiny.**

6          Courts apply strict scrutiny to limits on contributions to IE committees, especially

7    when the limits dramatically curb committees' expenditures.  Motion at 10-14.  Two judges

8    from this District (Judges Ware and Jenkins) recently applied strict scrutiny in enjoining

9    limits substantially similar to those at issue here, a fact that the City effectively concedes.

10   *See San Jose Silicon Valley Chamber of Commerce PAC v. City of San Jose,* No. C 06-

11   04252-JW, 2006 WL 3832794 (N.D. Cal. Sept. 20, 2006) ("*COMPAC*"), Request for

12   Judicial Notice (Dkt. 14) ("RFJN") Ex. G; *OakPAC v. City of Oakland*, No. 06-CV-06366-

13   MJJ (N.D. Cal. Oct. 19, 2006), RFJN Ex. E.  A third (Judge Wilken) struck down the

14   predecessor to the limits at issue here, although she did not specify the standard of review

15   she was applying in doing so.  *San Franciscans for Sensible Government v. Renne*, No. C-

16   99-02456-CW (N.D. Cal. 1999), RFJN Ex. H.  The City says little about these decisions,

17   other than that they are "unpublished" or not final.  *See* Opp. at 10-11.

18         The City attempts to minimize the significance of *Lincoln Club v. City of Irvine*,

19   292 F.3d 934, 938 (9th Cir. 2002).  *See* Opp. at 9-10.  In so doing, the City glosses over the

20   fact that Judges Ware and Jenkins both relied on *Lincoln Club* in applying strict scrutiny to

21   the limits at issue in the *COMPAC* and *OakPAC* cases.  They did so despite the fact that the

22   plaintiffs could not show that San Jose's or Oakland's ordinances barred them from making

23   _____

24   [3]        The City's reliance on *FEC v. Beaumont,* 539 U.S. 146, 149 (2003) also is
     misplaced.  While *Beaumont* holds that the federal ban on corporate contributions

25   extended to nonprofit corporations, the holding does not apply to political action
     committees or to independent expenditures.  Indeed, the Court said that a nonprofit was

26   free to establish a separate segregated fund PAC to be used for political purposes.  *Id.* at
     149.  It also affirmed that *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238 (1986),

27   which barred limits on independent expenditures by nonprofits, remains good law.
     *Beaumont,* 539 U.S. at 191.

28

1    any IEs, as the plaintiffs in *Lincoln Club* had established.  *See COMPAC*, 2006 WL

2    3832794, at *6, RFJN Ex. G; *OakPAC*, RFJN Ex. E, at 3.  Indeed, Judge Ware concluded

3    that "[i]t is indisputable that there has been no showing of hardship to COMPAC

4    comparable in magnitude to that suffered in *Lincoln* Club," and that "[r]ather than facing a

5    complete bar on expenditures, COMPAC faces restrictions on expenditures."  *COMPAC*,

6    2006 WL 3832794, at *6, RFJN Ex. G.  Nonetheless, Judge Ware held that "the appropriate

7    level of constitutional review is strict scrutiny."  *Id.*

8          The City insists that while Section 1.114(c) may restrict the expenditures Plaintiffs

9    can make, Plaintiffs can, like the political parties in *McConnell*, "'solicit from a wider array

10   of potential donors.'"  Opp. at 8 (quoting *McConnell*, 540 U.S. at 140).  Therefore, says the

11   City, Section 1.114(c) does not prevent Plaintiffs from making IEs in the way that the

12   ordinance in *Lincoln Club* did.  *Id.*  The City forgets that Plaintiffs are not at all like

13   political parties.  Political parties are open to everyone and will take money from anyone.

14   In contrast, Plaintiffs have a very specific focus and membership criteria, and solicit money

15   only from their members.  Nayman Decl. (Dkt. 13) ¶¶ 2, 5, 19-20; Intermaggio Decl. (Dkt.

16   12) ¶¶ 2, 5, 8.

17         If Plaintiffs were forced to admit more members or solicit contributions from non-

18   members, their basic nature would change.  This is particularly true of the JOBS Fund.

19   JOBS has always had less than 50 members—its bylaws prevent it from taking on more.

20   Nayman Supplemental Declaration (filed herewith) ¶ 5.  The JOBS Fund only accepts

21   contributions from JOBS's members.  *Id.* ¶ 6.  JOBS has no intention of changing these

22   aspects of its or its PAC's organizational structure.  *Id.* ¶ 7.

23         In light of these facts, forcing Plaintiffs to change their fundraising practices as the

24   City urges would violate their right to freedom of association.  As with the Lincoln Club,

25   Section 1.114(c) is "a double-edged sword, placing a substantial burden on protected

26   speech (i.e., barring expenditures) while simultaneously threatening to burden associational

27   freedoms (i.e., by requiring a restructuring of [Plaintiffs])."  *Lincoln Club*, 292 F.3d at 939.

28   Accordingly, Section 1.114(c) should receive strict scrutiny.  *Id.*

1    **B.**    **Section 1.114(c) is Not Closely Drawn to Match a Sufficiently Important**

2          **Interest Or Narrowly Drawn to Serve a Compelling Government Interest.**

3          The City does not even attempt to argue that Section 1.114(c) could survive strict

4    scrutiny.  It cannot.  The City also cannot show that Section 1.114(c) could survive "closely

5    drawn" scrutiny.  The City's evidence does not meet the threshold required; instead, it

6    shows that Section 1.114(c) targets free speech and association, not corruption.

7    **1.**    **The City has a heavy evidentiary burden to justify Section 1.114(c).**

8          Even under less rigorous scrutiny, the City must prove that Section 1.114(c) is

9    closely drawn to match a sufficiently important government interest.  *See Randall v.*

10    *Sorrell*, 126 S. Ct. 2479, 2994-2500 (2006); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377,

11    386 (2000) (citing *Buckley*, 424 U.S. at 25).  This requires evidence, not press clippings and

12    conjecture:  "We have never accepted mere conjecture as adequate to carry a First

13    Amendment burden."  *Shrink*, 528 U.S. at 392; *see also Randall*, 126 S. Ct. at 2499 ("The

14    record contains no indication that, for example, corruption (or its appearance) in Vermont is

15    significantly more serious a matter than elsewhere.").

16          "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny

17    of legislative judgments will vary up or down with the novelty and plausibility of the

18    justification raised."  *Shrink*, 528 U.S. at 391.  Here, the City argues a novel and

19    implausible theory:  that an IE committee's receipt of more than $500 from any of its

20    members, to be used to express their views on candidates for office, would corrupt or

21    appear to corrupt such candidates, even though the committee is barred from coordinating

22    its speech with them.  The City's evidence (*see* Dkts. 21-23) falls short of the quantum

23    needed to justify a theory the Supreme Court has rejected.  *See Buckley,* 424 U.S. at 45-48.

24    **2.**    **The City's "evidence" does not establish that Section 1.114(c) matches a**

25          **sufficiently important interest.**

26          The City attempts to argue that its IE limitations were a measured response to

27    corruption.  This is, to put it mildly, revisionist history.

28          The 13 meetings of the Ethics Commission (St. Croix Decl. (Dkt. 21) Exs. A-M)

1   focused only briefly, and belatedly, on IE limitations—and then the rationale offered was

2   not one allowed by the Supreme Court.  For the most part, the Ethics Commission focused

3   on (1) public financing of campaigns and (2) improved disclosures, neither of which this

4   lawsuit challenges.  When the Commission discussed IEs, it was largely in this context.

5         Thanks to Judge Wilken's ruling, the 1999 mayoralty race did see large IEs, almost

6   all of which favored the incumbent, Mayor Willie Brown, over the challenger, Board

7   President Tom Ammiano.  Dkt. 21-11, at 12-28.  But lots of speech cannot glibly be

8   equated with lots of corruption, nor (as the City would suggest) were all the speakers

9   business people currying favor.  The testimony of the Ethics Commission's Executive

10   Director does not even suggest that this independent speech amounted to corruption.  *Id.* at

11   12-28.  Indeed, her testimony shows that six of the seven largest IE PAC expenditures were

12   made by labor union or Democratic Party committees (the State Central Committee, the

13   County Central Committee and the Alice B. Toklas Lesbian and Gay Democratic Club).  *Id.*

14   at 15 (the seventh was a business group).  The broad range of IEs reflect the fact that a lot

15   of people across the ideological spectrum favored Mayor Brown and feared a Mayor

16   Ammiano.  So too the voters, who re-elected Mayor Brown by a margin of 131,983 to

17   89,428.  *See* http://www.sfgov.org/site/elections_page.asp?id=61447.

18         Before the 1999 election and after, the Ethics Commission—at the request of Board

19   President Ammiano and subsequently the full Board of Supervisors—set out to create a

20   system of public financing for elections (which in the main is what Proposition O

21   accomplished).  Dkt. 21-3, at 6.  To the extent the Ethics Commission discussed IEs at all, it

22   was almost always in the context of how IEs might affect public financing.  Most of the

23   discussion was about whether a candidate who agreed to spending limits as the price of

24   public financing ought to have that limit lifted if IEs exceeded a certain level.  *E.g.,* Dkt.

25   21-3, at 6, 19, 31; Dkt. 21-4, at 3, 8, 10, 11; Dkt. 21-5, at 11; Dkt. 21-12, at 29.  Some

26   discussion focused on a "gap" in the disclosure rules then applicable to IE committees.

27   Dkt. 21-4, at 12; 21-6, at 5-6; 21-7, at 11; 21-9, at 10, 16; 21-10, at 15; 21-12, at 23, 28, 33.

28   At the time, state law required such committees to file reports in even-numbered years—

1   whereas San Francisco held mayoral elections in odd-numbered years.  *E.g.,* Dkt. 21-6, at

2   5-6.  The Ethics Commission explored and ultimately adopted a regime of much more

3   robust disclosure, with disclosure of major spending required within 24 hours.  *E.g.,*

4   Dkt. 21-4, at 12; 21-9, at 10, 16; 21-10, at 15; 21-12, at 23.

5          Until May 15, 2000, the Ethics Commission mainly discussed IEs in this context.

6   Occasionally, however, a speaker would express a desire to limit IEs for constitutionally

7   impermissible reasons such as limiting their effectiveness or creating a level playing field.

8   *E.g.,* Dkt. 21-7, at 8-10.[4]  The response of one "expert witness" (Robert Stern) was

9   enlightening:

10         Commissioners Melbostad and Dockendorff expressed their concern over
           the impact of independent expenditures on campaigns. They asked Mr. Stern
11         how independent expenditures might be limited.  Mr. Stern stated that the
           courts have thus far prevented municipalities from limiting independent
12         expenditures.  He stated that disclosure is the best way to reduce their impact
           on campaigns, since the public would then know who is financing the
13         independent spending.  Mr. Stern suggested that another way to reduce the
           impact of independent spending is to provide greater public financing to
14         candidates who do not receive independent expenditures.  Commissioner
           Norris asked Mr. Stern if there was any way to anticipate and prepare for last
15         minute spending by independent expenditure committees.  Mr. Stern
           indicated that there is no accurate way to do this.  He stated that an effective
16         remedy for independent spending could only be achieved through an
           amendment to the U.S. Constitution.

17

18   Dkt. 21-7, at 8.

19         Meanwhile, Board President Ammiano, no doubt smarting from his defeat, asked

20   for an investigation into campaign and IE fund-raising in connection with the 1999

21   mayoralty election.  Dkt. 21-10, at 10-11.  In particular, he asked the Ethics Commission

22   staff to look for evidence of corruption.  *Id.*[5]  The Executive Director reported back to the

23   _____

24   [4]    *Buckley* makes clear that such goals are unconstitutional:  "But the concept that
        government may restrict the speech of some elements of our society in order to enhance
25      the relative voice of others is wholly foreign to the First Amendment, which was designed
        to secure the widest possible dissemination of information from diverse and antagonistic
26      sources, and to assure unfettered interchange of ideas for the bringing about of political
        and social changes desired by the people." 424 U.S. at 48-49 (internal quotations
27      omitted).

     [5]    The Ethics Commission discussed expanding its audits to see whether expenditures
28                                                                              (continued…)

1    Board of Supervisors; as noted, her testimony contains no suggestion of any corruption.

2    Dkt. 21-11, at 12-28.  The same is true of the Executive Director's "remarks" to the Board's

3    Finance Committee.  In response to a statement by Supervisor Yee attacking "the level of

4    independent spending," the Director said:  "IT IS IMPORTANT TO NOTE THAT THE

5    COURTS HAVE THUS FAR INVALIDATED THE EFFORTS OF MUNICIPALITIES

6    TO LIMIT INDEPENDENT EXPENDITURES.  IT IS THE COMMISSION'S POSITION

7    THAT GIVEN THESE CONSTRAINTS, PUBLIC DISCLOSURE IS THE BEST WAY

8    TO REDUCE THE IMPACT OF INDEPENDENT EXPENDITURES ON CAMPAIGNS."

9    Dkt. 21-12, at 28 (emphasis in original).

10          There things stood until a month before the Ethics Commission finished work on its

11   public financing proposal, which became Prop. O.  Then, at the meeting of May 15, 2000,

12   "expert witness" Robert Stern suggested a way to work around Judge Wilken's injunction:

13          Mr. Stern asked the Commission to consider adding a section to the proposal
             that would limit contributions made to independent expenditure committees.
14          He stated that although the district court found unconstitutional a similar
             provision in the Campaign Finance Reform Ordinance, the City could now
15          defend the provision, given the influence of independent expenditures in the
             last mayoral election.
16

17   Dkt. 21-13, at 7.  Apparently Mr. Stern favors free speech only if it has no influence on

18   voters.  The "Coordinator" of San Francisco Common Cause, Charles Marsteller (who has

19   filed a declaration in support of the City, Dkt. 22), also spoke in favor of Mr. Stern's idea.

20   Dkt. 21-13, at 8.

21          At the next meeting (June 12, 2000), Mr. Stern again spoke in favor of limiting IEs.

22   This time, apparently repenting his previous rationale for IE limits, he offered a different

23   justification:

24          Mr. Stern stated that the rationale for limiting contributions to committees is
             that a committee could theoretically launder money to a candidate.  He said
25   _____

      (…continued)
26   made by IE committees "are in fact independent" (as opposed to whether donors were
     being shunted to IEs by campaigns).  Dkt. 21-12, at 8-10.  There is no evidence in the
27   record that the Commission expanded its audits.  In any event, there is no suggestion that
     anyone funneled a nickel to Plaintiffs, who take contributions only from their members.
28

1    that courts have upheld this rationale as a lawful restriction on contributions
      to PACs.  Thus, San Francisco would be justified in lowering contributions
2    to committees to $500, he said.

3    Dkt. 21-14, at 6.  Despite the absence of any evidence that any San Francisco IE PAC has

4    ever 'laundered' money to a candidate ("theoretically" or otherwise), this rationale

5    apparently carried the day.[6]  At the same meeting, the Commission approved adding IE

6    limits to the proposed legislation.  *Id.* at 9.  The IE limitation, crammed in with a raft of

7    popular initiatives such as public financing and increased disclosures, passed at the next

8    general election; Prop. O received 53.4% of the vote.  Dkt. 21-16, at 8.

9        This, then, is what a fair reading of the administrative record shows:  a last-minute

10   suggestion, supported by a series of constitutionally-invalid rationales designed to avoid a

11   court order, leading to the adoption of an ordinance designed to limit independent speech.

12       Eager to avoid a record devoid of any constitutionally valid rationale for

13   Section 1.114(c), the City offers instead a series of newspaper clippings (Dkt. 20 Exs. A-O)

14   and the recollections of the San Francisco Coordinator of Common Cause about telephone

15   conversations he had in 1999 and 2000 (Dkt. 22 ¶¶ 6-10).  With all due respect, attempts to

16   limit First Amendment freedoms, if they are to have any constitutional validity, must rest

17   on some firmer foundation than articles in the *Bay Guardian*[7] and one man's perception

---

19   [6]    This rationale makes no sense; IE committees simply cannot "launder" money.  The
      concept of "laundering money" refers to a situation when a person makes a contribution
20   to an intermediary, and the intermediary uses those funds to make contributions to a
      candidate without disclosing the true source of the funds.  The public then does not know
21   who actually made the contribution.  Laundering is a device used primarily to get around
      contribution limits.  *See* Cal. Gov't Code § 84301 (prohibiting contributions "by any
22   person in the name of a person other than the name by which such person is identified for
      legal purposes"); *id.* § 84302 (prohibiting contributions by intermediaries or agents
23   without disclosure).  This rationale has no application to contributions made to a
      committee that will then use the money for independent expenditures.

24   [7]    The City relies extensively on newspaper articles to insinuate that contractors who
      gave money to IE committees who supported Mayor Brown corruptly received favorable
25   treatment from Mayor Brown's administration.  *See* Opp. at 1-3.  These bold and
      sensational charges are not supported by competent evidence, let alone indictments or
26   convictions.  The City's chain of inferences is missing too many links.  The projects and
      contracts referred to in the articles were not awarded by the Mayor but by various City
27   commissions and boards, only some of whose members were appointed by the Mayor.
      Many of the articles talk not about IE contributions but about campaign contributions—
28                                                          (continued…)

1    about the consensus views of people who telephoned Common Cause seven years ago to

2    vent.  This kind of group-think has no place in First Amendment jurisprudence.

3        The City's declarations and exhibits tell us nothing about why the voters approved

4    Prop. O, much less whether the IE limits were even a factor.  In contrast, the cases cited by

5    the City relied on better evidence.  In *Shrink*, 528 U.S. at 393-94, the evidence included the

6    criminal conviction of Missouri's former Attorney General on corruption charges and an

7    affidavit from the chair of Missouri's Interim Joint Committee on Campaign Finance

8    Reform, who stated that large candidate contributions—not IE contributions—have "'the

9    real potential to buy votes.'"  In *Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th

10   Cir. 2003), the evidence included "testimony of a 30-year veteran of the Montana

11   legislature who stated that special interests funnel more money into campaigns when

12   particular issues approach a vote 'because it gets results'" and a contemporaneous letter

13   from a state senator to his colleagues urging them to vote for a certain bill to ensure that

14   contributions from a particular PAC would continue to flow to his party.  *Id.* at 1093.

15       The City cites *Shrink* for the proposition that newspaper articles can prove that

16   legislation is supported by a sufficiently important government interest.  Opp. at 11.  But

17   *Shrink* involved restrictions that were neither novel nor implausible; indeed, the limits in

18   that case were imposed on contributions to *candidates*.  *See Shrink*, 528 U.S. at 394-96.

19   *Shrink* also instructs courts to disregard evidence unless it can be shown to have influenced

20   the voter's thinking.  *Shrink*, 528 U.S. at 395 (stating that "absence of any reason to think

21   that public perception has been influenced by the studies cited" calls into question their

22   value as evidence).  The City makes no such showing.  And the fact that the Ethics

23   Commission drafted the ordinance does not demonstrate that its current director (who was

24   not Director in 2000) knows the voters' purposes in enacting Prop. O.[8]

25

26   (…continued)
       quite a different matter.  *Buckley,* 424 U.S. at 47; *NCPAC,* 470 U.S. at 498.

27   [8]    The current Executive Director of the Ethics Commission certainly cannot know the
       voters' intent with respect to IE limits, as he was not even working for the Ethics

28                                                                              (continued…)

1    **3.      Section 1.114(c) is not closely drawn or narrowly tailored to an anti-corruption**

2    **purpose.**

3            Even if "less rigorous" scrutiny applies, and even if it could be shown that voters

4    approved IE limits out of concern for corruption, Section 1.114(c) would still be

5    unconstitutionally overbroad.  The City's theory—based on newspaper articles—is that

6    City commissions and boards approved contracts or other measures that benefited certain

7    contributors to IE committees.  *See* Opp. at 1-3.  If that is truly a concern—as opposed to a

8    *post-hoc* rationalization—it cannot justify limiting the free speech of people who do not do

9    business with the City.  The proper narrowly-tailored response is that taken by another

10   section of the Campaign and Governmental Conduct Code.  Section 1.126 prohibits

11   contributions by City contractors or prospective contractors to candidates who would have

12   to approve such contracts, or whose appointees would have to do so, in the time period

13   surrounding negotiations or award of such a contract.  *See* RFJN Ex. C, at 15-16.  In

14   comparison to a blanket restriction on IE committees, Section 1.126 *is* closely drawn to

15   match the City's interest in reducing corruption.  Restricting the speech of numerous non-

16   contractors reaches far too broadly.  *Cf. Day v. Holohan*, 34 F.3d 1356, 1365 (8th Cir.

17   1994) ("the concern of a political *quid pro quo* for large contributions, which becomes a

18   possibility when the contribution is to an individual candidate . . . is not present when the

19   contribution is given to a political committee or fund that by itself does not have legislative

20   power").  Section 1.114(c) reaches far too broadly.

21

22

23

24   _____

       (…continued)

25     Commission when Prop. O was passed.  *See* St. Croix Decl. ¶ 2 (noting that he became
       Executive Director in 2004).  Even if the City had offered evidence from a Commissioner

26     at that time, "'an after-the-fact declaration of intent by a drafter … [would] … by no
       means govern our determination how the voters understood the ambiguous provisions.'"

27     *Kennedy Wholesale v. State Bd. of Equalization*, 53 Cal. 3d 245, 250 (1991) (citing
       *Carman v. Alvord*, 31 Cal. 3d 318, 331 n.10 (1982)).

28

1  **C.    The Loss of First Amendment Freedoms Constitutes Irreparable Injury and**

2  **       the Balance of Hardships Weighs in Favor of Plaintiffs.**

3  **1.    The First Amendment has no expiration date.**

4        The City contends that Plaintiffs have slept on their First Amendment rights because

5  they did not file this lawsuit shortly after Prop. O was passed.  *See* Opp. at 14.  The City

6  argues that this passage of time eliminates any claim of irreparable injury.  In a First

7  Amendment case such as this, the City's argument falls flat.  Notably, the City does not

8  dispute that "the loss of First Amendment freedoms, even for minimal periods of time,

9  unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 372 (1976), as

10 Plaintiffs pointed out in their Motion. *See* Motion at 19.  Indeed, when a deprivation of a

11 constitutional right is involved, courts hold that no further showing of irreparable injury is

12 necessary.  *See Warsoldier v. Woodford,* 418 F.3d 989, 1001-02 (9th Cir. 2005) (citing

13 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948.1 (2007)).  In contrast,

14 the cases cited by the City did not involve the loss of constitutional rights.  *See Citibank v.*

15 *Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (trademark); *Oakland Tribune, Inc. v Chronicle*

16 *Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (monopolization); *Lydo Enterprises, Inc. v.*

17 *City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) (plaintiff asserted a First Amendment

18 claim, but Ninth Circuit held that there was no First Amendment violation).[9]

19 **2.    Plaintiffs have established First Amendment violations.**

20       Plaintiffs have already demonstrated that "contribution restrictions could have a

21 severe impact on political dialogue if the limitations prevented candidates and political

22 committees from amassing the resources necessary for effective advocacy."  *See Buckley*,

23

24 _____

25 [9]      As one court has explained the *Lydo* case, "[i]n fact, the Ninth Circuit in *Lydo*
   seemed inclined to find irreparable harm despite the delay but for its disagreement 'with
26 the [district] court's conclusion that Lydo has made a showing that First Amendment
   freedoms are in fact violated.'"  *Legal Aid Soc'y v. Legal Servs. Corp.*, 961 F. Supp. 1402,
27 1418 (D. Haw. 1997), *rev'd in part on other grounds*, 145 F.3d 1017 (9th Cir. 1998)
   (citing *Lydo*, 745 F.2d at 1214).

28

1    424 U.S. at 21; Motion at 7-9, 19 (discussing various hardships to Plaintiffs).[10]  The City's

2    suggestion that JOBS's members could alleviate these burdens simply by making IEs

3    themselves, Opp. at 14, ignores that Plaintiffs' challenge to Section 1.114(c) includes a

4    freedom of association claim.  JOBS and BOMA-SF created Plaintiffs so that their

5    members could band together to amplify their voices, recognizing that there is strength in

6    numbers.  *See NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both

7    public and private points of view, particularly controversial ones, is undeniably enhanced

8    by group association."); *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290,

9    296 (1981) ("To place a Spartan limit-or indeed any limit-on individuals wishing to band

10   together to advance their views on a ballot measure, while placing none on individuals

11   acting alone, is clearly a restraint on the right of association.").[11]  Plaintiffs should not have

12   to sacrifice their associational rights to alleviate the hardship that Section 1.114(c) imposes.

13   **3.      The balance of hardships weigh in favor of Plaintiffs.**

14          In addressing the alternate test for a preliminary injunction, the City does not

15   dispute that questions of law have been raised that are "substantial, difficult and doubtful as

16   to make them a fair ground for litigation and thus for more deliberative investigation."

17   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  Instead, it

18   aims at the other half of the alternate test, contending that the balance of hardships that

19   would flow from an injunction tips in its favor.  Opp. at 15.  The City argues that an

20   injunction could "promote voter cynicism and disengagement . . . and cast a cloud over the

21   City's system of representative government."  *Id.*  The City offers no evidence, however,

22   _____

23   [10]    *Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1095 (9th Cir. 2003), which
          the City cites in claiming that Plaintiffs' Declarations are "insufficient" to establish
24        irreparable harm (*see* Opp. at 14), is inapposite.  In *Eddleman*, no harm was shown
          because the plaintiffs' witnesses raised *more* money after contributions were limited.  *Id.*

25   [11]    Ironically, if any of JOBS's or BOMA-SF's members followed the City's
          command, its political advertisements would have to disclose who paid for the ad.  *See,*
26   *e.g.,* CFRO §§ 1.162-1.163, RJFN Ex. C, at 34-38.  If anything, this would seem *more*
          likely to produce "the appearance of corruption," not less, as a candidate could more
27        easily determine and then reward the sponsor of the ad.  Individuals stand out; PAC
          members are part of a group.

28

1    for this bald speculation.  In contrast, the evidence shows that IE limits have had a

2    considerable impact on the ability of Plaintiffs to engage in political speech.  *See* Motion at

3    7-9, 19; Nayman Decl. ¶¶ 13-23; Intermaggio Decl. ¶¶ 15-22.

4         The City also contends that "[i]n 'balanc[ing] the hardships of the public interest

5    against a private interest, the public interest should receive greater weight.'"  Opp. at 15

6    (quoting *FTC v. Affordable Media LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999)).  *Affordable*

7    *Media* does not involve constitutional rights at all but instead the FTC's efforts to enjoin a

8    Ponzi scheme pursuant to the Federal Trade Commission Act (15 U.S.C. § 53(b)), which

9    decreases the traditional equitable standards for a preliminary injunction—for the FTC, not

10   the City.  *Id.* at 1233.  More fundamentally, the City's argument misconceives the issue.

11   Free speech under the First Amendment is merely not a "private interest"; it is a

12   fundamental constitutional right.  Particularly in light of the First Amendment rights at

13   stake, the balance of hardships here tilts decidedly toward Plaintiffs.

14   **III.    CONCLUSION.**

15        For the foregoing reasons and those stated in the Motion, the Court should grant the

16   Motion, and enjoin Defendants from enforcing Sections 1.114(c) (1) and 1.114(c)(2) of the

17   San Francisco Campaign Finance Reform Ordinance.  The Court should also exercise its

18   discretion and waive the bond requirement of Fed. R. Civ. P. 65(c).

19        Dated:  August 31, 2007.

20                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                      FREDERICK K. LOWELL
21                                    BRUCE A. ERICSON
                                      ANITA D. STEARNS MAYO
22                                    MARC H. AXELBAUM
                                      AUGUST O. STOFFERAHN
23                                    50 Fremont Street
                                      Post Office Box 7880
24                                    San Francisco, CA 94120-7880

25
                                      By _____/s/ Bruce A. Ericson_____
26                                             Bruce A. Ericson

27                                    Attorneys for Plaintiffs

28